**FILED**

**NF**

DEC 0 5 2007
12-5-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

NOLAN

MAGISTRATE JUDGE NOLAN

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
| v. | CASE NUMBER: |
| JU WEN ZHOU, also known as ("a/k/a") "Goi," and the defendants on the attached list | **07CR 799** |
| | **UNDER SEAL** |

I, Christopher W. Yoder, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Beginning in or about November 2003, and continuing until in or about June 2006, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, each of the defendants named on the attached list did conspire with each other and other persons known and unknown to knowingly and intentionally distribute and to possess with the intent to distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II controlled substance, quantities of 3,4-methylenedioxymethamphetamine (commonly known as "Ecstasy" or "MDMA"), a Schedule I controlled substance, and 100 kilograms or more of mixtures containing marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

All in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

I further state that I am a Special Agent of Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security, and that this complaint is based upon the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes  ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

| | |
|---|---|
| December 5, 2007 | at Chicago, Illinois |
| Date | City and State |

| | |
|---|---|
| NAN R. NOLAN | |
| United States Magistrate Judge | _____ |
| Name & Title of Judicial Officer | Signature of Judicial Officer |

1.   JU WEN ZHOU, a/k/a "Goi"

2.   KENNETH QUOC LUONG, a/k/a "Kenny"

3.   YVONNE LAW

4.   SU JUNG CHEN, a/k/a "Tina"

5.   SUSAN CHEN, a/k/a "Sue"

6.   THOMAS MAN LUNG LO, a/k/a "Tommy Lo"

7.   YONG OUYANG, a/k/a "Alun"

8.   LI XIEN WU, a/k/a "Ray"

9.   SEJIN OH, a/k/a "Lee"

10.   JONG KYUN CHAE, a/k/a "Big John"

11.   CARLO PANADERO, a/k/a "Chito" and "Ted"

12.   CARLOS PANADERO JR., a/k/a "CJ"

13.   JUNG BAE, a/k/a "John"

14.   MELVIN DUMANLANG

15.   ANDREW SO

16.   HENRY CHUN

17.   MICHAEL CRUZ

18.   ROBERTO VALDEZ

19.   MICHAEL MYINT

20.   JORGE HUERTA

21.   JOAHAN TRUJILLO

STATE OF ILLINOIS        )
                         )    SS
COUNTY OF COOK           )

## A F F I D A V I T

I, Christopher W. Yoder, being duly sworn under oath, state as follows:

### I.    PRELIMINARY MATTERS

1.    I am currently a Special Agent employed with United States Immigration and Customs Enforcement ("ICE"), which is an agency within the United States Department of Homeland Security, and have been so employed for over four years. I am currently assigned to the Chicago Field Office. Prior to being employed by ICE, I was employed as a Special Agent with the United States Department of Housing and Urban Development, Office of Inspector General ("HUD-OIG"), for approximately six years in Chicago, Illinois.

2.    My primary duty as an ICE Special Agent is to investigate international drug trafficking organizations that unlawfully smuggle controlled substances into the United States and distribute those controlled substances within the United States. The federal offenses that I typically investigate include, but are not limited to, controlled substance offenses defined at Title 21, United States Code, Sections 841, 843, 846, 952, 960 and 963; money laundering offenses defined at Title 18, United States Code, Sections 1956 and 1957; and bulk cash smuggling defined at Title 31, United States Code, Section 5332. My duties as a HUD-OIG Special Agent primarily consisted of investigating criminal offenses pertaining to federal housing programs under HUD jurisdiction, particularly with respect to the illegal trafficking of controlled substances by criminal organizations and street gangs within Chicago's public housing projects.

3.    During my employment as a Special Agent with ICE and HUD-OIG, I have received specialized training in the following areas: (1) the enforcement of laws concerning the trafficking of controlled substances, including the smuggling of controlled substances across United States borders; (2) the means and methods used by international and domestic drug trafficking organizations to unlawfully manufacture, smuggle, distribute and possess with intent to distribute controlled substances, including the use of telephones, digital display paging devices, numerical codes and code words to conduct drug trafficking activities; (3) the means and methods used by international and domestic drug trafficking organizations to launder the proceeds from drug trafficking, including the unlawful movement of drug proceeds generated in the United States to locations outside the United States; and (4) the means and methods used by street gangs to illegally traffic in controlled substances.

4.    As a Special Agent with ICE and HUD-OIG, I have also received specialized training in, and have personally participated in, various types of investigative activity, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants and other individuals who have knowledge of unlawful drug trafficking activity; (c) the use of informants and confidential sources to obtain evidence of unlawful drug trafficking; (d) undercover operations; (e) electronic surveillance through the use of pen registers and trap and trace devices; and (f) the interception of both wire and electronic communications.

5.    This Affidavit is made for the limited purpose of establishing probable cause in support of a Criminal Complaint charging multiple defendants with conspiracy to distribute and possess with intent to distribute controlled substances and aiding and

abetting such conspiracy, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2. Since this Affidavit is for the limited purpose of establishing probable cause to support the Criminal Complaint for the named defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and the events described in this Affidavit.

6.      The statements made in this Affidavit are based upon multiple sources of information, including the following:  (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) information provided to me and other law enforcement officers by witnesses, confidential sources, cooperating individuals and other persons; (d) review of consensually monitored and/or recorded conversations; (e) criminal history records maintained by various law enforcement agencies; and (f) the training and experience of myself and other law enforcement agents and officers.

7.      To the extent that consensually recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. All quotations from recorded conversations are based upon preliminary transcriptions of those conversations and/or aural review of the recordings. Times given for various events are approximations.

III.    OVERVIEW OF THE INVESTIGATION

8.      Based upon my experience and training, I know that the controlled substance 3,4-methylenedioxymethamphetamine, which is commonly known as "Ecstasy" or "MDMA" (hereinafter "MDMA") is a synthetic drug that is manufactured and distributed in the form

of tablets or pills.  MDMA pills are most often around 250 mg in size, although some pills, known as "double stack pills," may be up to approximately 500 mg in size.  MDMA is often manufactured with, and contains detectable amounts of, amphetamine and methamphetamine.  In order to identify their product, manufacturers of MDMA pills often give their pills a distinct color and a "logo" or "stamp.  MDMA is often distributed at night clubs, parties, concerts or other social events.  The over-consumption of MDMA can lead to an overdose resulting in various forms of injury, including the loss of consciousness, seizure, stroke, brain damage or death.  The risk of overdose increases when MDMA is used with other drugs.

9.    Based upon my experience and training, I know that the hydroponic marijuana, which is commonly known as "hydro," is a form of marijuana that is grown in a controlled water environment using special techniques.   Hydroponic marijuana is considered more potent than field-grown marijuana.  During the time frame of this investigation, hydroponic marijuana typically sold for an ultimate retail price of approximately $2,500 to $4,000 per pound.  Comparatively, during the same time period, a pound of field-grown marijuana typically sold for approximately $750 to $1,000 per pound.

10.    This investigation has focused upon the international smuggling of MDMA and hydroponic marijuana into the United States by Canadian-based drug traffickers between approximately November 2003 and June 2006.[1]  The investigation was conducted jointly by ICE and the DuPage County Sheriff's Office ("DPCSO"), with assistance from the

---

[1] Unless otherwise noted, the term "marijuana" in this Affidavit refers to hydroponically grown marijuana.

Federal Bureau of Investigation ("FBI"), the United States Secret Service ("USSS"), the Illinois State Police ("ISP"), the Cook County Sheriff's Office ("CCSO"), the Drug Enforcement Administration ("DEA") and other agencies. In addition, ICE and DPCSO, with the assistance of the DEA, coordinated with and assisted Canadian law enforcement authorities, primarily the Royal Canadian Mounted Police ("RCMP"), in its investigation of the Canadian-based suppliers. Based upon information gathered during this investigation, RCMP was able to dismantle one of the Canadian drug trafficking supply groups primarily responsible for smuggling into the United States the MDMA and marijuana that was the subject of this investigation.

11.    During this investigation law enforcement agencies have seized more than 180,000 MDMA pills, several thousand marijuana plants and drug proceeds in excess of $300,000. Based upon this investigation, law enforcement believes that, during the course of their operation, the Canadian drug suppliers distributed several times the number of MDMA pills seized by law enforcement. The retail value of the MDMA distributed by the Canadian drug suppliers during the course of this investigation is believed to be well into the millions of dollars.[2]

12.    The investigation has revealed the existence of an international conspiracy involving the distribution of large amounts of MDMA and marijuana by Canadian drug suppliers of primarily ethnic Chinese individuals in Toronto to two drug trafficking "crews"

---

[2] Like other illegal drugs, the price of MDMA increases with each step in the distribution chain, with the user of the drug paying the highest price. Based upon information currently available to law enforcement officers, the ultimate retail cost for a single pill of MDMA in the Chicago area may range as high as $25. Thus, the seized MDMA alone has an ultimate street value of approximately $6,250,000.

in Chicago. Individuals from Chicago's Chinatown neighborhood facilitated the trafficking

of MDMA and marijuana from the Canadian suppliers to the two Chicago distribution

crews. Listed below is a breakdown of the defendants according to the group with which

they were primarily associated:

<u>Canadian Suppliers</u>
1. JU WEN ZHOU, a/k/a "Goi"
2. KENNETH QUOC LUONG, a/k/a "Kenny"
3. SU JUNG CHEN, a/k/a "Tina"
4. YVONNE LAW
5. SUSAN CHEN, a/k/a "Sue"

<u>Chinatown Connection</u>
6. THOMAS MAN LUNG LO, a/k/a "Tommy Lo"
7. YONG OUYANG, a/k/a "Alun"
8. LI XIEN WU a/k/a "Ray"

<u>Sejin Oh's Crew</u>
9. SEJIN OH, a/k/a "Lee"
10. JONG KYUN CHAE, a/k/a "Big John"
11. CARLO PANADERO, a/k/a "Chito" and "Ted"
12. CARLOS PANADERO JR., a/k/a "CJ"
13. JUNG BAE, a/k/a "John"
14. MELVIN DUMANLANG
15. ANDREW SO
16. HENRY CHUN

<u>Ivan Myint's Crew</u>
17. MICHAEL CRUZ
18. ROBERTO VALDEZ
19. MICHAEL MYINT

<u>Other Dealers</u>
20. JORGE HUERTA
21. JOAHAN TRUJILLO

13.     The Canadian drug suppliers, JU WEN ZHOU ("ZHOU") and KENNETH

LUONG ("LUONG"), negotiated and concluded drug transactions with the two Chicago

distribution crews. The transactions were brokered and facilitated by individuals with

connections to Chicago's Chinatown neighborhood, including defendants THOMAS MAN

LUNG LO ("TOMMY LO"), YONG OUYANG ("OUYANG") and LI XIEN WU ("WU"). One

of the Chicago distribution crews was led by defendant SEJIN OH, while the other was led

by Ivan Myint.  Ivan Myint was a member of a Filipino-based faction of the Latin Kings street gang in Chicago (known as the "Flip City Kings") and his crew included several other members of the Latin Kings street gang, including defendants MICHAEL CRUZ and ROBERTO VALDEZ.

14.     The conspiracy is believed to have begun in or about November 2003.  At that time, TOMMY LO was operating a brothel in Chinatown.  Both OUYANG and SEJIN OH were customers of TOMMY LO's brothel.  OUYANG was associated with ZHOU and was aware that ZHOU, a Canadian drug supplier, and his associates in Canada had large amounts of MDMA and marijuana for sale.  OUYANG made that fact known to TOMMY LO.  TOMMY LO was aware that SEJIN OH was a drug dealer and informed SEJIN OH that he (TOMMY LO) could help arrange SEJIN OH's purchase of MDMA and marijuana from Canada.  SEJIN OH agreed to meet with the Canadian drug suppliers.

15.     Thereafter, in November 2003, ZHOU arranged for the delivery of approximately 10,000 MDMA pills and 20-30 pounds of marijuana to SEJIN OH.  Most of those drugs were distributed by SEJIN OH to JORGE HUERTA ("HUERTA"), although some of the drugs were also provided to TOMMY LO and OUYANG.

16.     Between December 2003 and February 2004, SEJIN OH and members of his distribution crew arranged to sell 10,000 MDMA pills containing methamphetamine to two undercover DPCSO officers investigating SEJIN OH's crew.  That deal, however, was never concluded.

17.     In or about March 2004, SEJIN OH and his crew received and distributed another load of MDMA from Individual B.  Some of that MDMA was delivered to an individual who has since become a confidential source ("CS2").  CS2 was arrested with the

-7-

MDMA received from SEJIN OH.

18.    After the arrest of CS2, ICE and DPCSO, with the assistance of other law enforcement agencies, formed a joint investigation into the international smuggling of MDMA and marijuana from Canada into the United States.

19.    The investigation has revealed that SEJIN OH failed to properly repay the Canadian suppliers for the drugs he had received in December 2003. Therefore, in late June 2004, in order to obtain further drugs from Canada, SEJIN OH enlisted the help of HUERTA and Ivan Myint, both of whom SEJIN OH knew to be well-established drug dealers from Chicago.[3] A meeting was then held in Chicago between ZHOU, LUONG, SEJIN OH, Ivan Myint, TOMMY LO, LI XIEN WU ("WU") and others, including CS1, to discuss the continued trafficking of MDMA and marijuana. The parties agreed to continue the trafficking of MDMA and marijuana from Canada to the United States. SEJIN OH and TOMMY LO were to remain the primary buyers of the drugs, while Ivan Myint was to serve primarily as a surety for SEJIN OH, meaning that Ivan Myint would be a substantial purchaser of MDMA who would serve as a reliable source of repayment for the drugs. In exchange for acting as a surety, Ivan Myint obtained access to a cheap supply of MDMA and marijuana from the Canadian suppliers.

20.    Thereafter, in July 2004, the Canadian suppliers, including ZHOU and LUONG, distributed additional loads of the MDMA and marijuana to SEJIN OH and TOMMY LO. During July 2004 and August 2004, law enforcement successfully concluded

_____

[3] Ivan Myint has prior federal drug trafficking convictions for conspiracy to distribute cocaine (1991) and possession with intent to distribute heroin (1999). HUERTA was convicted with Ivan Myint in the latter case.

multiple controlled buys of MDMA (containing methamphetamine) from HUERTA, SEJIN OH, ANDREW SO ("SO") and JUNG BAE.

21.     In Fall 2004, following SEJIN OH's failure again to make proper payment for the MDMA provided by ZHOU, Ivan Myint began to purchase MDMA and marijuana directly from LUONG, who had assumed ZHOU's position of negotiating the supply of drugs to various customers. In particular, in November 2004 and December 2004, LUONG delivered to Ivan Myint two loads of 30,000 MDMA pills and approximately 100 pounds of marijuana. HUERTA was the primary purchaser of those pills. In November 2004 and January 2005, CS1 conducted the controlled purchase of approximately 2,000 MDMA pills from Ivan Myint and VALDEZ.

22.     In early 2005, Ivan Myint was arrested and charged with a federal narcotics offense. After his arrest, Ivan Myint agreed to cooperate and did, in fact, cooperate against other members of the conspiracy for a period of time. However, Ivan Myint fled to Mexico in early 2005 to avoid prosecution, but nonetheless attempted to continue his drug trafficking operation in both the United States and in Mexico.

23.     After Ivan Myint's flight, law enforcement officers secured the cooperation of two members of Ivan Myint's crew. One of those two crew members was able to eventually introduce a DPCSO undercover officer posing as a large scale drug dealer to LUONG. Following a series of undercover calls and meetings, and in cooperation with the RCMP, an RCMP undercover officer posing as an associate of the DPCSO undercover officer, made a controlled purchase of approximately 30,000 MDMA pills from LUONG in March 2006. In addition, RCMP was able to conduct a court-authorized wiretap interception of LUONG's phone based upon information generated during this investigation.

-9-

24.    In June 2006, LUONG and six other individuals were arrested and charged in Canada with various drug trafficking offenses. During the execution of search warrants by RCMP, RCMP located and seized approximately 150,000 MDMA pills, a hydroponic marijuana growing operation involving approximately 3,000 marijuana plants, approximately 100 pounds of processed and packaged marijuana, approximately two kilograms of cocaine, approximately 200 grams of heroin, approximately $100,000 in United States Currency and approximately $200,000 in Canadian Currency.

## IV.    SUMMARY OF DEFENDANTS' ROLES IN THE CONSPIRACY

25.    A summary of the roles played by the defendants and a reference to some of the paragraphs in this affidavit pertaining to that defendant is set forth below. The summary descriptions and referenced paragraphs do not identify all of the activities of, or the evidence related to, that particular defendant:

### A.    Canadian Suppliers

[1]    JU WEN ZHOU, a/k/a "Goi": ZHOU is believed to be a Canadian citizen. ZHOU partnered with LUONG to smuggle MDMA and marijuana into the United States. ZHOU was responsible for negotiating the prices of the drugs, especially with respect to SEJIN OH's crew. ZHOU arranged the collection of drug debts and the subsequent smuggling of drug proceeds from the United States back into Canada. (See ¶¶ 28-52, 69-89, 95-101, 112-129, 134, 167-168, 195, 199-208, 229-235)

[2]    KENNETH QUOC LUONG, a/k/a "Kenny": LUONG is believed to be a Canadian citizen. LUONG partnered with ZHOU to smuggle MDMA and marijuana into the United States. LUONG was responsible for

negotiating the prices of the aforementioned drugs, especially with respect to Ivan Myint's crew. LUONG arranged the collection of drug debts and the subsequent smuggling of drug proceeds from the United States back into Canada. LUONG delivered approximately 30,000 MDMA pills to a Canadian undercover officer in March 2006. (See ¶¶ 112-129, 134, 167-168, 195, 199-208, 229-235, 258-263, 269-273, 279-302, 310-316)

[3]    YVONNE LAW:  LAW is believed to be a Canadian citizen. LAW worked as a courier for another Canadian drug supplier, Individual B. LAW, along with others, smuggled MDMA and marijuana from Canada into the United States, collected drug debts owed to Individual B and smuggled the drug proceeds back across the border into Canada. (See ¶¶ 99-101, 303-309, 317-324)

[4]    SU JUNG CHEN, a/k/a "Tina":  SU CHEN is believed to be a Canadian citizen. SU CHEN, along with her sister, defendant SUSAN CHEN, collected drug proceeds from LUONG's drug customers in the United States, including Ivan Myint, and smuggled the drug proceeds from the United States into Canada for delivery to LUONG. SU CHEN maintained a bank account in Canada into which her sister wired drug proceeds from a bank account in the United States. (See ¶¶ 310-316)

[5]    SUSAN CHEN, a/k/a "Sue":  SUSAN CHEN is a United States citizen. SUSAN CHEN, along with her sister, defendant SU JUNG CHEN, collected drug proceeds from LUONG's drug customers in the United States, including Ivan Myint, and smuggled the drug proceeds from the

United States into Canada for delivery to LUONG. SUSAN CHEN also wired drug proceeds from her personal bank account in the United States to a bank account maintained by her sister in Canada. (See ¶¶ 310-316)

     B.    Chinatown Connection

     [6]    THOMAS MAN LUNG LO, a/k/a "Tommy Lo": TOMMY LO is a national of the People's Republic of China and a lawful permanent resident in the United States. In or about Fall 2003, TOMMY LO introduced SEJIN OH to ZHOU and OUYANG. TOMMY LO served as a translator in meetings at which drug trafficking deals were negotiated. TOMMY LO also purchased and redistributed some of the MDMA and marijuana from the Canadian suppliers. (See ¶¶ 28-52, 75-89, 95-101, 107-121, 124-134, 160-189, 303-309, 317-324)

     [7]    YONG OUYANG, a/k/a "Alun": OUYANG is a national of the People's Republic of China and a lawful permanent resident in the United States. OUYANG was a drug dealer who purchased MDMA from ZHOU and was the individual who, along with TOMMY LO, introduced ZHOU to SEJIN OH in November 2003. OUYANG also received some MDMA for his role in the conspiracy and assisted TOMMY LO in his distribution of MDMA. (See ¶¶ 28-52, 75-84)

     [8]    LI XIEN WU, a/k/a "Ray": WU is a naturalized United States citizen. In June 2004, WU facilitated meetings between ZHOU, LUONG, SEJIN OH and Ivan Myint in which they discussed their drug trafficking agreement. WU stored large amounts of marijuana that ZHOU

and LUONG smuggled into the United States. WU also distributed that marijuana to ZHOU's and LUONG's customers, including Ivan Myint. (See ¶¶ 112-129, 131-133, 195)

    C.    <u>SEJIN OH's Crew</u>

    [9]    <u>SEJIN OH</u>: SEJIN OH is a citizen of the Republic of South Korea and a lawful permanent resident of the United States. SEJIN OH led one of the Chicago-based distribution crews that purchased MDMA and marijuana from ZHOU, LUONG and Individual B. SEJIN OH's crew then sold those drugs to various customers, including TOMMY LO, OUYANG, HUERTA and Ivan Myint, as well as to street gang members from the south side of Chicago. SEJIN OH, together with his crew, attempted to sell 10,000 MDMA pills to two DPCSO undercover officers between December 2003 and February 2004. During July 2004 and August 2004, SEJIN OH sold, or helped arrange the sale of, approximately 1,671 pills containing MDMA and methamphetamine to CS1. (See ¶¶ 28-121, 124-134, 145-195, 211, 255, 265, 301, 303-309, 317-324)

    [10]    <u>JONG KYUN CHAE, a/k/a "Big John"</u>: CHAE is a citizen of the United States. CHAE was SEJIN OH's primary partner in the purchase of MDMA and marijuana from the Canadian suppliers, including ZHOU and Individual B. CHAE distributed those drugs and helped collect payment from customers for those drugs. CHAE provided counter-surveillance and protection during SEJIN OH's negotiations for the sale of 10,000 MDMA pills to the two DPCSO officers in February 2004. (See ¶¶

-13-

28-84, 90-101, 134, 190-194, 303-309)

[11]  CARLO PANADERO, a/k/a "Chito" and "Ted": CARLO PANADERO is a citizen of the Philippines and a lawful permanent resident of the United States. CARLO PANADERO was involved in the delivery of MDMA and marijuana that SEJIN OH had purchased from ZHOU. With SEJIN OH, CARLO PANADERO helped negotiate the sale of 10,000 MDMA pills to two DPCSO undercover officers between December 2003 and February 2004. (See ¶¶ 28-84, 90-94)

[12]  CARLOS PANADERO JR., a/k/a "CJ":  CARLOS PANADERO JR. is a citizen of the Philippines and is a lawful permanent resident of the United States. He is the brother of CARLO PANADERO. CARLOS PANADERO JR. introduced the DPCSO undercover officers to SEJIN OH and CARLO PANADERO in January 2004 and helped negotiate the sale of 10,000 MDMA pills to the undercover officers between December 2003 and February 2004. (See ¶¶ 53-84)

[13]  JUNG BAE, a/k/a "John": BAE is a citizen of the Federal Republic of Germany and is a lawful permanent resident of the United States. BAE allowed SEJIN OH and his associates to store MDMA and marijuana inside BAE's apartment located at 4321 North Western Avenue in Chicago. BAE's apartment was known to SEJIN OH's crew as "The Warehouse." BAE also conducted hand-to-hand deliveries of the drugs to SEJIN OH's drug customers. (See ¶¶ 28-37, 95-98, 145-166, 190-194)

-14-

[14] <u>MELVIN DUMANLANG</u>: DUMANLANG is a citizen of the United States. DUMANLANG provided security for SEJIN OH and CARLO PANADERO during the delivery to customers of MDMA and marijuana that SEJIN OH obtained from ZHOU and Individual B. DUMANLANG also delivered MDMA and marijuana for SEJIN OH and CHAE and smuggled a sample of MDMA pills across the Canadian border for delivery to the DPCSO undercover officers as a sample of the 10,000 MDMA pills that SEJIN OH and CARLO PANADERO intended to sell to the undercover officers. (See ¶¶ 28-84, 90-94)

[15] <u>ANDREW SO</u>: SO is a citizen of the United States. SO stored MDMA pills that SEJIN OH had purchased from ZHOU and LUONG in July 2004. SO also repackaged and prepared the MDMA pills for distribution to SEJIN OH's customers. SO also used his car wash business in Skokie, Illinois, to facilitate the distribution of SEJIN OH's MDMA pills. SO delivered approximately 1,000 MDMA pills to CS1 in July 2004. (See ¶¶ 131-133, 145-159, 255)

[16] <u>HENRY CHUN</u>: CHUN is a citizen of the United States. In late 2004 and early 2005, CHUN partnered with SEJIN OH in the purchase of MDMA and marijuana from Individual B and the resale of those drugs to various customers. CHUN also collected drug proceeds for SEJIN OH and participated in meetings with SEJIN OH, TOMMY LO and Individual B in Canada in an attempt to set up future narcotics purchases. (See ¶¶ 190-194, 317-324)

D.    Ivan Myint's Crew

[17]    MICHAEL CRUZ:  CRUZ is a citizen of the United States.  CRUZ is a member of the Latin Kings street gang and was second in command of Ivan Myint's crew.  CRUZ was responsible for arranging for the sale and distribution of MDMA and marijuana purchased by Ivan Myint from ZHOU and LUONG.  Ivan Myint also assigned CRUZ to set up a sale of 10,000 MDMA pills to CS1.  (See ¶¶ 119, 199-208, 229-235, 245-254, 258-263, 291)

[18]    ROBERTO VALDEZ:  VALDEZ is a citizen of the United States.  VALDEZ is a member of the Latin Kings street gang and was primarily responsible for MDMA and marijuana to Ivan Myint's customers. VALDEZ also collected drug proceeds and transported drug proceeds to LUONG as payment for the drugs purchased by Ivan Myint from LUONG. In November 2004, VALDEZ, acting on behalf of Ivan Myint, delivered approximately 1,000 MDMA pills to CS1 during a controlled buy of MDMA. (See ¶¶ 119, 199-208, 211-236, 245-254, 258-263)

[19]    MICHAEL MYINT:  MICHAEL MYINT is a citizen of the United States.  MICHAEL MYINT is the brother of Ivan Myint.  At the direction of Ivan Myint, MICHAEL MYINT stored approximately 16,000 MDMA pills at his residence and later delivered those MDMA pills to CD3. MICHAEL MYINT also maintained drug ledgers for Ivan Myint.  MICHAEL MYINT also assisted Ivan Myint in his flight to avoid prosecution in the United States by lying to federal agents concerning Ivan Myint's whereabouts, hiding

Ivan Myint's vehicle, and providing Ivan Myint with his (MICHAEL MYINT's)
State of Illinois driver's license so that Ivan Myint could falsely assume
MICHAEL MYINT's identity. (See ¶¶ 91, 119, 229-235, 258-268, 273-278)

      E.    Other Dealers

      [20]    JORGE HUERTA:  HUERTA is a citizen of the United
States. HUERTA was a major investor in the purchases of MDMA by SEJIN
OH, TOMMY LO and Ivan Myint from the Canadian suppliers. HUERTA is
known to have purchased and distributed at least 5,000 MDMA pills from
SEJIN OH and TOMMY LO and 20,000 MDMA pills from Ivan Myint. In July
2004, HUERTA sold approximately 100 MDMA pills to CS1 as part of a
controlled buy. (See ¶¶ 28-52, 85-111, 135-144, 180-189, 196-208, 215,
265)

      [21]    JOAHAN TRUJILLO:  TRUJILLO is a citizen of the
United States. TRUJILLO is a relative of HUERTA and stored some of
HUERTA's MDMA. In July 2004, TRUJILLO delivered approximately 100
MDMA pills to CS1 as part of a controlled buy of MDMA from HUERTA.
(See ¶¶ 135-144)

**V.   COOPERATING SOURCES OF INFORMATION**

      26.    Some of the information in this affidavit comes from cooperating individuals,
including CS1 and CS2, as well as four cooperating individuals who have agreed to
cooperate with the government even though they understand that the government intends
to seek charges against them in this matter. Three of these individuals are identified
herein as CD (Cooperating Defendant) 1, CD2 and CD3. CD1, CD2 and CD3 have each

agreed that, when they are charged in this matter, they will plead guilty pursuant to plea agreements providing for an agreed term of incarceration assuming their continued truthful cooperation with the government. Background information for each of the six cooperating individuals is as follows:

      A.    CS1: CS1 is under investigation by the USSS for credit card fraud. In addition, I understand that CS1 has an outstanding warrant in Montreal, Canada, for possession of fraud related equipment. CS1 is cooperating with the hope that he will either not be charged with respect to the USSS investigation or, if he is charged, that he will receive a lower sentence. The government has neither paid CS1 for his services to the investigation nor promised CS1 any specific benefit for his cooperation to date. However, the government has paid for some of CS1's expenses (e.g., use of a cell phone during his cooperation) and provided CS1 housing in order to ensure CS1's safety. CS1 has arrests for various offenses including assault and narcotics possession. Between 1987 and 2004, CS1 sustained convictions for aggravated battery, theft and possession of a controlled substance. The underlying offense conduct for the 2004 conviction occurred prior to the time that CS1 began cooperating with federal authorities. In addition, as further discussed herein, CS1 is believed to have unlawfully possessed drugs during the investigation of this case. Nonetheless, CS1 has provided credible, reliable and timely information to the government since approximately late 2003. Since that time, agents and officers have spoken to CS1 in person or telephonically on numerous occasions. A

-18-

substantial portion of CS1's information regarding Ivan Myint, SEJIN OH and TOMMY LO has been corroborated by independently obtained evidence.

B.    CS2:  In March 2004, CS2 was charged with drug offenses in the Circuit Court of Cook County following CS2's arrest for possession of approximately 600 MDMA pills.  CS2 entered into a cooperation plea agreement with the Cook County State's Attorney's Office.  Pursuant to that cooperation agreement, CS2 is obligated to speak with law enforcement about the circumstances surrounding CS2's offense.  CS2 actively cooperated with ISP after being arrested.  As a result of CS2's cooperation, CS2 received a reduced sentence with respect to the March 2004 charge. CS2 has no prior criminal history.

C.    CD1:  Agents interviewed CD1 during the investigation and CD1 admitted to being involved with SEJIN OH and others in the trafficking of MDMA and marijuana.  CD1 has also provided further information to the government, pursuant to proffer protection, about CD1's involvement in the charged conspiracy.    CD1 has provided credible, reliable and timely information to the government during the investigation.  CD1 has a prior conviction for trespass to State land in 1996.  CD1 is currently facing charges in State cour for a controlled substance offense.

D.    CD2:  Agents interviewed CD2 during the investigation and CD2 admitted to being a member of Ivan Myint's crew and to assisting Ivan Myint in the trafficking of MDMA and marijuana.  CD2 has also provided further information to the government, pursuant to proffer protection, about

-19-

CD2's involvement in the charged conspiracy. CD2 has provided credible, reliable and timely information to the government during the investigation. CD2 has no prior criminal convictions.

E. _CD3_: Agents interviewed CD3 during the investigation and CD3 admitted to being a member of Ivan Myint's crew and to assisting Ivan Myint in the trafficking of MDMA and marijuana. CD3 has also provided further information to the government, pursuant to proffer protection, about CD1's involvement in the charged conspiracy. CD3 has provided credible, reliable and timely information to the government during the investigation. CD3 has no prior criminal convictions, but does have arrests for assault and mob action.

F. _Individual A_: Individual A was a member of Ivan Myint's crew who briefly cooperated with law enforcement officers in early 2005. Individual A is no longer cooperating with the government. Individual A was facing narcotics charges during the period of Individual A's cooperation.

## VI. EVIDENCE ESTABLISHING PROBABLE CAUSE TO SUPPORT CRIMINAL COMPLAINT

27. This section is divided into ten subsections identified as Subsection A through Subsection J. The titles of those subsections along with the page numbers on which they appear are set forth below:

Subsection A. With the Assistance of TOMMY LO and OUYANG, ZHOU Delivers a First Load of Approximately 10,000 MDMA Pills to SEJIN OH in November 2003 (pp. 21-32)

Subsection B. SEJIN OH's Crew Negotiates the Delivery of 10,000 MDMA Pills to Two DPCSO Undercover Officers Between December 2003 and February 2004 (pp.

32-53)

Subsection C.    The Trafficking of MDMA and Marijuana by Individual B to SEJIN OH's Crew in March 2004 (pp. 53-58)

Subsection D.    The Meeting Between the Canadian Suppliers, the Two Chicago Distribution Crews and the Chinatown Facilitators on June 28, 2004 (pp. 58-65)

Subsection E.    The Controlled Buys of MDMA by CS1 from SEJIN OH, HUERTA and Others in July and August 2004 (pp. 65-93)

Subsection F.    The Trafficking of MDMA and Marijuana by ZHOU and LUONG to Ivan Myint's Crew Between November 2004 and January 2005 (pp. 94-112)

Subsection G.    Ivan Myint Becomes a Fugitive but Attempts to Continue His Drug Trafficking Operation Going in the United States Through CD3 (pp. 112-117)

Subsection H.    The Arrest and Cooperation of Individual A Against LUONG and Others (pp. 117-120)

Subsection I.    The Cooperation of CD3 and the Investigation Against LUONG and Others (pp. 120-135)

Subsection J.    Additional Evidence Against the Canadian Suppliers and HENRY CHUN (pp. 135-148)

Several of these subsections are further subdivided into topics that are separated by sequential numbers within brackets.

A.    With the Assistance of TOMMY LO and OUYANG, ZHOU Delivers a First Load of Approximately 10,000 MDMA Pills to SEJIN OH in or about November 2003

    [1]    CD1's admissions regarding initial load of MDMA and marijuana to SEJIN OH in or about November 2003

28.    CD1 has admitted in debriefings and under oath that he has known SEJIN OH since high school. After losing touch with SEJIN OH for several years, CD1 began

"hanging out" with SEJIN OH and his circle of friends in approximately 2002. CD1, SEJIN

OH and SEJIN OH's friends often used cocaine together. CD1 often converted the powder

cocaine into crack cocaine and smoked the crack cocaine with SEJIN OH. CD1 identified

SEJIN OH's circle of friends as including defendants JONG KYUN CHAE (who went by the

street name "Big John"), CARLO PANADERO ("Chito"), MELVIN DUMANLANG ("Melvin")

and TOMMY LO ("Tommy"). CD1 further identified CARLOS PANADERO JR. ("CJ") as

an associate (or "shorty") of CARLO PANADERO. Based upon his own observations, CD1

knew that SEJIN OH and his associates were supplied cocaine by CS1 (whom CD1

correctly identified by his street name), HUERTA (whom CD1 knew as "Jorge") and

MICHAEL MYINT. CD1 identified photographs of CS1, HUERTA and MICHAEL MYINT

as the individuals to whom he was referring.

29.    CD1 has further stated that, in Summer 2003, he and SEJIN OH started

selling marijuana in partnership with SEJIN OH, but they were not successful in selling

marijuana because they made too little profit.

30.    According to CD1, toward the end of Summer 2003, CHAE and SEJIN OH

went to a brothel in Chicago's Chinatown neighborhood that was operated by TOMMY LO.

At the brothel, SEJIN OH and CHAE met with TOMMY LO and OUYANG. CD1 knew

OUYANG by the street name "Alun" and has identified a photograph of OUYANG as the

person CD1 knew as "Alun." CD1 learned from SEJIN OH and TOMMY LO that OUYANG

knew individuals in Canada who could supply large amounts of MDMA and hydroponic

marijuana to SEJIN OH and CHAE for resale. CD1 stated that SEJIN OH, CHAE, TOMMY

LO and OUYANG discussed on various occasions the possibility of establishing a drug

trafficking operation. CD1 stated that SEJIN OH handled most of the discussions with

-22-

TOMMY LO and OUYANG and that SEJIN OH frequently related the substance of those conversations to CD1 at a later time. According to CD1, SEJIN OH and CHAE agreed to meet with the Canadian drug suppliers.

31. CD1 further stated that, in or about October 2003, TOMMY LO introduced SEJIN OH and CHAE to a Canadian supplier of the MDMA and marijuana. CD1 has met the Canadian supplier, whom CD1 knows as "Goi." CD1 has identified a photograph of JU WEN ZHOU as the Canadian drug dealer he knew as "Goi." According to CD1, SEJIN OH and CHAE met with TOMMY LO and ZHOU at a restaurant near Argyle and Broadway in Chicago. At the restaurant, with TOMMY LO serving as a translator from Chinese (ZHOU's language) to English, ZHOU agreed to sell MDMA and marijuana to SEJIN OH and CHAE. As a result of that meeting, ZHOU agreed to sell to SEJIN OH and CD1 the MDMA for $3-$4 per pill and marijuana for $2,700 per pound. CD1 further stated that DUMANLANG and CARLO PANADERO were also at the meeting but not involved in the negotiations.

32. CD1 has also stated that CD1 knows that, in November 2003, SEJIN OH, CHAE, TOMMY LO and OUYANG drove in SEJIN OH's black Nissan Maxima to Canada in order to get a sample of MDMA from ZHOU.[4] At the meeting in Canada, TOMMY LO again served as a translator for some of the discussion (ZHOU spoke some English). Also during that meeting, ZHOU gave to SEJIN OH and CHAE approximately 20 MDMA pills and a few grams of marijuana as samples of the drugs ZHOU could provide to SEJIN OH and CHAE. ZHOU confirmed that the price for the MDMA was $3-$4 per pill and the price for the marijuana was $2,700 per pound. After ZHOU left the meeting, SEJIN OH, CHAE,

---

[4] As discussed in Paragraph 53 below, border crossing records confirm that this vehicle crossed into the United States on November 19, 2003.

TOMMY LO and OUYANG returned to the United States with the drugs hidden in SEJIN OH's car. Upon their return to Chicago, SEJIN OH and CHAE gave the MDMA sample pills to HUERTA because HUERTA was a large scale drug dealer whom SEJIN OH and CHAE expected to be their main MDMA buyer. SEJIN OH later told CD1 that HUERTA liked the MDMA sample obtained in Canada.

33.    CD1 further stated that, within a few days of returning from Canada and getting HUERTA's approval of the sample MDMA, SEJIN OH called ZHOU and ordered 10,000 MDMA pills and 20-30 pounds of marijuana. The amount of drugs that SEJIN OH ordered was agreed upon through discussions between SEJIN OH and CHAE, who were working as partners with respect to buying and selling the drugs. According to CD1, SEJIN OH and CHAE agreed to pay ZHOU around $4 per pill of MDMA and $2,700 per pound of marijuana.

34.    CD1 further stated that in late November or early December 2003, ZHOU came to Chicago to deliver the drugs that SEJIN OH and CHAE had ordered. CD1 further stated that SEJIN OH met with ZHOU at SEJIN OH's apartment on North Sheridan Road in Chicago, and that, inside the apartment, ZHOU delivered at least approximately 10,000 MDMA pills and 25-30 pounds of marijuana to SEJIN OH and CHAE. CD1 has seen the drugs and, based upon those observations, remembered that half of the MDMA pills were yellow and had the logo of an airplane, while the other half were blue and had the logo of a dolphin on them. ZHOU "fronted" the MDMA and marijuana to SEJIN OH and CHAE, meaning that ZHOU provided the drugs on credit with the expectation that SEJIN OH and CHAE would pay for the drugs out of the proceeds realized from resale of the drugs. The total debt owed to ZHOU was around $70,000 to $80,000.

-24-

35.     CD1 further stated that SEJIN OH and CHAE then sold the drugs, including the sale of approximately 8,000 MDMA pills to HUERTA for about $6-$7 per pill. HUERTA picked up the pills in installments. According to CD1, SEJIN OH and CHAE sold the remaining pills to TOMMY LO and OUYANG for the same price, and the marijuana was sold to various customers for about $2,900 to $3,000 per pound. CD1 also stated that, while SEJIN OH and CHAE were looking for customers, they stored the drugs at JUNG BAE's apartment in the 4300 block of North Western Avenue in Chicago. SEJIN OH told CD1 that SEJIN OH was going to give BAE some marijuana in exchange for allowing SEJIN OH and CHAE to store the drugs at BAE's apartment. CD1 stated that BAE was present on several occasions when CD1 retrieved the drugs from BAE's apartment for delivery to customers.

36.     CD1 further stated that, during this first delivery of drugs in late November or early December 2003, ZHOU waited in Chicago for a period of time. Before ZHOU returned to Canada, SEJIN OH and CHAE had paid ZHOU about $40,000 in United States Currency toward the cost of the drugs. Most of that money came from HUERTA for HUERTA's purchase of those drugs. Even after this payment, SEJIN OH and CHAE owed ZHOU more than $30,000 for the drugs.

37.     CD1 further stated that SEJIN OH and CHAE spent a lot of their drug profits at night clubs and buying drugs for their own use. As a result, SEJIN OH and CHAE failed to pay off their drug debt to ZHOU. ZHOU, in turn, refused to front any more drugs to SEJIN OH and CHAE until the full drug debt was paid off. Therefore, around the middle of December 2003, SEJIN OH, CHAE, TOMMY LO and OUYANG all traveled back to Canada to meet with ZHOU in order to reach an agreement on future drug shipments.

However, ZHOU refused to give any more drugs to SEJIN OH and CHAE until they paid off their drug debt to ZHOU.

[2]     TOMMY LO's admissions concerning his facilitation of the first load of MDMA delivered by ZHOU to SEJIN OH and CHAE

38.     On multiple occasions beginning on October 10, 2006, law enforcement officers interviewed of TOMMY LO, who was then detained at the DuPage County Jail on state drug charges for conduct that occurred in October 2006. Prior to each interview, officers advised TOMMY LO of his Miranda rights, which TOMMY LO waived.

39.     TOMMY LO told the officers that, in Fall 2003, he was operating a prostitution house in Chicago's Chinatown neighborhood. SEJIN OH was a customer of TOMMY LO's brothel and TOMMY LO knew SEJIN OH to be a drug dealer. Another customer of TOMMY LO's brothel was a person who TOMMY LO knew as "Alun." TOMMY LO identified a photograph of OUYANG as the person he knew as "Alun." On occasion, OUYANG would watch the brothel for TOMMY LO when TOMMY LO needed to be away from the brothel. OUYANG occasionally brought other customers to the brothel. One of those customers was known to TOMMY LO as "Goi." TOMMY LO identified a photograph of ZHOU as the person he knew as "Goi." In conversations with OUYANG and ZHOU in Fall 2003, TOMMY LO learned that ZHOU was selling MDMA (which TOMMY LO referred to during the interview as "ecstasy") and hydroponic marijuana. In the hope of making some extra money, TOMMY LO introduced SEJIN OH to ZHOU, knowing that ZHOU was looking for MDMA buyers. TOMMY LO hoped that, by acting as a middleman, he could receive a portion of the profits made from the trafficking of MDMA and marijuana from ZHOU to SEJIN OH.

40.    TOMMY LO further admitted that, after SEJIN OH received his first shipment of MDMA pills from ZHOU, he learned that SEJIN OH failed to pay ZHOU all the money that SEJIN OH owed to ZHOU. After SEJIN OH fell behind in his drug debt to ZHOU, ZHOU no longer wanted to deal with SEJIN OH. TOMMY LO claimed that he loaned $30,000 to SEJIN OH so that SEJIN OH could pay his drug debt to ZHOU.

41.    TOMMY LO further stated that SEJIN OH had several other individuals working for his drug operation, including individuals named "Big John," "Chito" and "Mel." TOMMY LO identified a photographs of CHAE as the person he knew as "Big John," CARLO PANADERO as the person he knew as "Chito" and DUMANLANG as the person he knew as "Mel." TOMMY LO said that CARLO PANADERO was one of SEJIN OH's "partners" involved in selling MDMA pills and marijuana. TOMMY LO also stated that SEJIN OH had told him (TOMMY LO) that DUMANLANG was involved in selling MDMA pills and marijuana and had traveled with SEJIN OH to Canada on one occasion in order to pick up a sample of MDMA pills from ZHOU.

42.    TOMMY LO further stated that he had traveled with SEJIN OH to Toronto, Canada on two occasions in order to meet with ZHOU and LUONG in Canada. TOMMY LO stated that CHAE traveled with them on the two trips. TOMMY LO stated he eventually stopped translating for SEJIN OH and that SEJIN OH began using the services of another person as a translator. TOMMY LO identified a photograph of LI XIEN WU (whom TOMMY LO knew as "Ray") as the person who later helped translate negotiations between ZHOU and SEJIN OH related to drug trafficking.

[3]    OUYANG's admissions concerning his facilitation of the first load of MDMA delivered by ZHOU to SEJIN OH and CHAE

-27-

43. On April 30, 2007, law enforcement officers interviewed OUYANG at the FBI offices in Chicago, Illinois. OUYANG voluntarily agreed to be interviewed and stated that he wished to cooperate. Agents told OUYANG that he was not under arrest and free to leave at any time. A Chinese-English translator was present to translate the interview because OUYANG was not fluent in English.

44. During the interview, OUYANG stated that, in approximately 2001, he first purchased MDMA from "Goi" and Ivan Myint. OUYANG identified a photograph of ZHOU as the person he knew as "Goi."[5] OUYANG stated that, around that time, he purchased approximately 5,000 MDMA pills from ZHOU and Ivan Myint for the price of $7 per pill.

45. OUYANG further stated that, in early 2003, he met a brothel owner from Chinatown named "Tommy." OUYANG identified a photograph of TOMMY LO as the person he knew as "Tommy." OUYANG stated he was not an employee of TOMMY LO's, but that he helped run the prostitution house whenever TOMMY LO was away and would socialize with TOMMY LO away from the brothel. OUYANG stated that he brought ZHOU to TOMMY LO's prostitution house during this period of time so that ZHOU could consort with prostitutes. OUYANG stated "Goi" visited TOMMY LO's prostitution house on at least four occasions.

46. OUYANG further stated in the early Fall 2003, OUYANG approached TOMMY LO at TOMMY LO's prostitution house and told TOMMY LO that ZHOU was

---

[5] It should be noted various witnesses pronounced "Goi" differently. For example, the phonetic pronunciation of the name as given by several witnesses is closest to "goy" (rhymes with "joy"), whereas the phonetic pronunciation of the name as given by OUYANG sounds like "go-we." For simplicity, this affidavit refers to ZHOU's street name by the single term "Goi."

selling MDMA. In order to make some money, OUYANG approached TOMMY LO and informed TOMMY LO that ZHOU could sell MDMA to TOMMY LO. TOMMY LO was interested in arranging the trafficking of MDMA into the United States. OUYANG further stated that ZHOU had agreed to pay to OUYANG 25 cents for every MDMA pill that was smuggled into the United States and distributed to buyers arranged by TOMMY LO. OUYANG identified ZHOU as the source of the MDMA.

47.     OUYANG further stated that TOMMY LO eventually introduced OUYANG to a Korean guy named "Sej." OUYANG has identified a photograph of SEJIN OH as the person he came to know as "Sej."

48.     OUYANG further stated that, in about mid-November 2003, OUYANG, TOMMY LO, SEJIN OH, a person named "John" and two other Filipino individuals, one of whom was named "Melvin," all drove in SEJIN OH's car to Toronto, Canada, to meet ZHOU and ZHOU's "boss" to discuss the sale of MDMA by ZHOU and his boss to SEJIN OH and his associates. OUYANG has identified a photograph of CHAE as a person he knew as "John" and a photograph of DUMANLANG as the person he knew as "Melvin." OUYANG also identified a photograph of CARLO PANADERO as one of the people who went to Canada with them.

49.     OUYANG further stated that, in Toronto, they met with ZHOU and ZHOU's boss. TOMMY LO served as a Chinese-English translator because ZHOU and his boss spoke very little English. The discussion was about the amount and price of MDMA and hydroponic marijuana ZHOU was going to sell to SEJIN OH and his associates. By the end of the meeting, ZHOU agreed to sell approximately 10,000 to 13,000 MDMA pills to SEJIN OH and TOMMY LO.

50.    OUYANG stated he was not present when the first load of MDMA pills came from Canada to TOMMY LO and SEJIN OH in Chicago, although SEJIN OH gave to OUYANG 200 MDMA pills from the shipment. OUYANG was present several weeks later when ZHOU came to Chicago in order to pick up the money that TOMMY LO and SEJIN OH owed for the MDMA pills. This meeting was at SEJIN OH's apartment, which OUYANG recalled as being on the north side of Chicago and right next to Lake Michigan. OUYANG also recalled that SEJIN OH lived around the 50th floor of the apartment building. OUYANG, TOMMY LO, SEJIN OH and ZHOU were present at this meeting. OUYANG was present when SEJIN OH and TOMMY LO handed ZHOU at least $40,000 of the payment for the pills. OUYANG stated that he was paid $3,000 by ZHOU for assisting with the ecstasy deal.

51.    OUYANG further stated that, after the first shipment from ZHOU, OUYANG began buying MDMA from TOMMY LO. OUYANG estimated that the total number of MDMA pills that he bought from TOMMY LO after the delivery of the first load of MDMA pills from ZHOU to SEJIN OH was approximately 600 pills. OUYANG also delivered MDMA pills to various MDMA customers of TOMMY LO during 2005. However, OUYANG stated that he did not know whether, after the first shipment of MDMA, ZHOU ever sold any more MDMA to TOMMY LO and SEJIN OH, although he did know that TOMMY LO and SEJIN OH had bought marijuana from ZHOU on several occasions.

[4]    Border records confirm SEJIN OH's vehicle crossing the border in September, November and December 2003

52.    Land border crossing records maintained by the United States Customs and Border Protection ("CBP") verify the following:

-30-

A.    On September 15, 2003, at approximately 8:48 p.m. (Eastern Time ("ET")), a vehicle bearing Illinois license plate 238 9994, and registered with the Illinois Secretary of State ("ISOS") to SEJIN OH at an address in Elgin, Illinois, crossed into the United States from Canada at the Ambassador Bridge point of entry ("POE") in Detroit, Michigan;

B.    On November 19, 2003, at approximately 7:53 a.m. (ET), a vehicle bearing Illinois license plate 555 5654, and registered with ISOS to a person who according to ICE records is known to be a relative of MELVIN DUMANLANG, crossed into the United States from Canada at the Blue Water Bridge POE in Port Huron, Michigan;[6]

C.    On November 19, 2003, at approximately 5:39 p.m. (ET), a vehicle bearing Illinois plate 238 9994 crossed into the United States from Canada at the Blue Water Bridge POE in Port Huron, Michigan, and that the occupants of the vehicle were SEJIN OH and OUYANG;[7] and

D.    On December 15, 2003, at approximately 8:26 a.m. (ET), a vehicle bearing Illinois plate 555 5654 crossed into the United States from Canada at the

_____

[6] In an interview of SEJIN OH on September 29, 2005, at JUNG BAE's apartment, SEJIN OH told the interviewing officers that he was driving DUMANLANG's car.  That same day, a gray Chevrolet Malibu bearing Illinois plate 555 5654 was located on Western Avenue very near BAE's apartment building.

[7] CBP separately records the license plates of incoming vehicles from the identification provided by occupants of the vehicle, if requested.  The identification of OUYANG and SEJIN OH as the occupants of car is based upon a comparison of the two databases and, particularly the proximity in time and location (including the particular entry lane) between the vehicle and the identification of SEJIN OH and OUYANG crossing the border.

-31-

Detroit/Windsor Tunnel POE in Detroit, Michigan.

B.    SEJIN OH's Crew Negotiates the Delivery of 10,000 MDMA Pills to Two
       DPCSO Undercover Officers Between December 2003 and February 2004

       [1]    Investigation of SEJIN OH's crew by two DPCSO undercover officers

53.    On December 2, 2003, an informant ("CS3") notified a DPCSO officer

("UCO1") that CS3 knew a large marijuana dealer who went by the street name "CJ."

UCO1 instructed CS3 to give UCO1's phone number to "CJ" and to tell CJ that UCO1 was

CS3's partner and interested in buying marijuana.

54.    At approximately 7:00 p.m. on December 2, 2003, UCO1 received an

incoming call and spoke with an individual who identified himself as "CJ." Based upon

having met "CJ" at a later time, UCO1 can identify "CJ" as CARLOS PANADERO JR. from

an ISOS photograph of CARLOS PANADERO JR. Based upon having heard his voice,

UCO1 can also identify the caller as CARLOS PANADERO JR. The call was not recorded.

CARLOS PANADERO JR. asked UCO1 if UCO1 was looking to buy some "green," which

UCO1 understood as a reference to marijuana. UCO1 stated that he did not like to talk on

the phone. CARLOS PANADERO JR. said that he (CARLOS PANADERO JR.) wanted

to meet in person.

55.    On December 20, 2003, CARLOS PANADERO JR. and UCO1 met in person

at a restaurant in Lombard, Illinois. A second DPCSO undercover officer ("UCO2")

accompanied UCO1 to the meeting. The meeting was not recorded.[8] During the

_____

[8] At this point, the DPCSO officers were not conducting a joint investigation with
federal agents. Therefore, in accordance with State of Illinois law, the officers could not
record the conversation without the authority of a court order (commonly known as an
overhear order) which will only issue upon a showing of probable cause.

approximately one hour meeting, CARLOS PANADERO JR. and the two officers discussed the possibility of UCO1 buying "A and AA hydro," which UCO1 understood as a street term for high potency hydroponically grown marijuana. CARLOS PANADERO JR. said the price for the marijuana was $3,500 to $3,800 per pound. When UCO1 said that UCO1 bought 50-100 pounds of marijuana each month, CARLOS PANADERO JR. stated that he and his "partners" could supply that amount of marijuana without any problem. CARLOS PANADERO JR. also stated that he could supply MDMA ("pills" and "candies"), but wanted to sell the marijuana first because of the much higher penalty that came with MDMA. When one of the UCOs asked him what he meant by that, CARLOS PANADERO JR. stated that he understood a person could do more jail time if he was arrested in the possession of MDMA. UCO2 told CARLOS PANADERO JR. that they had a reliable source of MDMA and did not need to get MDMA. CARLOS PANADERO JR. responded by stating that he thought he and his "partners" could beat any price the officers were being charged for MDMA. In addition, CARLOS PANADERO JR. described the MDMA as quality pills that always have the same "stamp," which the officers understood as a reference to the logo that is typically stamped upon MDMA pills. CARLOS PANADERO JR. stated that he was very interested in selling MDMA and marijuana to the officers and said that he would speak with his "partners" to see if they could work out a compromise on the price of the drugs.

56.    On January 9, 2004, CARLOS PANADERO JR. contacted UCO1 by telephone. The call was not recorded. CARLOS PANADERO JR. asked if UCO1 was ready to complete a buy of drugs. UCO1 told CARLOS PANADERO JR. that the officers were no longer interested in buying cannabis but maintained an interest in buying MDMA

from CARLOS PANADERO JR. CARLOS PANADERO JR. stated that he wanted to talk to UCO1 and UCO2 about the "green or little ones," which UCO1 understood as a reference to marijuana and MDMA. UCO1 agreed to call CARLOS PANADERO JR. back within a couple days but did not do so.

57.    On January 20, 2004, CARLOS PANADERO JR. called UCO1. The conversation was not recorded. During the call, CARLOS PANADERO JR. asked to meet with UCO1 the next day. CARLOS PANADERO JR. said his "partners" wanted to meet UCO1. UCO1 agreed to meet with CARLOS PANADERO JR. and his "partners." Following additional unrecorded conversations on January 21, 2004, a meeting between the officers, CARLOS PANADERO JR. and his partners was set for January 22, 2004.

58.    On the afternoon of January 22, 2004, the UCOs met with CARLOS PANADERO JR. and his "partners" at a restaurant in Oak Brook, Illinois. The meeting was not recorded:

A.    Upon arriving at the restaurant, the two UCOs met with CARLOS PANADERO JR. and individuals who identified themselves as "Lee" and "Ted." Based upon ISOS photographs of SEJIN OH and CARLO PANADERO, UCO1 and UCO2 have identified SEJIN OH as the individual who introduced himself as "Lee" and CARLO PANADERO as the individual who identified himself as "Ted." The five individuals sat together inside the restaurant.

B.    During the meeting, SEJIN OH said that he could drop his price for marijuana to $3,400 per pound, and both repeatedly emphasized that they could deliver the marijuana to wherever the UCOs wanted. With regard to MDMA, CARLO PANADERO asked the officers how much MDMA they sold and UCO2

-34-

stated that they sold 2,000 MDMA pills every two weeks. SEJIN OH then stated that he would sell 1,000 MDMA pills to the UCOs for $7,500. CARLO PANADERO stated that they obtained the MDMA pills from Canada and that the UCOs could design their own stamp on the pills if they wished. SEJIN OH further stated that they could sell MDMA pills with different potencies. SEJIN OH also explained that he (SEJIN OH) liked to sell 5,000 MDMA pills at a time because he receives the MDMA pills in bags of 1,000 and that one "box" usually contains 5,000 pills. Further, SEJIN OH said he would front the pills to the UCOs and that he had a "return policy" if the UCOs were unsatisfied with the pills.

C.    At one point, UCO2 said that they already had an MDMA supplier and they did not want to just drop their supplier. CARLO PANADERO immediately responded that they would offer such a good price that the UCOs' supplier would want to buy MDMA from them. SEJIN OH agreed to give five MDMA pills to the UCOs as a sample. UCO1 asked SEJIN OH if SEJIN OH would bring the sample pills to UCO1 and SEJIN OH stated words to the effect, "No, we don't come to deals. We have runners for that." The UCOs then exchanged Nextel direct connect numbers with CARLO PANADERO.

59.    On January 26, 2004, CARLOS PANADERO JR. contacted UCO1 by telephone. The conversation was not recorded. During the conversation, CARLOS PANADERO JR. told UCO1 that the sample of five MDMA pills would be ready for delivery on January 28, 2004.

60.    On January 28, 2004, the UCOs obtained an order from the DuPage Circuit Court allowing them to consensually record meetings related to the investigation. Later

that day, CARLOS PANADERO JR. notified UCO1 that the MDMA sample had not arrived from "up north," which UCO1 understood as a reference to Canada. The call was recorded but technical difficulties prevented the recording of CARLOS PANADERO JR.'s half of the conversation.

61.    On the evening of February 4, 2004, the UCOs met with SEJIN OH and CARLO PANADERO at the same restaurant in Oak Brook, Illinois. The meeting was consensually recorded by UCO1:

A.    The UCOs were in the parking lot of the restaurant when SEJIN OH, CARLO PANADERO and another subject arrived in a silver Chevrolet bearing Illinois registration number 555 5654. Based upon an ISOS photograph, UCO1 identified DUMANLANG as the subject who arrived with SEJIN OH and CARLO PANADERO. DUMANLANG stayed in the car. When UCO1 asked SEJIN OH about the person inside the car (DUMANLANG), SEJIN OH said that he was one of their "drivers." The two UCOs then started walking toward the restaurant, at which time SEJIN OH shook the hand of UCO1 and, in doing so, handed to UCO1 approximately six suspect MDMA pills inside a cellophane wrapper.

B.    Inside the restaurant, the two UCOs sat at a table with SEJIN OH and CARLO PANADERO, where they discussed, among other things, arranging for the UCOs to purchase a large amount of MDMA from SEJIN OH and CARLO PANADERO. During the discussion, SEJIN OH told the UCOs that the price for 5,000 MDMA pills would be $7.50 per pill, while the cost for 10,000 MDMA pills would be $7.00 per pill. SEJIN OH and CARLO PANADERO further stated that they had a "shipping service" that moved the MDMA pills across the border and that

-36-

they could only move the drugs across the border when the Homeland Security threat level was at "yellow" because, otherwise, there was a heightened risk of being stopped at the border. When one UCO asked whether it was easier to ship 5,000 MDMA pills every two weeks or 10,000 MDMA pills once each month, CARLO PANADERO responded, "Whatever you want to do . . ."

C.    The UCO suggested that he would prefer to get the pills once each month to "save on shipping" costs. In response, CARLO PANADERO stated, "One thing I respect is the money." In further discussion about the pill logo, CARLO PANADERO suggested that the logo on the MDMA ("candy") is important to the ultimate MDMA consumers ("That's what I was saying, that's the best thing with these things, this thing that I noticed, this candy, it's all about the name that is out there"). SEJIN OH stated that personalizing the logo would require additional time to complete the order ("if they're going to personalize the stamp, it's going to take time").

D.    When one of the officers asked if the effect of the pills would last up to six hours ("are these going to last six hours?"), CARLO PANADERO responded that the pills would last three hours but have a potent effect ("No, three hours . . . when they take this, you know it's serious"). However, SEJIN OH also suggested that the pills could easily be modified to so that they could include other drugs such as methamphetamine ("speedy"):

SEJIN OH:         With this, once you show your guy, you can alter it, it's very clean, some people like it kind of dirty depending what you mix into it. But we can adjust it, some people are looking for . . .

-37-

| PANADERO: | It's more like . . . I think what Lee is trying to say is this is more like a prototype and from this prototype you can make the changes that you want. |
|---|---|
| UCO2: | That's fine, as long as they are getting it what they are supposed to like, they are mixing it with all that nasty shit now, you know? |
| PANADERO: | Right. (Unintelligible) he can tell you that this is a little more speedy or this is a little more like this, but the feedback that you get . . . |

SEJIN OH also suggested that CARLOS PANADERO JR. was no longer part of the group but that he was going to get paid based upon the UCOs purchase of drugs ("CARLOS PANADERO JR.'s out of it, he is going to get his percentage").

62.    At approximately 7:30 p.m. on February 9, 2004, UCO1 and UCO2 arrived at the parking lot of a restaurant in Park Ridge for a meeting with SEJIN OH. The meeting was consensually recorded by UCO1. UCO1 entered the restaurant, while UCO2 waited in his undercover vehicle. Upon entering the restaurant, UCO1 saw SEJIN OH and CARLO PANADERO sitting at a table. The two waved UCO1 over to their table. At the beginning of the meeting, SEJIN OH stated that he and CARLO PANADERO had another table at the restaurant at which three subjects were sitting. Based upon later investigation and ISOS photographs, UCO1 has identified DUMANLANG and CHAE as two of the men at the other table. UCO1 then called UCO2 to join him at the table with SEJIN OH and CARLO PANADERO. UCO2 then joined the meeting. During the conversation, SEJIN OH asked what drugs UCO1 wanted to buy and UCO1 told SEJIN OH that he wanted 5,000 "yellow Rolexs" and 5,000 "green spades," referring to the colors and logos of the sample pills given to the UCOs on February 4, 2004. SEJIN OH and CARLO PANADERO then stated that they would not complete the deal unless the UCOs supplied them with a sample

of marijuana or some United States Currency because they knew that police officers would not do so. They agreed to then meet on another day.

63.     On February 12, 2004, CS3 called UCO1 and told UCO1 that CARLOS PANADERO JR. had just called CS3 to get more information about the UCOs, particularly background information regarding how CS3 had come to know the UCOs. After that call, UCO1 called CARLO PANADERO and told CARLO PANADERO about the contact by CARLOS PANADERO JR. to CS3. CARLO PANADERO stated that he was doing a background check on the UCOs. Later that day, CS3 called UCO1 to say that he was being called by CARLOS PANADERO JR. CS3 then connected UCO1 into a three-way call with CARLOS PANADERO JR. CS3 told CARLOS PANADERO JR. that he had spoken with UCO1 and, in response, CARLOS PANADERO JR. stated that he was aware from one of SEJIN OH's associates ("one of my guys") that CS3 had spoken with UCO1.

64.     On the afternoon of Monday, February 16, 2004, UCO1 called SEJIN OH and told SEJIN OH that he wanted to buy 10,000 MDMA pills ("magazines") and that UCO1 would give SEJIN OH a ten percent advance payment down on the 5,000 pill order. At the price previously quoted by SEJIN OH, the total purchase price was $35,000, ten percent of which was $3,500. SEJIN OH agreed and said that the order would arrive on the upcoming Friday (February 20, 2004). They agreed to meet the next day (February 17, 2004).

65.     On the afternoon of February 17, 2004, UCO1 met with SEJIN OH and CARLO PANADERO at a restaurant in Hanover Park, Illinois. During the meeting, which was recorded via a body recording device worn by UCO1, CARLO PANADERO told UCO1 that they had finished their "background check" on the UCOs and that the UCOs cleared

-39-

(*i.e.*, were determined not to be law enforcement officers). Both SEJIN OH and CARLO PANADERO talked at length about completing the 10,000 pill deal later in the week. UCO1 gave $3,500 in advance buy money to CARLO PANADERO, who counted the money and told SEJIN OH that the amount was correct. SEJIN OH then gave UCO1 his State of Illinois identification card as an expression of trust. At the end of the meeting, UCO1 walked with SEJIN OH to UCO2's undercover vehicle. UCO2 was in the driver's seat of the car. UCO1 invited SEJIN OH into the front passenger's seat. Inside the car, UCO2 handed to SEJIN OH a bag with $70,000 inside of it. SEJIN OH said that he did not need to count it and that he knew the UCOs were not law enforcement officers. The UCOs did not give the money to SEJIN OH.

[2]    CD1's admissions regarding agreement to sell 10,000 MDMA pills to the DPCSO UCOs

66.    CD1 stated in debriefings and under oath that, in January 2004, SEJIN OH told CD1 that SEJIN OH had two potential drug customers who were "white guys from Elgin," Illinois. These two potential customers were in fact UCO1 and UCO2. CD1 stated that SEJIN OH and the other members of their crew, including CHAE, DUMANLANG, CARLO PANADERO and CARLOS PANADERO JR. decided to work together to sell MDMA to the "two white guys from Elgin." SEJIN OH told CD1 that the UCOs wanted to buy 10,000 MDMA pills from SEJIN OH and his crew. SEJIN OH and CARLO PANADERO handled the negotiations with the UCOs, while the rest of the group assisted the negotiations. SEJIN OH further informed CD1 that SEJIN OH, DUMANLANG and CARLO PANADERO had traveled to Canada to obtain a sample of MDMA for the UCOs and that, after obtaining the sample, DUMANLANG smuggled the sample MDMA across the border

-40-

in his underwear.  DUMANLANG was searched by border officials but they did not find the MDMA.

67.    CD1 admitted to assisting during the negotiations and to unsuccessfully attempting to follow the UCOs from a meeting in order to determine whether or not the UCOs were police officers.  According to CD1, the UCOs had given $3,500 to SEJIN OH and PANADERO as a down payment for 10,000 pill order.

68.    CD1 further stated that, based upon his conversations with the members of SEJIN OH's crew, CD1 knew that they intended to go through with the sale of the 10,000 MDMA pills to the UCOs but that the deal never concluded because SEJIN OH and CHAE had still not paid off their debt to ZHOU for the first load of MDMA and marijuana that arrived in Fall 2003.  CD1 also stated that, according to what CD1 learned from SEJIN OH, a contributing factor to the deal not being concluded was that DUMANLANG was approached by the USSS.  CD1 said that he heard that CARLO PANADERO fled from the United States to either Japan or the Philippines in order to avoid prosecution for credit card fraud.

[3]    CARLOS PANADERO JR.'s admissions regarding agreement to sell 10,000 MDMA pills to the undercover officers

69.    On January 18, 2007, SEJIN OH, CHAE, CARLO PANADERO, CARLOS PANADERO JR. and DUMANLANG were charged in DuPage County Circuit Court with violations of Illinois law with respect to their agreement to sell MDMA to the two DPCSOs between December 2003 and February 2004.  Arrest warrants were issued for each defendant.

70.    On May 8, 2007, CARLOS PANADERO JR. was taken into custody by the

-41-

DPCSO pursuant to the arrest warrant for him issued out of the DuPage County Circuit Court. After being arrested, CARLOS PANADERO JR. was interviewed by law enforcement regarding his role in SEJIN OH's crew with respect to the distribution of MDMA and marijuana. CARLOS PANADERO JR. agreed to cooperate and expressed his willingness to be interviewed. Prior to being interviewed, CARLOS PANADERO JR. was given Miranda warnings by the officers.

71. During the ensuing interview, CARLOS PANADERO JR. admitted that he met with the UCOs and that he offered to sell MDMA and marijuana to them. CARLOS PANADERO JR. stated that he met the UCOs through another individual whom he met at a party in the suburbs. CARLOS PANADERO JR. stated that he attended the party in order to find possible customers to whom SEJIN OH and CARLO PANADERO could sell MDMA ("ecstasy") and marijuana ("weed"). CARLOS PANADERO JR. further admitted that he was responsible for introducing SEJIN OH and CARLO PANADERO to the two UCOs, and acknowledged making several telephone calls to the UCOs in order to set up the eventual meeting between SEJIN OH, CARLO PANADERO and the UCOs.

72. CARLOS PANADERO JR. admitted that he knew from SEJIN OH and CARLO PANADERO that the deal that SEJIN OH and CARLO PANADERO were going to conduct with the UCOs was for 10,000 MDMA pills, but that SEJIN OH did not inform him of all the details. CARLOS PANADERO JR. also stated that his brother fled to the Philippines when DUMANLANG told CARLO PANADERO that he (CARLO PANADERO) had become the subject of another investigation.

73. CARLOS PANADERO JR. stated that it was his understanding that SEJIN OH was the lead drug dealer and was good friends with CARLO PANADERO. CARLOS

-42-

PANADERO JR. also stated that SEJIN OH and CARLO PANADERO were partners in the drug dealing and were searching for prospective buyers of MDMA and marijuana. CARLOS PANADERO JR. stated that SEJIN OH held himself out as the main connect to the Canadian drug suppliers and that he knew SEJIN OH made several trips to Canada to meet with the Canadian drug suppliers. CARLOS PANADERO JR. also stated that CARLO PANADERO had also gone with SEJIN OH to Canada on a couple occasions.

74.    CARLOS PANADERO JR. stated that DUMANLANG was a delivery person for SEJIN OH and CARLO PANADERO. CARLOS PANADERO JR. stated that DUMANLANG made at least three trips to Canada and that he smuggled a small number of pills across the border in order to give the MDMA pills to the UCOs as a sample. CARLOS PANADERO JR. also stated that DUMANLANG sold MDMA pills and marijuana for CARLO PANADERO and that he also kept the drugs at his house on Gresham Avenue in Chicago.

[4]    DUMANLANG's admissions regarding agreement to sell 10,000 MDMA pills to the undercover officers

75.    On April 11, 2007, DUMANLANG was arrested by law enforcement pursuant to the arrest warrant issued out of the DuPage County Circuit Court. After being arrested, DUMANLANG was interviewed by law enforcement regarding his role in SEJIN OH's crew with respect to the distribution of MDMA and marijuana. DUMANLANG agreed to cooperate and expressed his willingness to be interviewed. Prior to being interviewed, DUMANLANG was given his Miranda warnings by the officers.

76.    During the ensuing interview, DUMANLANG admitted that he began selling marijuana for CARLO PANADERO and that, along with Individual C, worked with CARLO

PANADERO selling drugs and engaging in credit card fraud. DUMANLANG stated that when SEJIN OH and CARLO PANADERO became partners selling marijuana, DUMANLANG's role was to ride along with SEJIN OH and CARLO PANADERO whenever they went to the south side of Chicago to sell the marijuana to gang members. DUMANLANG also provided security during drug deals. DUMANLANG stated he would buy pounds of marijuana from OH and PANADERO for $3,000 per pound.

77. DUMANLANG also admitted to traveling to Canada in order to meet SEJIN OH's drug source. DUMANLANG stated that the first trip was in mid-November 2003 and that DUMANLANG and CARLO PANADERO drove to Toronto, Canada, to meet SEJIN OH's drug supplier, who he knew as "Goi." DUMANLANG identified a photograph of ZHOU as the person he knew as "Goi." DUMANLANG stated while he and CARLO PANADERO drove up in his vehicle, SEJIN OH, TOMMY LO and an individual named "Alun" drove up in SEJIN OH's vehicle. DUMANLANG identified a photograph of OUYANG as the person he knew as "Alun." DUMANLANG further stated that SEJIN OH had a large amount of United States Currency and that SEJIN OH had brought the money across the border to give to ZHOU. DUMANLANG stated that, while they were in Toronto, they all went to a prostitution house with ZHOU and that, at the prostitution house, SEJIN OH and CARLO PANADERO negotiated with ZHOU over the price for marijuana.

78. DUMANLANG also stated that, prior to first trip to Canada, there was a meeting between SEJIN OH, TOMMY LO, OUYANG and ZHOU to discuss the drug trafficking. DUMANLANG attended the meeting.

79. DUMANLANG further stated that he, SEJIN OH, CARLO PANADERO and TOMMY LO took a second trip to Toronto, Canada, in order to meet with ZHOU.

DUMANLANG stated that he drove his own vehicle up to Toronto on this second occasion. DUMANLANG stated that he was present while CARLO PANADERO held discussions with ZHOU about the prices for MDMA pills.

80.    DUMANLANG stated that SEJIN OH and CARLO PANADERO were introduced to two "Elgin guys" who were interested in buying a large quantity of MDMA pills. DUMANLANG did not remember the exact number of pills the "Elgin guys" wanted to buy, but knew it was "thousands of pills." UCO2 participated in the interview of DUMANLANG and DUMANLANG stated that the he recognized UCO2 as one of the "Elgin guys." DUMANLANG stated SEJIN OH and CARLO PANDERO were introduced to the UCOs by CARLO PANADERO's brother "CARLOS PANADERO JR." DUMANLANG stated he was present for several meetings in the Chicago area with the UCOs. DUMANLANG stated his job was to act as security for SEJIN OH and CARLO PANADERO, mostly by serving as "an extra set of eyes."

81.    DUMANLANG further admitted that, in February 2004, he traveled in his car to Canada with CARLO PANADERO and SEJIN OH in order to meet with SEJIN OH's MDMA source in Canada and to pick up a sample of MDMA pills.[9] DUMANLANG stated that, when they got to Detroit, he dropped SEJIN OH and CARLO PANADERO off at a casino in Detroit because SEJIN OH and CARLO PANADERO felt that they would not be allowed into Canada. DUMANLANG stated that he was instructed by SEJIN OH to go across the border and meet with some Chinese guys at a casino in Windsor, Canada.

_____

[9] As set forth in paragraph 84 below, CBP records verify DUMANLANG's crossing of the border on February 4, 2004, which was the same date upon which SEJIN OH gave the sample MDMA pills to UCO1.

DUMANLANG stated that, when he got to the casino, he met with two unknown Chinese individuals who handed to DUMANLANG fourteen multi-colored MDMA pills. DUMANLANG stated that when he attempted to return to the United States, he was stopped by United States customs officials, who searched him and his vehicle. DUMANLANG stated he had placed the fourteen pills in his crotch and thus the Customs officers did not find the MDMA pills. DUMANLANG stated that he then picked up SEJIN OH and CARLO PANADERO in Detroit and they then drove back to Chicago. DUMANLANG stated that, upon their return to Chicago, he drove to a restaurant at which SEJIN OH and CARLO PANADERO then met with the two UCOs.

82.    DUMANLANG stated that, in Spring 2004, he was questioned by federal agents about his and CARLO PANADERO's roles in a credit card fraud scheme. DUMANLANG admitted that he immediately notified CARLO PANADERO of the approach by law enforcement and that, as a result, CARLO PANADERO fled to the Philippines. DUMANLANG believed that the MDMA deal with the UCOs was called off because CARLO PANADERO fled from the United States.

83.    DUMANLANG further stated that, after CARLO PANADERO fled the country, SEJIN OH began selling marijuana with both CD1 and TOMMY LO. DUMANLANG stated that, at one point in time, SEJIN OH had a falling out with both CD1 and TOMMY LO. DUMANLANG stated that he knew TOMMY LO was getting marijuana from a new Canadian supplier named "Nam." DUMANLANG identified a photograph of Individual B as the person he knew as "Nam." DUMANLANG stated that "John Bae" lived on Western Avenue and that DUMANLANG had seen both marijuana and cocaine at that residence. DUMANLANG identified a photograph of JUNG BAE as the person he knew as "John Bae."

-46-

    [5]    <u>Border records confirm DUMANLANG's border crossing on February 4, 2004, with the MDMA sample for the DPCSO UCOs</u>

84.    CBP border crossing records verify that, on February 4, 2004, at approximately 3:58 p.m. (ET), a vehicle bearing Illinois plate 555 5654 crossed into the United States from Canada at the Detroit/Windsor Tunnel POE at Detroit, Michigan.

    [6]    <u>Recorded conversation between CS1, SEJIN OH and TOMMY LO on January 22, 2004</u>

85.    On January 22, 2004, at the direction of USSS law enforcement officers, CS1 met with SEJIN OH and TOMMY LO at SEJIN OH's apartment on North Sheridan Road in Chicago. The meeting was consensually recorded with both audio and video. The purpose of the meeting was for CS1 to obtain counterfeit currency that SEJIN OH had offered to provide to CS1. Before the meeting, officers searched CS1 and CS1's vehicle for contraband with negative results. CS1 was then outfitted with the recording device and followed under law enforcement surveillance to SEJIN OH's apartment located at 5415 North Sheridan Road in Chicago, Illinois. Inside the apartment, CS1 asked SEJIN OH about whether his Canadian drug source was gone for a month ("So, I thought you said the guy from Toronto, he is away for a month"). SEJIN OH confirmed that his source was away for a month. CS1 then asked whether, since the source had already been gone for two weeks, whether he would return in two weeks. SEJIN OH then asked TOMMY LO when the source would return ("When he coming back? Two weeks?"). In response, TOMMY LO responded: "Goi? He left like 16th, one month and February 16th, February 16th and like three weeks." Further, TOMMY LO stated, "fucking forget it, its two months." When CS1 expressed surprise at the length of the vacation ("So, all the guys went out of the country? How they go for a month and shit?"), TOMMY LO responded, "They take

fuckin' vacation, too much money." Based upon my experience and training, I believe that TOMMY LO's reference to "Goi" identified ZHOU as the Canadian source of MDMA and marijuana being purchased by SEJIN OH.

    86.     Later in the conversation, CS1 asked SEJIN OH about how much SEJIN OH was going to charge UCO1 for MDMA ("the rolls"). CS1 referred to UCO1 as "the guy from Carbondale" because SEJIN OH had told CS1 that his prospective buyers (UCO1 and UCO2) sold the MDMA at Southern Illinois University. At the time, neither the federal investigating agents handling CS1 nor CS1 were aware that the "guy from Carbondale" was really UCO1. The following exchange occurred during the conversation:

| | |
|---|---|
| CS1: | So, this guy from Carbondale, he's going to put up the money but you're afraid he's a cop? |
| SEJIN OH: | Right. I gotta talk to him tomorrow. He's been selling it to Chito's little brother's friends. So, I told him I wanted money up front. |
| CS1: | How much you gonna charge him for the rolls? |
| SEJIN OH: | For the "rolls," probably about eight depending on how many he buys. If he grabs 10,000, I will charge him 8, if he only grabs 1,000 at a time I will charge him 10. |
| TOMMY LO: | He needs 10 to do it right . . . |

Based upon my experience and training, as well as the other evidence in this case, I believe that SEJIN OH told CS1 that he intended to sell to the UCOs 10,000 MDMA pills for $8 per pill or, if the UCOs wanted to buy the pills in units of 1,000, then he would charge the UCOs $10 per pill.

    87.     Later in the conversation on January 22, 2004, CS1 asked SEJIN OH if HUERTA was seeking to buy more MDMA pills ("How about Jorge? Is he hurtin' for

candy?"). The following exchange then takes place.

| | |
|---|---|
| SEJIN OH: | He's given up thinking about it, but he still wants it. He said that's the easiest way to make money, he said he can do 20 to 30 of them. |
| CS1 | So, the guys from Toronto with the rolls . . . because you moved 10,000 for them last time . . . |
| SEJIN OH: | It's no problem, I've got to put up 70%, and I can't come up with 70%, because it's supposed to be 70% at the time of arrival. Remember last time what happened? |
| CS1: | Yeah, they had to wait a couple days for their money. |
| SEJIN OH: | Yeah. |
| CS1: | And they were pissed . . . |
| SEJIN OH: | Yeah, they said that's not 70% at time of arrival, that's how tight they are. |
| CS1: | You got a source for bud right? You just told me . . . |
| SEJIN OH: | Uh-huh, one guy's gone for two months, but the other guy can't make it down here right now…I shouldn't have listened to "I" in the first place right. I had no choice. He sort of got me out . . . still, I have to come up with 70%. |
| CS1: | What's the minimum you can order 5,000? |
| SEJIN OH: | Yeah, and I have to come up with 70% . . . |

Based upon my experience and training, as well as the other evidence in this case, I believe that SEJIN OH informed CS1 that HUERTA was able to buy 20,000 to 30,000 MDMA pills ("he said he can do 20 to 30 of them"). SEJIN OH also acknowledged that the first load of MDMA from Fall 2004 involved approximately 10,000 MDMA pills but that, in order to get another load, SEJIN OH was going to have to pay for 70% of the cost of the MDMA pills up front ("I have to come up with 70%") because of his failure to timely repay

-49-

the Canadian sources for the first load of MDMA ("remember what happened last time" and "they were pissed"). Further, SEJIN OH acknowledged that the minimum order of MDMA he could purchase from one of the Canadian suppliers was 5,000 pills. I also believe that the reference to "I" is a reference to Ivan Myint.

88.    Later in the conversation on January 22, 2004, CS1 told SEJIN OH that CS1 wanted to buy some MDMA from SEJIN OH ("try to do something with the candy for me") but, in apparent reference to the requirement that he pay 70% of the cost up front for another load of MDMA, SEJIN OH responded, "[t]he only thing with that, I got no control over it, you know what I mean?" CS1 stated the CS1 would buy at least 2,000 MDMA pills ("at least two boats") and further stated that HUERTA might buy up to 4,000 MDMA pills ("you know Jorge is gonna be good for 2 or 3 maybe 4"). SEJIN OH stated that they would have to pay for the MDMA up front ("that's all COD [cash on delivery] once it gets here"). CS1 responded by noting that CS1 understood and, further, that HUERTA had paid up front for the MDMA that HUERTA had purchased from SEJIN OH's first load ("[f]or me it's COD and last time Jorge was ready, he was COD too"). SEJIN OH responded, "Yeah, Jorge, he actually pre-paid." Based upon my experience and training and the other evidence in this case, SEJIN OH's response confirmed that HUERTA had purchased some of the MDMA from the first load of MDMA that SEJIN OH received from ZHOU in Fall 2003.

89.    After the conversation, CS1 left SEJIN OH's apartment and drove in CS1's vehicle to a predetermined meeting spot under law enforcement surveillance. CS1 had $120 in counterfeit United States Currency. CS1 stated that, upon arriving at SEJIN OH's apartment, SEJIN OH handed to CS1 the $120 in counterfeit United States Currency. SEJIN OH also told CS1 that SEJIN OH had $3,000 in counterfeit United States Currency.

CS1 also stated that SEJIN OH and TOMMY LO were using cocaine while CS1 was at the apartment.

[7]   Information provided by CS1 concerning drug trafficking by SEJIN OH's crew

90.   In or about December 2003, CS1 began cooperating with law enforcement in this investigation. During his initial debrief, CS1 identified several individuals as drug dealers involved in the smuggling of MDMA and hydroponic marijuana to the Chicago area from Asian drug dealers in Toronto, Canada, including SEJIN OH, TOMMY LO, CHAE (whom CS1 knew as "Big John"), CARLO PANADERO (whom CS1 knew as "Chito"), HUERTA and Ivan Myint. CS1 described CHAE as SEJIN OH's "right hand man" in the distribution of MDMA. CS1 stated that SEJIN OH recently received a shipment of 10,000 MDMA pills from his Canadian supplier. CS1 stated that CS1 had purchased and resold 1,000 MDMA pills from this shipment and that HUERTA had purchased 3,500 of the MDMA pills. CS1 stated that SEJIN OH was recently visited by the Chinese MDMA and marijuana suppliers from Canada and that these individuals have a connection to several Chinese individuals from the Chinatown neighborhood of Chicago. CS1 also identified CS2 (by CS2's first name) as a distributor who sells MDMA in units of 100 pills (commonly known as "jars") or 1,000 pills (commonly known as "boats").

91.   CS1 stated that Ivan Myint was engaged in selling cocaine and that, within the last year, CS1 had purchased several ounces of cocaine from Ivan Myint. CS1 further stated that Ivan Myint would routinely send MICHAEL MYINT to deliver the cocaine. CS1 stated that Ivan Myint was released from federal prison a few years prior after time on drug charges.

92.    On February 2, 2004, CS1 was again debriefed. CS1 stated that, on or about February 1, 2004, CS1 received a telephone call from SEJIN OH, who informed CS1 that he was going to Toronto, Canada, in order to meet with SEJIN OH's MDMA and marijuana supplier, so that he could get a sample of MDMA pills. CS1 stated that SEJIN OH told CS1 that his reason for obtaining the sample was because the supplier occasionally changed their product. During the call, SEJIN OH asked CS1 to supply SEJIN OH with a fraudulent credit card to use during the trip, but CS1 told SEJIN OH that he did not have any such credit cards at that time.

93.    During a debriefing on February 11, 2004, CS1 told officers that CS1 had recently had an unrecorded conversation with SEJIN OH about SEJIN OH's MDMA trafficking activity. CS1 stated that SEJIN OH informed CS1 that SEJIN OH was attempting to sell 10,000 MDMA pills to "two white guys from Elgin." SEJIN OH told CS1 that SEJIN OH was attempting to purchase additional MDMA pills from his Canadian source of supply, but that SEJIN OH needed to provide 70% of the purchase money up front to his supplier. SEJIN OH also told CS1 that the MDMA would be delivered to a Chinese individual in Chicago's Chinatown neighborhood. SEJIN OH also told CS1 that SEJIN OH, DUMANLANG, CARLO PANADERO and Individual C drove to Canada last week in order to pick-up a sample of MDMA pills from SEJIN OH's MDMA supplier. SEJIN OH further told CS1 that SEJIN OH and CARLO PANADERO did not go across the border and, instead, remained in Detroit, while DUMANLANG and Individual C drove into Windsor, Canada, in DUMANLANG's car to obtain sample pills of MDMA. SEJIN OH also told CS1 that DUMANLANG's car was stopped by United States customs officials in Detroit on the return trip but that no drugs were found even though the customs officials searched

-52-

DUMANLANG, Individual C and DUMANLANG's car.

94.   In a later debriefing in March 2004, CS1 told officers that SEJIN OH had informed CS1 that CARLO PANADERO had fled from the United States back to the Philippines because DUMANLANG told CARLO PANADERO that law enforcement was looking for CARLO PANADERO.

C.   The Trafficking of MDMA and Marijuana by Individual B to SEJIN OH's Crew in March 2004

[1]   CD1's admissions concerning a second load of MDMA and marijuana delivered by Individual B in March 2004

95.   CD1 has admitted in debriefings and under oath that, in February 2004, CD1 heard from SEJIN OH that SEJIN OH was contacted by Individual B, who was interested in selling MDMA and marijuana to SEJIN OH, CHAE and TOMMY LO. CD1 also described Individual B as ZHOU's driver. According to CD1, SEJIN OH stated to CD1 that Individual B "wanted to do some stuff with us," which CD1 understood as meaning that Individual B wanted to sell MDMA and marijuana to SEJIN OH, CHAE and TOMMY LO.

96.   CD1 has further stated that, soon after that initial conversation with SEJIN OH, Individual B came to Chicago and met with SEJIN OH and CHAE. During that meeting, Individual B offered to sell MDMA and marijuana to SEJIN OH and CHAE at the same prices that ZHOU had offered to them. Individual B was also willing to front the drugs completely, so that no up-front payment was required. SEJIN OH and CHAE then ordered from Individual B 10,000 MDMA pills and 30 pounds of marijuana. They agreed to buy the MDMA at $3-$4 per pill and the marijuana for $2,700 per pound.

97.   CD1 further stated that, in March 2004, Individual B came to Chicago with approximately 8,000 MDMA pills and 25 pounds of marijuana. CD1 remembered that

Individual B stayed at the Chicago Lodge Motel on Foster between Marine Drive and Sheridan Road in Chicago. CD1 remembered Individual B delivering the drugs inside SEJIN OH's apartment. CD1 stated that SEJIN OH and CHAE then sold the drugs to various people, including HUERTA and some south side gang members. SEJIN OH also told CD1 that SEJIN OH had delivered 600 MDMA pills to CS2.

98.     CD1 further stated that Individual B left Chicago about three days after he first arrived with the drugs. SEJIN OH and CHAE were able to pay Individual B for most of the delivery. However, Individual B did leave some fronted drugs for SEJIN OH to continue to sell. The drugs that remained were stored at BAE's apartment on North Western Avenue in Chicago. Over the next two weeks, SEJIN OH and CHAE sold the remainder of the drugs and repaid Individual B for some of the drugs by delivering money to some of Individual B's associates in Chinatown.

[2]     TOMMY LO's admissions concerning a second load of MDMA and marijuana delivered by Individual B in March 2004

99.     During interviews in Fall 2006, TOMMY LO stated that, after the problems between ZHOU and SEJIN OH concerning the first load of MDMA and marijuana, SEJIN OH and CHAE started dealing with ZHOU's courier, who was named "Nam." TOMMY LO identified a photograph of Individual B as the person he knew as "Nam." TOMMY LO stated he has personally met with Individual B on at least four occasions and they have talked on the telephone on numerous other occasions about drugs, money and other deliveries of drugs. TOMMY LO stated that, on Individual B's instructions, TOMMY LO twice wired money to Individual B from a store in Chicago to Vietnam.

100.    TOMMY LO further stated that Individual B had a courier working for him

-54-

named "Yvonne." TOMMY LO identified a photograph of YVONNE LAW as the person he knew as "Yvonne." TOMMY LO stated that he met with "Yvonne" on at least ten occasions and that, on at least four occasions, he did so with SEJIN OH. On each of the occasions involving SEJIN OH, TOMMY LO saw SEJIN OH hand "Yvonne" an unspecified amount of United States Currency. TOMMY LO stated that he knew based upon his conversations with SEJIN OH that the money that SEJIN OH was giving to "Yvonne" was from previous drug deliveries.

101. On October 11, 2006, law enforcement officers conducted a consent search of TOMMY LO's residence located in the 3200 block of West Bryn Mawr Avenue in Chicago, Illinois. During this search, officers seized 149 suspect MDMA pills that were yellow in color and had an airplane imprinted on each pill; handwritten phone numbers associated with Individual B and LAW; wire transfer records, including a wire transfer receipt for $100 sent from TOMMY LO to HUERTA on November 22, 2005, and two wire transfer receipts dated June 28, 2005, and October 29, 2005, for money wired by TOMMY LO to an individual in Vietnam via Western Union from a business at 4947 North Broadway in Chicago.

[3] Information from CS2 concerning MDMA that CS2 received from SEJIN OH in March 2004

102. On February 7, 2006, law enforcement officers interviewed CS2 concerning CS2's possession of the approximately 600 MDMA pills in March 2004. An acquaintance of CS2, Individual D, was present for the interview.

103. CS2 stated that CS2 had known SEJIN OH for several years and had purchased small amounts of cocaine from SEJIN OH on approximately 30 occasions. CS2

stated that the approximately 600 MDMA pills in CS2's possession at the time of CS2's arrest were given to CS2 by SEJIN OH in March 2004. CS2 stated that CS2 did not speak with SEJIN OH but, instead, had gotten the MDMA pills from Individual D. In particular, Individual D had called CS2 and told CS2 that SEJIN OH had the MDMA for sale. CS2 admitted that CS2 intended to sell the MDMA pills to an undercover officer who had been introduced to CS2 by CS1.

104.    CS2 also stated that CS2 knew HUERTA and that CS2 had bought small amounts of cocaine from HUERTA on at least 7-8 occasions. CS2 remembered that, on one occasion, HUERTA told CS2 that HUERTA could sell MDMA to CS2.

105.    Individual D stated that, during the period that the 600 MDMA pills were supplied by SEJIN OH to CS2, SEJIN OH was bragging about obtaining large quantities of MDMA pills from Canada. Individual D stated that, several days before CS2 was arrested, SEJIN OH had called Individual D and asked Individual D if Individual D knew anybody who was interested in buying MDMA pills. Individual D told SEJIN OH that CS2 would be interested in buying the MDMA pills. SEJIN OH then dropped off the pills at Individual D's apartment. Individual D further stated that SEJIN OH fronted the pills to CS2 and that neither CS2 nor Individual D ever paid SEJIN OH for the pills.

106.    Individual D further stated that, after CS2 was arrested, Individual D called SEJIN OH asking for help. However, SEJIN OH never helped CS2 and, instead, complained to Individual D that the Canadian drug suppliers were in town and that SEJIN OH owed them a lot of money. Individual D also stated that SEJIN OH was at one point also involved in trafficking counterfeit United States Currency.

[4]    Information provided by CS1 related to March 2004 delivery of drugs by Individual B to SEJIN OH, CHAE and TOMMY LO

107.    On March 10, 2004, CS1 provided the following information to law enforcement officers. CS1 stated that, during the preceding weekend, on or about March 5, 2004, CS1 was with SEJIN OH and TOMMY LO in the vicinity of Irving Park Road and Halsted Street in Chicago. At that time, CS1 said that SEJIN OH and TOMMY LO met with a then-unknown Asian male who was driving a minivan bearing Ontario, Canada, license plate ARXH 780. Based upon CS1's past experience with SEJIN OH and statements made by SEJIN OH to CS1, CS1 knew that TOMMY LO and SEJIN OH were there to conduct a drug transaction with the individual. SEJIN OH later told CS1 that the unknown Asian male gave approximately 2,000 MDMA pills to SEJIN OH. CS1 further stated that SEJIN OH told CS1 that the Asian male was staying at the Chicago Lodge Motel at the intersection of Foster Avenue and Sheridan Road in Chicago, Illinois. SEJIN OH later told CS1 that SEJIN OH gave 1,000 MDMA pills to HUERTA.

[5]    Vehicle records, border crossing records and hotel records show Individual B's presence in Chicago on March 5, 2004

108.    Ontario vehicle registration records provided to ICE by the RCMP identify the vehicle bearing Ontario plate ARXH 780 as assigned to a 2002 Dodge van registered to a person with the same last name as Individual B at an address in Ontario, Canada.

109.    CBP border crossing records show that, on March 5, 2004, at approximately 9:21 p.m. (ET), a vehicle bearing Ontario license plate ARXH 780 crossed into the United States at the Detroit/Windsor Tunnel POE in Detroit Michigan.

110.    Records obtained from the Chicago Lodge Motel located at 920 West Foster Avenue, Chicago, Illinois, identify a guest with the same name as Individual B as staying

at the hotel for one evening on March 5, 2004. A vehicle associated with this guest was identified as bearing Ontario, Canada, license plate ARXH 780. The address given for the guest in hotel records was "2598 Lebocup Avenue, Windsor, Ontario, Canada."

111. Additional CBP records show border crossings (or attempted border crossings) by the vehicle bearing Ontario, Canada, license plate ARXH 780 on at least 15 separate occasions between October 24, 2003, and April 15, 2006.

    D.    <u>The Meeting Between the Canadian Suppliers, the Chinatown Facilitators and the Two Chicago Distribution Crews on June 28, 2004</u>

    [1]    <u>CS1's information regarding the June 28, 2004, meeting</u>

112. On June 28, 2004, CS1 contacted me and stated that, earlier that evening, CS1 had attended a meeting at a Korean restaurant located near the corner of Lincoln Avenue and Bryn Mawr Avenue in Chicago. CS1 was further debriefed about the incident on June 29, 2004.

113. CS1 stated that the meeting, which was not recorded, included SEJIN OH, Ivan Myint, TOMMY LO and several Chinese individuals from Canada. CS1 stated that he was invited to the meeting by SEJIN OH in order to meet with SEJIN OH's Canadian MDMA and marijuana supplier. Further, CS1 stated that SEJIN OH had told CS1 that SEJIN OH invited Ivan Myint to the meeting as well.

114. According to CS1, after they arrived at the restaurant, Ivan Myint arrived with his associate (whom CS1 identified as CD2) and another member of Ivan Myint's crew (Individual E) whom agents have subsequently identified. CS1 stated that SEJIN OH, TOMMY LO, Ivan Myint and CS1 sat at one table with three young Chinese males from Canada. CS1 stated that CD2 and Individual E sat at another table. CS1 stated that the

conversation at his table consisted of negotiations for the smuggling of marijuana into the United States. The conversation was largely translated by TOMMY LO. CS1 stated that, during the meeting, the Chinese individuals from Canada wanted SEJIN OH and Ivan Myint to purchase 100 pounds of marijuana each week for $2,800 per pound and that the marijuana would be smuggled into the United States from Ontario, Canada, by tractor-trailers. CS1 stated that he later heard that, after the meeting, CD2 went with one of the Chinese individuals to Chinatown in order to pick up 20-30 pounds of marijuana in Chinatown. CS1 also identified the license plate on one of the vehicles driven by the Chinese sources as being Ontario, Canada, plate ASDT 332. CS1 has identified a photograph of LUONG as one of the Chinese males at the meeting.

[2]    Records tie the vehicle to LUONG

115. Information obtained from RCMP identifies Ontario license plate ASDT 332 as being assigned to a black 2003 Honda Accura RSX registered to an individual from Richmond Hill, Ontario, Canada.

116. CBP border crossing records verify that, on June 25, 2004, at approximately 5:24 a.m., a vehicle bearing Ontario license plate ASDT 332, crossed from Canada into the United States at the Ambassador Bridge POE in Detroit, Michigan. Persons in the vehicle at the time of crossing included "Quoc Luong," who is believed to be defendant KENNETH LUONG.

[3]    Admissions by TOMMY LO concerning the June 28, 2004, meeting

117. During interviews, TOMMY LO stated that he was introduced to ZHOU's partner, who he knew as "Ken," when he attended a meeting in late June 2004 that took place at a restaurant located at the corner of Bryn Mawr and Lincoln Avenue in Chicago.

TOMMY LO identified a photograph of LUONG as the person he knew as "Ken." TOMMY
LO stated SEJIN OH had asked TOMMY LO to set up a meeting with ZHOU so that SEJIN
OH could start buying drugs from ZHOU again. TOMMY LO stated that he attended the
meeting at the request of SEJIN OH and that the purpose of the meeting was to discuss
the purchase of MDMA pills and marijuana from ZHOU. TOMMY LO stated ZHOU and
LUONG were at the meeting, as were SEJIN OH, CHAE and Ivan Myint (whom TOMMY
LO knew by the name "I"). During the meeting, TOMMY LO translated for SEJIN OH and
Ivan Myint because ZHOU spoke Chinese and LUONG spoke very little English. TOMMY
LO further admitted that, during the meeting, SEJIN OH and Ivan Myint were discussing
with ZHOU and LUONG the prices of MDMA pills and marijuana and the shipment of those
drugs from Canada to Chicago.

[4]    Admissions by CD2 concerning the June 28, 2004, meeting

118.   CD2 admitted in debriefings and under oath that he first met Ivan Myint at
some time in the 1980s, during which time CD2 was buying cocaine from Ivan Myint for
personal use. CD2 often picked up the cocaine from one of Ivan Myint's associates, one
of whom was SEJIN OH.

119.   When Ivan Myint was released from federal prison in 2003, Ivan Myint asked
CD2 to become partners in cell phone stores, and CD2 invested $50,000 in Ivan Myint's
cell phone business, which consisted of two stores in Chicago and Waukegan, Illinois.
Soon thereafter, CD2 began to socialize with Ivan Myint and his friends, which over time
included MICHAEL CRUZ, ROBERTO VALDEZ, Individual E, Individual G, SEJIN OH and
MICHAEL MYINT.

120. When CD2 first began working as a business partner with Ivan Myint, CD2 was aware that Ivan Myint was still selling small amounts of cocaine. CD2 later learned that Ivan Myint was involved in selling MDMA and marijuana. CD2's work for Ivan Myint at this time included picking up various amounts of drugs from Ivan Myint's suppliers, whom CD2 identified as including SEJIN OH, TOMMY LO, WU and Individual H.

121. In debriefings and testimony under oath, CD2 has admitted that, in late June 2004, Ivan Myint asked CD2 to attend a meeting with Ivan Myint, SEJIN OH, TOMMY LO and several Chinese drug dealers from Canada. CD2 stated that the meeting took place at a Korean restaurant at the corner of Bryn Mawr Avenue and Lincoln Avenue in Chicago. CD2 stated that Individual E and Ivan Myint's wife, Individual F, were also at the meeting. CD2 and Individual F sat at a different table. Ivan Myint told CD2 that SEJIN OH was being supplied MDMA and marijuana by the Chinese suppliers. CD2 was introduced to one of the Chinese individuals as "Kenny." CD2 has since identified a photograph of LUONG as the person he knew as "Kenny." CD2 remembered that another of the Chinese individuals had very yellow teeth from smoking cigarettes. CD2 identified a photograph of ZHOU as the person with the yellow teeth who was introduced to CD2 as "Kenny's" partner. Also present at the meeting was an individual named "Ray." CD2 has identified a photograph of LI XIEN WU as the person he knew as "Ray." CD2 was not part of the conversation because he sat at a different table, but afterward Ivan Myint told CD2 that they discussed how they would work together to sell MDMA and marijuana. CD2 stated that, after the meeting, Ivan Myint instructed CD2 to follow WU to Chinatown, where WU was to give CD2 20 pounds of marijuana, and to thereafter store the marijuana in CD2's apartment in Des Plaines, Illinois. CD2 then followed WU to a fish warehouse in Chicago's

Chinatown neighborhood. Once at the warehouse, WU took CD2's car and returned a short time later with the car, which then had 20 pounds of marijuana in the trunk. CD2 then took the marijuana to his apartment. CD2 later helped deliver the marijuana to Ivan Myint's customers and collected the payments from those customers for the marijuana.

[4]    Recorded meeting between UCO1 and LI XIEN WU on October 9, 2005

122.    On October 9, 2005, UCO1 met with LI XIEN WU in the role of a large scale drug dealer who purchased MDMA and marijuana from Ivan Myint. Prior to the meeting, UCO1 made multiple recorded phone calls to WU in the same undercover capacity. In those phone calls, UCO1 informed WU that UCO1 was interested in paying off Ivan Myint's drug debt to WU because UCO1 believed WU to be a possible drug supplier to UCO1.

123.    The meeting between UCO1 and WU on October 9, 2005, was consensually recorded by UCO1. During the meet, WU admitted that Ivan Myint owed to WU approximately $11,000 to $15,000. UCO1 stated that UCO1 wanted to buy MDMA (UCO1 stated that he was "looking for some M&Ms"). WU responded by stating that WU understood what UCO1 meant and that Ivan Myint ("Ivan") obtained MDMA ("M&Ms") from WU. WU told UCO1 that he brokered a deal in which WU paid for 4,000 to 5,000 MDMA pills and fronted the MDMA pills to Ivan Myint. Further, WU stated that he knew the Canadian MDMA suppliers well and that he was "friends" with the Canadian drug suppliers. WU further admitted that WU introduced the Canadian suppliers of MDMA and marijuana ("cigarettes") to Ivan Myint. WU also told UCO1 that WU knew Ivan Myint owed the Canadian suppliers a debt of more than $100,000 and that the Canadian drug suppliers regularly called WU about the debt. In talking about the Canadian suppliers that dealt with

-62-

Ivan Myint, UCO1 claimed that UCO1 had to meet them at a casino in Windsor (which was a ruse claim). WU smiled and responded, "Yes, these are the same guys."

[5]    Admissions by LI XIEN WU concerning his role in facilitating the distribution of MDMA and marijuana by ZHOU and LUONG

124.    On June 16, 2006, law enforcement officers interviewed LI XIEN WU regarding his involvement in the distribution of MDMA pills and marijuana. Before the interview, officers gave WU his Miranda warnings. WU, who speaks fluent English, stated that he wished to cooperate with law enforcement in this investigation and agreed to be interviewed. During the interview, WU admitted that he knew a Canadian Chinese individual whom he knew as "Goi." WU identified a photograph of ZHOU as the person whom WU knew as "Goi." WU stated that he had first met ZHOU in Chinatown when WU was introduced to ZHOU by ZHOU's brother.

125.    During the interview, WU also identified photographs of Ivan Myint, SEJIN OH and TOMMY LO as persons to whom he was introduced to by ZHOU at a Korean restaurant on the north side of Chicago in Summer 2004. WU stated that, during the meeting, Ivan Myint, SEJIN OH and TOMMY LO discussed the purchase and prices of MDMA and marijuana from ZHOU and ZHOU's associate. WU identified a photograph of LUONG as ZHOU's associate who attended the meeting at the Korean restaurant in Summer 2004. WU stated that he considered himself the middleman throughout the drug operation that was run by ZHOU and LUONG. In particular, WU stated it was his job to translate Chinese for Ivan Myint and SEJIN OH and then translate English for ZHOU and LUONG. WU stated that he was paid $1,000 by ZHOU every time he was asked to help translate meetings between ZHOU and SEJIN OH or Ivan Myint.

-63-

126.    WU stated that, at one point, he was asked by ZHOU to rent a warehouse in order to store the hydroponic marijuana smuggled into the United States from Canada. WU agreed to rent the warehouse, which was located at 916 West 21st Street in Chicago, Illinois. WU stated that ZHOU was supposed to pay WU between $10,000 to $15,000 in United States Currency in order to rent the warehouse where the marijuana was stored. WU stated he met with Ivan Myint's associate, CD2, on a number of occasions in order to distribute marijuana to Ivan Myint through CD2. WU stated he would also meet with CD2 in order to pick up the money that was owed by Ivan Myint for the marijuana. WU stated that he then gave to ZHOU the money that WU had received from CD2 in payment for marijuana.

127.    On later occasions, law enforcement officers conducted additional interviews of LI XIEN WU. Prior to each interview, officers again gave WU his Miranda warnings. During those subsequent interviews, WU informed the officers that, on one occasion, WU was present in Chicago when ZHOU and LUONG took possession of a load of marijuana from a tractor-trailer that came from Toronto, Canada. WU stated that the marijuana was secreted in a number of large cardboard boxes and that WU stored these boxes at his warehouse on West 21st Street in Chicago. WU stated that, whenever LUONG or ZHOU needed to sell the marijuana, WU went to his warehouse on West 21st Street and retrieved the marijuana for ZHOU or LUONG. On a couple occasions, WU also picked up marijuana from the back of LUONG's vehicle, which was a silver colored Mercedes Benz.

128.    WU further stated that Ivan Myint eventually owed to WU as much as $10,000 for the marijuana that Ivan Myint obtained from WU and that, after trying to get Ivan Myint to pay his debt, WU and Individual H went to Ivan Myint's cell phone store in

-64-

Waukegan, Illinois, in order to collect the debt.

129.   During a subsequent interview, officers played intercepted phone calls between LUONG and ZHOU.  WU identified the voice of ZHOU on the recordings.

E.   The Controlled Buys of MDMA by CS1 from SEJIN OH, HUERTA and Others in July and August 2004

130.   The investigation has revealed that, after the meeting on June 28, 2004, SEJIN OH, in partnership with Ivan Myint and TOMMY LO, again began to get supplied with MDMA and marijuana from the Canadian suppliers.

[1]   Information provided by CD2 regarding the trafficking of MDMA and marijuana by SEJIN OH, CHAE, TOMMY LO, Ivan Myint and others

131.   In debriefings and under oath, CD2 stated that, on at least three occasions, CD2 picked up several thousand MDMA pills from a guy named "Andy" who worked for SEJIN OH.  In particular, CD2 remembered twice going to SO's apartment to pick up MDMA, as well as picking up a "couple thousand" MDMA pills from SO at SO's car wash in Skokie, Illinois.  CD2 has identified a photograph of ANDREW SO as the person he knew as "Andy."  CD2 has also stated that Ivan Myint was also buying marijuana from SEJIN OH and that, on several occasions, at Ivan Myint's instructions, CD2 picked up several pounds of marijuana from an associate of SEJIN OH's named "John."   CD2 identified a photograph of BAE as the person he knew as SEJIN OH's associate named "John".  CD2 specifically recalled picking up the marijuana from an apartment on North Western Avenue in Chicago that SEJIN OH and others referred to as the "Warehouse."

132.   CD2 also knew of another occasion on which Ivan Myint purchased 1,000 MDMA pills from TOMMY LO, whom CD2 identified as SEJIN OH's partner.  At Ivan Myint's direction, CD2 picked up the pills from TOMMY LO in Chinatown.

133.   CD2 stated that Ivan Myint also began buying marijuana from WU.   In addition to the 20 pounds of marijuana that CD2 received from WU after the June 2004 meeting, which was fronted, CD2, at Ivan Myint's direction began picking up approximately 10-20 pounds of marijuana from WU on a weekly basis.   Each time, CD2 obtained the marijuana in the same manner as he did after the June 2004 meeting.   On multiple occasions, CD2 delivered the payment for the marijuana to WU or Individual H, whom CD2 understood to be WU's cousin.   On at least one occasion, WU and Individual H went to Ivan Myint's cell phone store in Waukegan to collect some of the approximately $10,000 in debt owed by Ivan Myint for the marijuana that Ivan Myint purchased from WU.

[2]   <u>Information provided by CD1 regarding the trafficking of MDMA and marijuana by SEJIN OH, TOMMY LO, Ivan Myint, CD2 and others</u>

134.   CD1 stated in debriefings and under oath that, in Summer 2004, SEJIN OH and CHAE negotiated with another Canadian drug dealer named "Kenny" about possible drug deals in the future.   CD1 met with the Canadian drug dealer named "Kenny."   CD1 has identified a photograph of LUONG as the person CD1 knew as "Kenny."   Based upon CD1's conversations with SEJIN OH, CD1 knew that SEJIN OH, Ivan Myint and TOMMY LO were trying to work out larger drug deals with "Kenny" from Canada and that SEJIN OH and CHAE were again partnering in the trafficking of drugs, particularly marijuana.   Also during this time, SEJIN OH was selling marijuana to Ivan Myint.

[3]   <u>Controlled purchase of 100 MDMA pills from HUERTA and JOAHAN TRUJILLO by CS1 on July 9, 2004</u>

135.   On July 8, 2004, CS1 told law enforcement officers that SEJIN OH had informed CS1 that SEJIN OH had sold approximately 2,000 to 3,000 MDMA pills to HUERTA and that, if CS1 wanted to buy MDMA, CS1 should contact HUERTA.

-66-

136.    Later on July 8, 2004, CS1 placed a consensually recorded telephone call to HUERTA to determine if HUERTA would sell MDMA to CS1. During that conversation, CS1 told HUERTA that CS1 wanted to buy some MDMA from HUERTA so that CS1 could resell the MDMA (CS1 requested some "M&Ms for a fundraiser"). HUERTA asked CS1 if CS1 wanted the same MDMA that SEJIN OH had obtained ("Like Sejin's, you mean?").[10] CS1 responded affirmatively.

137.    On the early afternoon of July 9, 2004, at approximately 1:02 p.m., CS1 placed a consensually recorded telephone call to HUERTA in order to purchase MDMA from HUERTA  During the call, CS1 and HUERTA discussed CS1's purchase of 100 MDMA pills ("M&Ms") from HUERTA. HUERTA indicated that he had paid money to SEJIN OH for MDMA pills ("I borrowed him the money"). In another consensually recorded telephone call made at approximately 1:40 p.m., HUERTA told CS1 that one of HUERTA's associates was going to give the MDMA to CS1 ("old boy said he was going to hit you up"). After CS1 asked HUERTA who "old boy" was, HUERTA responded, "one of my niggas."

138.    Thereafter, at approximately 2:10 p.m., CS1 received on CS1's cell phone a consensually recorded incoming telephone call from an individual who identified himself as "J." "J" also said he was HUERTA's cousin ("I'm G's cousin"). "J" also told CS1 that, according to his instructions from HUERTA, $9.50 per pill was the best price that "J" could offer to CS1 for the MDMA pills ("he told me to tell you that the best I can do is nine and a half. . . . you know, that's what he gives it to me for, nine and a half, . . . that's as low as I can go"). CS1 agreed to buy 100 pills. The two agreed to conclude the transaction that

---

[10] CS1 identified the recipient of the call as HUERTA. Based upon conversations that I have had with HUERTA, I can also identify the voice as that of HUERTA.

day.

139.    Before the meeting between "J" and CS1, officers searched CS1 and CS1's vehicle for any illegal contraband with negative results. CS1 was then provided with $950 in government funds in order to pay "J" for the 100 MDMA pills. In addition, CS1 was fitted with digital recording device in order to record the conversations with "J." CS1 was then followed by law enforcement officers directly to the Shell gas station at 7201 West Higgins Road in Chicago, Illinois.

140.    At approximately 4:55 p.m., surveillance observed a black colored Nissan Maxima bearing Illinois plate 589 6455 park in the Wendy's parking lot just south of the Shell gas station. Based upon the videotape recording of the deal and an ISOS photograph of HUERTA, surveillance identified HUERTA as the driver of the Nissan Maxima. Surveillance also saw a then-unknown latino male in the car with HUERTA. According to ISOS records, Illinois license plate 589 6455 was then registered to HUERTA at 1707 North Parkside, Chicago, Illinois.

141.    Surveillance then observed the passenger in HUERTA's car walk through the Wendy's restaurant and then over to CS1's car, which was located in the Shell gas station parking lot. UCO1 and other officers assisting on the operation observed HUERTA's passenger from a close enough distance that they were able to later identify an ISOS photograph of HUERTA's passenger as JOAHAN TRUJILLO ("TRUJILLO"). The deal was also videotaped. Surveillance then observed CS1 and TRUJILLO in brief conversation with CS1 inside CS1's car. As heard on the recording, TRUJILLO introduced himself as "John" when he got inside CS1's car. CS1 then gave the $950 in buy money to TRUJILLO for the MDMA. TRUJILLO then left CS1's vehicle and walked back to HUERTA's vehicle.

HUERTA's vehicle then departed from the area. CS1 then exited the area under continuous surveillance to a predetermined location.

142.    At the meeting location, CS1 gave to law enforcement officers two clear plastic baggies containing approximately 100 multi-colored pills of suspect MDMA. The pills were not contained in any other packaging. CS1 did not have any of the government buy funds in his possession. CS1 and CS1's vehicle were searched by law enforcement for any illegal contraband with negative results.

143.    The pills that TRUJILLO gave to CS1 were later inventoried and subjected to laboratory testing. There were 100 pills consisting of 48 pink pills bearing a curved arrow logo and 52 purple pills bearing an apple logo. All of the pills tested positive for the presence of MDMA and methamphetamine. The weight of all the pills combined was over 23 grams.

144.    Approximately 15 minutes after TRUJILLO delivered the 100 pills to CS1, CS1 placed a consensually recorded telephone call to HUERTA. HUERTA answered the call. During the conversation, HUERTA confirmed for CS1 that both kinds of pills given to CS1 by TRUJILLO had the same potency:

CS1:        Hey, I just met your guy, everything's cool . . .

HUERTA:     Okay, cool, you straight?

CS1:        He came through for me.  Just one question.

HUERTA:     Go ahead, bro.

CS1:        Are these both the same?

HUERTA:     What did he give you bro?

CS1:       One's got a little apple, one's got some kind of freakin', uh, arrow on it.

HUERTA:   It's suppose, I thought he was going to give you all the same, but, nah, they're all good, you're all good. . . Alright, bro, be careful, nigga.

Based upon my experience and training, and the other evidence in this case, the foregoing conversation between CS1 and HUERTA suggests that HUERTA employs TRUJILLO to store, repackage and distribute HUERTA's MDMA.

> [4]    Controlled purchase of 200 MDMA pills from SEJIN OH, ANDREW SO and JUNG BAE on July 13, 2004, and the receipt of an additional 51 MDMA pills from SEJIN OH on July 14, 2004

145.    On July 13, 2004, at the direction of law enforcement officers, CS1 completed the controlled purchase of approximately 200 MDMA pills from SEJIN OH and ANDREW SO, with assistance from JUNG BAE.

146.    In particular, at approximately 12:25 p.m. on July 13, 2004, CS1 placed a consensually recorded telephone call to SEJIN OH. Both CS1 and UCO1 have been able to identify SEJIN OH's voice on the call. During the conversation, CS1 asked SEJIN OH if CS1 could buy 200 MDMA pills. In particular, after SEJIN OH asked CS1 how many MDMA pills CS1 wanted ("How many ya' gonna take?"), CS1 responded, "two." SEJIN OH confirmed the number by repeating, "two." SEJIN OH instructed CS1 that CS1 had to pick up the MDMA from SO's residence because SO did not take the MDMA pills to SO's car wash ("He didn't bring it out to work. I didn't ask him, I didn't tell him"). Based upon a previous unrecorded conversation between CS1 and SEJIN OH, CS1 understood that the MDMA would be fronted to him.

147.   CS1 informed officers that, at that time, SO was storing SEJIN OH's MDMA at SO's apartment and was also distributing MDMA to SEJIN OH's customers. CS1 also informed officers that SO typically used the code term "invitations" to refer to MDMA.

148.   At approximately 2:47 p.m. on July 13, 2004, CS1 placed another consensually recorded telephone call to SO. SO answered the call and spoke with CS1. SO's voice can be identified by CS1 and UCO1, who had previously spoken with SO at a social gathering. During the conversation, CS1 asked if SO had heard from SEJIN OH and SO indicated that he had gotten a call from SEJIN OH but missed the call. SO then gave CS1 the number of SO's "girl" and told CS1 to call her when CS1 was near SO's home. SO then asked how much MDMA CS1 wanted to buy and when CS1 might want to get it ("Give me an estimated time so I can let her know. How many invitations do you need?"). CS1 then requested 200 MDMA pills ("Ah, I need about 200 invitations, a pretty descent size wedding"), but SO told CS1 that they were only available in packages of 1,000 ("200, I don't have them like that, they're in a thousand packs"). CS1 then asked SO to "count it out" and SO objected ("Nobody told me I should separate those invitations"). CS1 then asked if SO's "girl" could separate out 200 MDMA pills ("Can she count them out?") and SO agreed to have her do so ("I guess so, if her calculations are incorrect it's not my fault, okay").

149.   Later in the afternoon, CS1 and SEJIN OH engaged in additional phone calls about the CS1's purchase of 200 MDMA pills from SEJIN OH. SEJIN OH originally instructed CS1 to meet SEJIN OH at SO's residence, but later instructed CS1 to meet with SEJIN OH at "Jonathan's house," which CS1 understood as a reference to JUNG BAE's apartment. CS1 was aware that BAE stored drugs for SEJIN OH in the apartment, which

SEJIN OH and other members of his crew referred to as "the Warehouse."

150.    Later on the afternoon of July 13, 2004, in anticipation of the meeting between SEJIN OH and CS1, law enforcement searched CS1 and CS1's vehicle for contraband. A small amount of suspect marijuana (not hydroponic marijuana) was found on the passenger side of the car. CS1 stated that CS1 believed the marijuana may have been left behind by a passenger who rode in the car the previous evening. No other contraband was found. CS1 was outfitted with digital recording equipment and then directly followed under law enforcement surveillance to the multi-story apartment building at 4321 North Western Avenue in Chicago, Illinois.

151.    Upon arriving near BAE's apartment, CS1 parked his car and then traveled up to BAE's apartment on the second floor of the building at 4321 North Western Avenue in Chicago, Illinois. Inside the apartment, CS1 made contact with SEJIN OH and BAE. During the ensuing conversation, CS1 told SEJIN OH to not let Ivan Myint impair SEJIN OH's relationship with the Canadian drug dealers ("Don't let him fuck this connect up man" and "Don't let Ivan fuck this up man"). In response, SEJIN OH suggested that he was considering the possibility of obtaining drugs from other sources ("I have more, I have two others . . . I'm working on it"). CS1 also stated that he did not make much money from his prior purchase of MDMA from HUERTA on July 9, 2004, and, in response, SEJIN OH suggested that HUERTA had taken advantage of CS1 by charging CS1 $9.50 per pill, but that CS1 should not be upset ("He got you . . . it's just business"). Furthermore, CS1 asked SEJIN OH why SO was reluctant to count out 200 MDMA pills for CS1 ("How come Andy did not want to count out the 200 for me?"), and SEJIN OH responded by stating that SO was "paranoid." Also during the conversation, CS1 asked BAE if CS1 could see the

marijuana that BAE was storing at his apartment ("Where's the stinky stuff?").  BAE responded by asking whether CS1 had a marijuana buyer lined up ("Why you got somebody?").  BAE's voice can be identified by officers based upon a later interview of BAE. CS1 confirmed that CS1 "just want[ed] to see the batch." According to CS1, BAE then showed CS1 the marijuana while BAE stated, as heard on the recording, that the marijuana smelled bad ("This is bad, this is worse").

152.    After CS1 left the apartment, he was followed under law enforcement surveillance to a predetermined meet location.  At that location, CS1 gave to law enforcement officers a black plastic baggie containing approximately 200 pills of suspect MDMA.  CS1 and the CS1's vehicle were searched by law enforcement for any illegal contraband with negative results.

153.    The pills that SEJIN OH gave to CS1 were later inventoried and subjected to laboratory testing.  There were 181 purple pills bearing an apple logo, which was the same as approximately one-half of the pills HUERTA had given to CS1 on July 9, 2004. The pills tested positive for the presence of MDMA and methamphetamine.  The weight of all the pills combined was over 40 grams.

154.    At approximately 12:55 a.m. on July 14, 2004, CS1, at the direction of law enforcement officers, placed a consensually recorded telephone call to SEJIN OH. During the call, CS1 told SEJIN OH that CS1 was ready to repay SEJIN OH for the 200 MDMA pills that SEJIN OH had sold to CS1 on July 13, 2004.  SEJIN OH told CS1 to meet SEJIN OH at BAE's apartment.

155.    Before the meeting with SEJIN OH, CS1 and the CS1's vehicle were searched by law enforcement officers for any illegal contraband with negative results. CS1

-73-

was then provided with $800 in official government funds in order to pay SEJIN OH for the 200 (actually 181) MDMA pills. In addition, CS1 was fitted with a digital recording device in order to record the conversations between himself and SEJIN OH. CS1 then drove under visual surveillance to BAE's apartment at 4321 North Western Avenue in Chicago.

156.   CS1 arrived near BAE's apartment at approximately 1:21 a.m. on July 14, 2004.   Surveillance observed BAE walk up to CS1's car and engage CS1 in brief conversation. BAE told CS1 that BAE was supposed to collect the payment for the MDMA pills sold to CS1 on July 13, 2004. CS1 refused and said he would wait for SEJIN OH. While they were waiting and later inside the apartment, BAE and CS1 talked about the marijuana BAE was storing at the apartment. In particular, BAE stated that customers do not like moldy marijuana ("They don't buy it, it's dank, mold's not good for you") and that BAE mixed the marijuana because of mold that develops on some of the marijuana ("Not all of them are moldy, cause the bottom ones are moldy, so I mix them up"). CS1 also suggested that it was dangerous for BAE to have the marijuana stored at his apartment ("He left 10 grand on the table? Aren't you nervous about having all that here? It's one thing if you're trying to be careful . . ."). BAE replied that it was "not the smartest thing" but that SEJIN OH may be moving his storage location ("he said he's going to move it"). BAE affirmed that SEJIN OH was likely going to move the drugs to "Bryn Mawr," which I believe is a reference to SEJIN OH's residence on Bryn Mawr Avenue in Chicago.

157.   CS1 eventually made contact with SEJIN OH inside the apartment. Upon meeting with SEJIN OH, CS1 counted out $800 for SEJIN OH as payment for the MDMA purchased on July 13, 2004. CS1 asked SEJIN OH if he had any more MDMA ("Hey, you got any more?") and SEJIN OH responded by saying, "Yeah." According to CS1, at that

-74-

point, SEJIN OH reached into the pocket of his pants and handed to CS1 a loose group of suspect MDMA pills.

158.    At approximately 1:42 a.m., surveillance units observed CS1 exit from BAE's apartment building, enter his car and drive under surveillance to a predetermined location. At that location, CS1 provided to officers approximately 51 purple pills bearing an apple logo. Further, CS1 and CS1's vehicle were searched by law enforcement for any illegal contraband with negative results.

159.    The 51 pills that SEJIN OH gave to CS1 were later subjected to laboratory testing. The pills tested positive for the presence of MDMA and methamphetamine. The weight of all the pills combined was over 11 grams.

> [5]    Controlled purchase of 120 MDMA pills from SEJIN OH on July 29, 2004

160.    On July 28, 2004, CS1 met with SEJIN OH to arrange for CS1 to buy 200 MDMA pills from SEJIN OH. Following multiple consensually recorded and monitored phone calls between SEJIN OH and CS1, CS1 and SEJIN OH met at a fast food restaurant near the 6200 block of North Lincoln Avenue in Chicago, Illinois, to discuss a buy of MDMA from SEJIN OH. CD1 was also present for part of the meeting. Prior to the meeting, CS1's person and vehicle were searched for contraband with negative results and CS1 was outfitted with a digital recording device. During the conversation, CS1 asked if TOMMY LO could sell MDMA to CS1 ("Can Tommy help me out?"). SEJIN OH replied, "I can ask Tommy or I can ask one of the guys." SEJIN OH also asked CS1 how much MDMA CS1 wanted ("How many you need?") and CS1 told SEJIN OH that CS1 wanted 200 MDMA pills ("200"). Immediately after that statement, the following exchange occurred:

-75-

SEJIN OH:    Tommy wants to get rid of the kangaroos . . . they're kind of bad.

CS1:    What price is he askin'?

SEJIN OH:    5 or 6.

CS1:    How soon can we get them?

SEJIN OH:    Tommy can get the kangaroos for 5.  Whenever . . . got to talk to Tommy . . . the yellow apples are the best ones

CS1:    You had the purple apples, right?  Oh no, Jorge had the purple apples, right?

SEJIN OH:    Yeah, . . . the yellow apples are the best ones now.

CS1:    You should have them make an omega stamp.

SEJIN OH:    It doesn't matter . . . I'll try.

. . .

CS1:    Tommy's coming here?

SEJIN OH:    Yeah.

CS1:    What time will you have an answer.

SEJIN OH:    Just be ready tomorrow.

CS1:    Tommy has a different hookup, right?

SEJIN OH:    Tommy has the same hookup . . . Tommy's trying to spread it out . . . I gotta get another $30,000 by next week.

Based upon my experience and training and the other evidence in this case, I believe that in the foregoing portion of conversation SEJIN OH informed CS1 that TOMMY LO could sell to CS1 200 MDMA pills bearing a kangaroo logo.  In addition, SEJIN OH expressed an awareness of the types of pills being sold by TOMMY LO and HUERTA, and acknowledged that he could order a personalized logo from the Canadian MDMA supplier.

-76-



SEJIN OH also confirmed his knowledge that TOMMY LO and SEJIN OH were being supplied MDMA from a common supplier.

161.    At approximately 1:35 p.m. on July 28, 2004, CS1, at the direction of law enforcement, placed a consensually recorded telephone call to SEJIN OH in order to conclude CS1's purchase of 200 MDMA pills from SEJIN OH. SEJIN OH indicated in the conversation that SEJIN OH would be ready to conclude the deal at approximately 4:00 p.m. in the afternoon.

162.    At approximately 3:40 p.m., CS1 placed another consensually recorded call to SEJIN OH regarding the purchase of 200 MDMA pills from SEJIN OH. During that call, SEJIN OH instructed CS1 to proceed to BAE's apartment to meet with SEJIN OH.

163.    Before the meeting between SEJIN OH and CS1, officers searched CS1 and CS1's vehicle for contraband with negative results. CS1 was then fitted with a digital recording device for the purpose of recording conversation between CS1 and SEJIN OH. CS1 was given $1,300 in government funds in order to buy the MDMA from SEJIN OH. CS1 then drove in his vehicle under law enforcement surveillance to BAE's apartment.

164.    Upon arriving near BAE's apartment at approximately 4:19 p.m., CS1 parked his vehicle and then walked up to BAE's apartment. CS1 met with and conversed with SEJIN OH. During their conversation, SEJIN OH stated that he only had 120 MDMA pills ("All I got is 120"). CS1 then confirmed that the deal was for 120 pills ("120?") and SEJIN OH agreed ("Yeah, 120"). When CS1 asked the total price for the pills ("120 times 5, what is that?"), SEJIN OH mistakenly calculated the total purchase price as being $640 ("700 . . . no, 640"). SEJIN OH also told CS1 that SEJIN OH would have to get CS1 the remainder of the MDMA later because SEJIN OH needed to get it from CHAE ("I'll give you

the rest tonight, I have to go get it from Big John"). SEJIN OH further stated that he was

trying to get another 1,000 MDMA pills from Ivan Myint ("I'm trying to get some more from

'I,' another 1,000") because SEJIN OH had no MDMA to sell ("I'm minus right now, the stuff

is not coming"). SEJIN OH confirmed that he could sell 100 MDMA pills to CS1 at that time

("I can do a hundred right now"). During their meeting, SEJIN OH handed to CS1 a

quantity of pills in a clear plastic baggie and CS1 paid SEJIN OH for the MDMA pills.

165.    At approximately 4:26 p.m., surveillance units observed CS1 exit from the

apartment building, enter his car and drive under surveillance to a predetermined location.

At that location, CS1 provided to officers a plastic baggie containing numerous pills of

suspect MDMA. Further, CS1 and CS1's vehicle were searched by law enforcement for

any illegal contraband with negative results. CS1 was found to be in possession of only

$640 of government buy money (CS1 gave SEJIN OH $660 in buy funds).[11]

166.    The pills that SEJIN OH gave to CS1 on July 29, 2004, were later subjected

to laboratory testing. The pills consisted of 120 purple pills bearing an apple logo. The

pills tested positive for the presence of MDMA and methamphetamine. The weight of all

the pills combined was over 26 grams.

[6]    Information from CS1 on August 9, 2004, and evidence of a border
crossing by LUONG and/or one of his associates

167.    On August 9, 2004, CS1 informed me that SEJIN OH's new address was in

the 3200 block of West Bryn Mawr Avenue in Chicago. CS1 further told me that TOMMY

---

[11] My report of this incident incorrectly states that the amount of buy money given
to CS1 for this deal was $1,000 and that CS1 returned $340. I have conferred with
DPCSO, which was responsible for the buy money, and have since confirmed that CS1
was given $1,300 and returned $640.

LO's address was in a building next to SEJIN OH's apartment building. CS1 also stated that SEJIN OH told CS1 that SEJIN OH had given 7,000 MDMA pills to Ivan Myint, who was now indebted to SEJIN OH for at least $30,000. SEJIN OH also told CS1 that SEJIN OH believed that Ivan Myint was failing to properly pay for the marijuana that they were getting from Canada. SEJIN OH also told CS1 that the Chinese suppliers from Canada were coming to Chicago that week in order to meet with SEJIN OH. During the same conversation, CS1 asked SEJIN OH for some MDMA, but SEJIN OH said that he was out of MDMA. However, SEJIN OH said that TOMMY LO had MDMA and that SEJIN OH would ask TOMMY LO to sell MDMA to CS1.

168.    CBP records show that on August 5, 2004, at approximately 6:35 a.m. (ET), a vehicle bearing Ontario license plate ATCJ 488 entered the United States from Canada at the Ambassador Bridge POE in Detroit, Michigan. LUONG and ZHOU were the occupants of the car. RCMP has identified the car as registered to a relative of LUONG's.

[7]    August 11, 2004, in person meeting between SEJIN OH and CS1

169.    On August 11, 2004, at approximately 12:30 a.m., CS1 told me that on the previous day (August 20, 2004,) CS1 had met with SEJIN OH and that, among other things, SEJIN OH had informed CS1 that TOMMY LO refused to sell MDMA to CS1 because TOMMY LO thought that CS1 was cooperating with law enforcement officers. SEJIN OH also told CS1 that, also on August 10, 2004, SEJIN OH had met with the Canadian marijuana suppliers who were mad that they were not getting repaid on a timely basis for the marijuana. SEJIN OH blamed the repayment problems on Ivan Myint.

170.    On August 11, 2004, CS1, at the direction of law enforcement officers met with SEJIN OH at SEJIN OH's apartment at 3217 West Bryn Mawr Avenue in Chicago in

-79-

order to discuss with SEJIN OH the possibility of purchasing an additional 300 MDMA pills

from SEJIN OH. CS1 was wearing a digital recording device placed upon his person by

officers. During the meeting, CS1 and SEJIN OH discussed the various persons involved

in their drug trafficking operation. SEJIN OH stated that he was trying to re-establish his

credit with the Canadian suppliers, whom SEJIN OH identified as associates of TOMMY

LO, and further stated that TOMMY LO is expecting a commission from the MDMA that has

been trafficking to SEJIN OH:

SEJIN OH:    Tommy is like, fuck, he wants some commission. The guy promised him some commission.

CS1:    He wants commission from you or the other guy?

SEJIN OH:    The other guy. Anyway, Tommy owes a lot of guys in Chinatown money. One of . . ., this guy who's giving it to me is his friend and owes him like $80,000. He wants me to set him up, tell him to come, he wants me to tell him I gave Tommy the commission thing already, a deduct it from the stuff that he has given me. I'm like, fuck, then he is not going to give me credit again. I'll tell him to call him, everyone is just thinking about themselves. . . . I told him my situation and that I built my credit up. I'm running around, if I get cut off I don't have nothing.

CS1:    You gotta keep your connect straight. If Ivan doesn't come up with the money, that's kinda on you in a way, because you introduced him?

SEJIN OH:    Ivan doesn't know him.

CS1:    This is on you. Didn't Tommy introduce you to him?

SEJIN OH:    Tommy introduced to the other guy, the guy that I'm getting this from. And then the other guy I met when I went up, and then I introduced him to Tommy.

CS1:    How's Tommy still straight with this guy?

-80-

SEJIN OH:  Cause Tommy speaks his language. . . . That guy speaks Chinese.

Further into the conversation, CS1 asked about MDMA trafficking ("the E thing") and asked to meet TOMMY LO's supplier. SEJIN OH indicated that the supplier "can't come into the States" because "he has a case." CS1 asked how the drugs would then get into the United States ("So, how does he get the stuff over here?") and SEJIN OH indicated that the supplier uses couriers ("He has people. I could introduce you to his people, but that won't do any good"). SEJIN OH also told CS1 that CS1 would have to travel to Canada in order to meet TOMMY's drug source ("connect"). In addition, SEJIN OH suggested that Ivan Myint was obtaining drugs from the same source: "If I was going to get caught I hope I get caught now. Ivan is going through the guys I'm going through, the guys that I was going through as the warehouse over here. Those guys are moving it, they're moving it to Ivan." SEJIN OH also suggested that he was looking into possibly obtaining MDMA from another source: "I have someone else, but their price is higher, like $5.50. The same guys from before, but you have to order like 5,000 at a time."

[8]  Controlled purchase of 300 MDMA pills from SEJIN OH and TOMMY LO on August 17, 2004

171.  On August 16, 2004, CS1 called me and told me that, on the previous day, CS1 was at SEJIN OH's apartment on West Bryn Mawr Avenue in Chicago and that, while CS1 was there, SEJIN OH gave to CS1 approximately 200 MDMA pills that were in plastic baggies. CS1 then put the baggies of MDMA pills into a cigarette box and intentionally left the MDMA pills in SEJIN OH's apartment because CS1 knew that he could not be in possession of drugs outside of the control of law enforcement officers. CS1 stated that the pills were pink in color and bore the logo of a kangaroo. The kangaroo logo made CS1

believe that the pills came from TOMMY LO.

172.    On the afternoon of August 17, 2004, law enforcement officers directed CS1 to go to SEJIN OH's apartment to obtain the MDMA pills that CS1 had left at SEJIN OH's apartment on August 15, 2004. Before the meeting between CS1 and SEJIN OH, CS1 and CS1's vehicle were searched by law enforcement for any illegal contraband with negative results. In addition, CS1 was fitted with digital recording device in order to record the conversations between CS1 and SEJIN OH. CS1 then drove in CS1's vehicle under law enforcement surveillance to SEJIN OH's apartment at 3217 West Bryn Mawr Avenue in Chicago. Upon reaching the vicinity of the apartment at 2:45 p.m., CS1 parked his car and proceeded on foot to SEJIN OH's apartment.

173.    Inside the apartment, CS1 made contact with SEJIN OH and the two of them engaged in conversation. SEJIN OH gave to CS1 a cigarette box that contained three plastic baggies. SEJIN OH stated to CS1 that each plastic baggie contained 100 MDMA pills ("There's three hundred, a hundred in each"). CS1 then told SEJIN OH that he should have the money for the pills that night and that he had trouble identifying the kangaroo logo on the pills ("These any good, these kangaroos? I can only tell they're kangaroos cause you told me they were"). SEJIN OH then showed the logo to CS1 (on the recording, SEJIN OH can be heard to say "See, right here."). CS1 then asked if TOMMY LO had any more such pills ("Tommy have any more of these?") and SEJIN OH confirmed that TOMMY LO did have more such pills ("Yeah"). When CS1 asked how many more such pills TOMMY LO had, SEJIN OH responded, "Thousands." CS1 then asked, "So, you want me to pay him or you?" SEJIN OH responded, "Him." Based upon my experience and training, and the other evidence in this case, it appears that SEJIN OH brokered this sale of MDMA to

CS1 for TOMMY LO.

174. At approximately 3:02 p.m., surveillance units observed CS1 exit from the apartment building, enter his car and drive under surveillance to a predetermined location. At that location, CS1 provided to officers three plastic baggies containing numerous pills of suspect MDMA. Further, CS1 and CS1's vehicle were searched by law enforcement for any illegal contraband with negative results.

175. The pills that SEJIN OH gave to CS1 on August 17, 2004, were later subjected to laboratory testing. The pills consisted of 298 reddish-orange pills bearing a kangaroo logo. The pills tested positive for the presence of MDMA and methamphetamine. The weight of all the pills combined was over 69 grams.

176. At approximately 1:30 a.m. on August 18, 2004, before having CS1 pay SEJIN OH for the approximately 300 MDMA pills purchased on August 17, 2004, officers again searched CS1 and CS1's vehicle for the presence of contraband or money with negative results. CS1 was given $1,500 in government funds to be used to pay for the MDMA and CS1 was outfitted with a digital recording device. CS1 then drove under law enforcement surveillance to SEJIN OH's apartment at 3217 West Bryn Mawr Avenue in Chicago. CS1 met with SEJIN OH's girlfriend, who informed CS1 that SEJIN OH was not home at that time. CS1 then left the apartment and contacted law enforcement officers. CS1's returned the $1,500 in buy money to the officers. CS1's person and vehicle were again searched with negative results.

177. At approximately 2:00 a.m., CS1 received a consensually recorded incoming telephone call from SEJIN OH. During the call, SEJIN OH instructed CS1 to drop the purchase money off with SEJIN OH's girlfriend. SEJIN OH also told CS1 that SEJIN OH

and TOMMY LO had spoken with each other and that TOMMY LO wanted to meet with CS1 at a bar to talk. SEJIN OH told CS1 not to worry about TOMMY LO. However, SEJIN OH told CS1 not to tell TOMMY LO that CS1 obtained the approximately 300 MDMA pills from SEJIN OH ("Don't tell him that, um, you that is his . . . That you know that is his, because I told him, he doesn't know that I sold it").

178.   CS1's person and vehicle were again searched for contraband with negative results and officers again provided CS1 with $1,500 in government funds. The digital recording device remained on CS1's person. CS1 was then followed under law enforcement surveillance to SEJIN OH's apartment on West Bryn Mawr Avenue in Chicago.

179.   At approximately 2:20 a.m., CS1 arrived in the vicinity of SEJIN OH's apartment, parked CS1's vehicle and then went inside SEJIN OH's apartment. Inside the apartment, CS1 paid the $1,500 in buy money to SEJIN OH's girlfriend. On the street in front of the building, CS1 encountered TOMMY LO. After some initial conversation, the following exchange between the two of them takes place:

| | |
|---|---|
| LO: | You got to stop by. |
| CS1: | OK, this weekend I will. |
| LO: | You get from him already? The candy? How come you call me and talk about candy? |
| CS1: | I just paid her. Sejin told that you think I'm . . . |
| LO: | I know. How can you talk on the phone candy? Call me out first. I know this phone is tapped. I know who is tapping my phone. When you have time, come by. I'm fucking hooked up now. |

Based upon my experience and training and the other evidence in this case, I believe that

in the foregoing conversation TOMMY LO told CS1 that CS1 should not speak openly about MDMA ("candy") on the phone but that TOMMY LO was willing to sell MDMA to CS1 because TOMMY LO has a large quantity of MDMA for sale ("I'm fucking hooked up now"). Further, TOMMY LO's reference to the MDMA that CS1 obtained from SEJIN OH ("You get from him already? The candy?") confirms that TOMMY LO was the source of the MDMA sold to CS1 on this particular occasion.

[9]    Controlled purchase of 1,000 MDMA pills by CS1 from SEJIN OH and
SO on August 27, 2004

180.    On the afternoon of August 25, 2004, CS1, at the direction of law enforcement officers, placed a consensually recorded phone call to SEJIN OH in an effort to arrange the purchase of 200 MDMA pills from SEJIN OH. In that call, CS1 asked if he could purchase an additional 200 MDMA pills from TOMMY LO through SEJIN OH. SEJIN OH stated that he would be able to sell the MDMA to CS1 but that the MDMA was being stored by SO. SEJIN OH also informed CS1 that TOMMY LO had been arrested by the Chicago Police Department ("CPD").[12]

181.    On August 26, 2004, in another consensually recorded telephone call, SEJIN OH informed CS1 that TOMMY LO's bond was set at $150,000 for robbery.

182.    On August 27, 2004, at approximately 8:26 a.m., CS1 engaged in a consensually recorded phone call with SO. In that call, CS1 asked SO if CS1 could come SO's car wash at 7236 Niles Center Road in Skokie, Illinois, in order to obtain the MDMA that SEJIN OH was selling to CS1. SO agreed that it was acceptable for CS1 to come to

---

[12] A law enforcement database confirms that CPD arrested TOMMY LO on August 24, 2004, for the offense of armed robbery with a firearm.

SO's car wash.

183.   Later that day, before the meeting between SO and CS1, officers searched

CS1's person and vehicle for any illegal contraband with negative results. CS1 was also

outfitted with a digital recording device in order to record the conversations between CS1

and SO. Law enforcement officers also provided CS1 with $1,000 government funds to

complete the purchase of the MDMA. CS1 then drove in his car under law enforcement

surveillance to the "Preferred Hand Wash and Car Detailing" located at 7236 Niles Center

Road.

184.   Upon arriving at the car wash at approximately 10:26 a.m., CS1 parked his

car and made contact with SO and the two discussed CS1's purchase of MDMA from

SEJIN OH and SO. In their conversation, SO told CS1 that SO had "the yellow ones" and

that "it's what I got left, I got two." CS1 saw, however, that SO intended to give to CS1

2,000 MDMA pills rather than 200 MDMA pills. SO told CS1 that SEJIN OH had told SO

that CS1 was coming to purchase 2,000 MDMA pills ("No, no, no, he said you were going

to take all of them"). CS1 then told SO that CS1 did not have enough money to buy 2,000

pills ("I don't know. I'll grab 'em. I don't have the loot for this, I wasn't expecting this"). SO

then unsuccessfully tried to call SEJIN OH. SO told CS1 to "take it all," but CS1 expressed

reluctance.[13]

185.   CS1 then returned to CD1's car and called the controlling agents to ask for

---

[13] Based upon this exchange between CS1 and SO, it appears that CS1 and
SEJIN OH had a misunderstanding in their August 25, 2004, conversation concerning
the number of MDMA pills that CS1 wanted to buy from SEJIN OH. CS1 intended to
only buy 200 MDMA pills, but SEJIN OH appears to have understood CS1 as asking to
buy 2,000 MDMA pills.

direction. The agent instructed CS1 to obtain from SO one full package of 1,000 MDMA pills. After the call, CS1 returned to the car wash and met with SO. CS1 told SO that CS1 would buy one package with 1,000 pills ("I'll grab one"). SO asked what kind of pills CS1 wanted ("What ones you want?") and CS1 asked for "whichever ones are better." SO stated that the "yellow ones are better."

186. At approximately 10:50 a.m., surveillance units observed CS1 exit from the car wash, enter his car and drive under surveillance to a predetermined location. At that location, CS1 provided to officers a white plastic shopping bag containing 10 small clear plastic baggies, each containing approximately 100 MDMA pills. In addition, CS1 returned to law enforcement officers the $1,000 in government funds that had been given to CS1 prior to his meeting with SO. CS1's person and vehicle were further searched by law enforcement for any illegal contraband with negative results.

187. The pills that SO gave to CS1 on August 27, 2004, were later subjected to laboratory testing. The pills consisted of 118 yellow pills bearing an apple logo and 882 red pills bearing a kangaroo logo. The pills tested positive for the presence of MDMA and methamphetamine. The weight of all the pills combined was over 227 grams.

188. On September 2, 2004, an ICE undercover officer ("UCO3") placed a recorded phone call to SEJIN OH in order to set up a meeting at which UCO3, in the role of CS1's ultimate purchase of the 1,000 MDMA pills purchased on August 27, 2004, could pay SEJIN OH for the 1,000 MDMA pills that SEJIN OH and SO sold to CS1 on August 27, 2004. In the call, SEJIN OH identified himself as "Sej" and offered to meet UCO3 later that day near Harlem Avenue and Higgins Avenue. At approximately 11:03 p.m., surveillance observed a black BMW bearing a license plate registered to SEJIN OH pull into the Shell

gas station near the intersection of Harlem Avenue and Higgins Avenue.  SEJIN OH then

called UCO3 and told UCO3 to meet SEJIN OH at that gas station.  At approximately 11:08

p.m., UCO3 arrived at the gas station.  Surveillance observed SEJIN OH walk from his

BMW to UCO3's car and get inside.  Inside UCO3's car, UCO3 gave SEJIN OH $5,000 in

buy money for the 1,000 MDMA pills that SEJIN OH had sold to CS1 on August 27, 2004.

189.   On September 3, 2004, CS1, at the direction of law enforcement, engaged

in a consensually recorded in-person meeting with SEJIN OH at SEJIN OH's apartment

on West Bryn Mawr Avenue in Chicago.  During that meeting, SEJIN OH acknowledged

that UCO3 had paid him the $5,000 but warned CS1 that UCO3 tried to deal directly with

SEJIN OH ("he tried to cut you out, bro").  SEJIN OH also noted that HUERTA was going

to be posting one-half of the bail money for TOMMY LO.  In particular, CS1 asked SEJIN

OH if TOMMY LO's arrest would result in their inability to obtain MDMA from the Canadian

suppliers ("When Tommy gets out, it is cut off or what?").  SEJIN OH responded, "I don't

know."  In addition, SEJIN OH told CS1 that Ivan Myint had calculated SEJIN OH's debt

from a second load of drugs they received together:

CS1:        What happened with Ivan?

SEJIN OH:   And then on the second shipment he pulled that shit out . . .
            He told us that he wrote out what he gave them. . . . I'm over
            10, after the first one, 17, 17 from the first shipment . . . OK.
            14 plus 14, all that right.  He's playing number games.

Based upon my experience and training and the other evidence in this case, I believe that

SEJIN OH is telling CS1 that SEJIN OH owes Ivan Myint a debt ("I'm over 10, after the first

one, 17") because Ivan Myint paid for a portion of a load of drugs that SEJIN OH, Ivan

Myint and others received collectively from the Canadian suppliers ("He told us that he

-88-

wrote out what he gave them").

[10]    Admissions by JUNG BAE about his role in drug trafficking by SEJIN
OH's crew

190.    On January 4, 2007, law enforcement interviewed JUNG BAE at a restaurant in Chicago.  BAE voluntarily appeared for the interview and was not under arrest.  The officers began by explaining the purpose of the interview.  BAE stated that he knew what the interview was about and was angry because he had done some "stupid" things and allowed other people to take advantage of him.  Officers then told BAE that he was free to leave at any time.  BAE stated that he wanted to be truthful and cooperate with the investigation.  Officers then gave BAE his Miranda warnings.

191.    BAE stated that in Summer 2004, SEJIN OH approached him and asked if he would keep a bag of narcotics in his apartment located at 4321 North Western Avenue in Chicago.  BAE stated that, on two separate occasions, SEJIN OH and others used BAE's apartment to store hydroponic marijuana and MDMA pills.  BAE stated as payment for allowing SEJIN OH to store the drugs at his apartment, SEJIN OH would give BAE rent money for his apartment.  BAE stated that SEJIN OH would bring the drugs to his apartment and then SEJIN OH, TOMMY LO, Ivan Myint, "Big John" and CD2 would take the drugs as needed.  BAE identified a photograph of CHAE as the person he knew as "Big John."  BAE stated that he would sometimes travel with SEJIN OH to a drug deal in order to provide extra protection because SEJIN OH sold drugs in some "bad areas" on the South side of Chicago.

192.    BAE stated that SEJIN OH usually kept the drugs in a large duffel bag inside BAE's apartment.  BAE stated that the duffel bag usually contained between 10-15 pounds

of marijuana in vacuum sealed freezer bags. BAE also saw at least one ziplock sandwich bag full of a light colored ecstasy pills. BAE stated at first he thought the drugs were coming from Mexico, but then SEJIN OH said that he received the material from Detroit.

193. BAE stated that CHAE usually retrieved 100-200 MDMA pills whenever he would stop by BAE's apartment to pick up drugs.

194. BAE also stated that, at one point, SEJIN OH partnered in his drug dealing with an individual named "Henry." BAE correctly identified a photograph of HENRY CHUN as the person BAE knew as "Henry." BAE stated that, while in partnership with SEJIN OH, CHUN also picked up drugs occasionally from BAE's apartment.

[11]   ZHOU and LUONG are denied entry into the United States and LUONG makes false statements to CBP officials

195. CBP records verify that, on October 5, 2004, at approximately 1:11 p.m., LUONG and ZHOU requested entry into the United States at the Ambassador Bridge POE in Detroit, Michigan. CBP denied entry to both ZHOU and LUONG for multiple reasons. First, according to CBP officers, LUONG had a previous drug conviction in Canada. Second, LUONG had in his possession three cellular telephones and a Blackberry pager which was consistent with the use of multiple phones to engage in drug trafficking. Third, when CBP officers asked LUONG why he had three phones, LUONG stated that he needed three phones for better reception, a claim of dubious merit. Fourth, LUONG claimed that he worked at a bank in Toronto, but he did not know the name of the bank. Based upon these factors, CBP officers conducted a more extensive inspection of LUONG's belongings including his three cellular telephones. Upon further review of the aforementioned telephones, CBP officers discovered several text messages describing

"BC Bud," which is a form of hydroponic marijuana, and the apparent prices for the purchase of the marijuana. In addition, LUONG's text messages included terms such as "pure blend vitamax," "super booster" and "pure bloom 120ml," which were all common terms known to law enforcement officers as associated with chemicals used to grow and cultivate hydroponic marijuana. In addition, LUONG's phone list on at least one of his phones included phone numbers that the investigation has established as connected to ZHOU, SEJIN OH, Ivan Myint and LI XIEN WU. CBP officers also noted that ZHOU was unable to answer questions regarding his travel and was inconsistent with the answer to the same question as put to LUONG. According to CBP officers, based upon the aforementioned information, both LUONG and ZHOU were refused entry into the United States and were allowed to leave back to Canada.

[12]   HUERTA acknowledges in recorded meeting with CS1 that HUERTA bought 10,000 MDMA pills from SEJIN OH

196.   On November 4, 2004, at the direction of law enforcement officers, CS1 was outfitted with a recording device for the purpose of recording an in-person meeting with HUERTA. CS1 was instructed to engage HUERTA in a discussion about MDMA availability and which individuals associated with the case had a current supply of MDMA for sale.

197.   At approximately 4:08 p.m. that day, CS1 was observed meeting with HUERTA. CS1 and HUERTA then engaged in a discussion about MDMA and the current status of the drug dealers with whom they were associated. The conversation was recorded via CS1's body recording device.

198.  During the conversation, CS1 asked HUERTA how long it would be until HUERTA ordered more MDMA ("How long until you reorder again?").  HUERTA responded, "two weeks, three weeks at the most."  CS1 then asked if he would be able to get a steady supply of MDMA ("Are we going to keep doing this on a monthly basis? I want to keep it steady").  HUERTA then confirmed that CS1 was referring to MDMA ("What do you mean?  The little ones?").  The following exchange then takes place:

CS1:	I spoke to Ivan and he said he can get it for $3.50.  I heard Ivan told you he can get it for $3.50.

HUERTA:	Yeah, yeah, yeah, right.  He told me 3.50, no 4.50, and two weeks later told me like 8.  I'm like, "Eight?  You told me fuckin' 4.50."

CS1:	And then he asked if I wanted some.  You know 'I' owes me money right?

HUERTA:	Right.  You need to get prepaid.

CS1:	You gotta keep this thing goin' smooth.  I can't pick up.  You know the minimum is 5, until you are ready to pick up.

HUERTA:	I thought you wanted to pick up like 5?

CS1:	I can only afford to pick up 1 or 2 at a time, maybe 3.  The only time I can afford to pick up is when you pick up.  You went large . . .

HUERTA:	They gave me 6 of the same shit.

CS1:	What kind?

HUERTA:	Fuckin' apples, man.

CS1:	It's good with apples, isn't it?

HUERTA:	Yeah, but I'm sayin', I bought 10.  They were supposed to mix it up.  They were supposed to give me at least five bro and they gave me two, they gave me three different kinds.  It's a good thing my people like the apples.

. . .

CS1:      I need you to hook me up, with a little bit.

HUERTA:      Like, a hundred or somethin'?

CS1:      Whatever, you know.

HUERTA:      What do you need exactly, bro? Cause I haven't opened anything except what I'm using, bro.

CS1:      You said you got 6,000 of the apples. It's all different stuff?

HUERTA:      It's apples and . . .

CS1:      Whatever you can spare. Whatever you have more of. It's all about eating.

HUERTA:      Let me see what I have opened now and I'll give you what I have left.

CS1:      OK, that's cool. I worried that . . . I was talking to Sejin. He talked to Ivan. They're going to fuck things up.

HUERTA:      That's probably where Sejin got it. From Ivan. I'm gonna go home, I'll check what I got and I'll get it to you.

Based upon my experience and training and the other evidence in this case, I believe that in this conversation HUERTA is informing CS1 that HUERTA had purchased 10,000 MDMA pills from the Canadian suppliers ("I bought 10") and that he was supposed to be supplied at least 5,000 MDMA pills ("[t]hey were supposed to give me at least five"). HUERTA then received 6,000 MDMA pills bearing apple logos ("[t]hey gave me 6 of the same shit" and "fuckin' apples"). Notably, as discussed above, the MDMA pills that CS1 purchased from HUERTA and SEJIN OH in July 2004 consisted of purple pills with an apple logo on them.

F.    The Trafficking of MDMA and Marijuana by ZHOU and LUONG to Ivan Myint's Crew Between November 2004 and January 2005

[1]    Evidence establishing the first load of 30,000 MDMA pills and 100 pounds of marijuana from Canada and the delivery of 10,000 MDMA pills to HUERTA from that load

199.    CD2 stated in debriefings and under oath that Ivan Myint's drug trafficking crew included MICHAEL CRUZ, ROBERTO VALDEZ (whom CD2 knew as "Rob"), CD2, Individual E and CD3, as well as others. CD2 stated that CRUZ found customers for Ivan Myint's drugs and arranged deals with those customers. CD2 stated that VALDEZ and CD3 delivered drugs to Ivan Myint's customers and picked up money from Ivan Myint's customers. Individual E, who was a Latin King gang member, provided security for Ivan Myint.

200.    CD2 further stated that an individual whom CD2 knew as "Jorge" was Ivan Myint's biggest customer for MDMA and marijuana. CD2 has identified a photograph of HUERTA as the person he knew as "Jorge."

201.    CD2 further stated that, in late August 2004, Ivan Myint's drug operation changed. Ivan Myint told CD2 that SEJIN OH had messed up and owed the Canadian drug suppliers about $60,000. Ivan Myint also told CD2 that Ivan Myint decided to take over SEJIN OH's operation. CD2 then drove with Ivan Myint to a meeting between Ivan Myint, ZHOU and another Asian male outside of a restaurant in Chinatown. CD2 was not part of the meeting (he waited in his car), but, after the meeting was over, Ivan Myint told CD2 that ZHOU was not going to work any longer with SEJIN OH and that Ivan Myint was taking over SEJIN OH's drug operation. CD2 has identified a photograph of the Mountain View Chef restaurant as the restaurant outside of which Ivan Myint met with ZHOU and the

other Asian male.

202.    Several weeks later, CD2 drove Ivan Myint back to the Mountain View Chef restaurant for another meeting with two other Asian individuals.  CD2 participated in the meeting with Ivan Myint.  During the meeting, Ivan Myint and the two individuals talked about the trafficking of MDMA and marijuana.  During the meeting, Ivan Myint handed a large amount of United States Currency to the two Asian individuals; CD2 recalls the amount of money being about $20,000.

203.    CD2 has also stated that, after that meeting, in early November 2004, Ivan Myint and VALDEZ drove to Toronto, Canada, in order to meet with LUONG.  CD2 knew this because Ivan Myint told CD2 that he (Ivan Myint) was going to Canada in order to take over SEJIN OH's drug operation.  Soon after Ivan Myint and VALDEZ returned from this trip, Ivan Myint informed CD2 that LUONG would be contacting CD2 to inform CD2 about future deliveries of MDMA and marijuana.

204.    CD2 has stated that, shortly thereafter, Ivan Myint received three deliveries of drugs from Canada.  The first and third shipments each consisted of approximately 30,000 MDMA pills.  The second load consisted of approximately 100 pounds of marijuana.

205.    For the first two deliveries, Ivan Myint contacted CD2 by phone and informed CD2 that the couriers were on their way to Chicago.  On the first delivery, the couriers became lost in Chicago and CD2, accompanied by VALDEZ, drove to meet the couriers near Northbrook, Illinois, and thereafter led them to a meeting with HUERTA.  HUERTA then led the couriers (in one car) and CD2 (in another car) to a residential street on the northwest side of Chicago.  The couriers and HUERTA pulled into a nearby alley while CD2 waited in his car on the residential street.  Soon thereafter, HUERTA walked over the

CD2's car and handed CD2 two large plastic bags, each of which contained approximately 10,000 MDMA pills. After HUERTA gave the pills to CD2, CD2 dropped VALDEZ off at his house and then drove to his apartment in Des Plaines, Illinois, at which CD2 stored the MDMA pills.

206.   CD2 stated that the second delivery of drugs from LUONG was for 100 pounds of hydroponic marijuana. The drugs were dropped off at CD2's apartment by an individual driving a van bearing New York license plates. The marijuana was secreted in several cardboard boxes, each containing a stack of aluminum cooking trays. The trays in the middle of the stack had the bottoms cut out of them in order to better store and secret the marijuana.

207.   At the time he was initially approached by law enforcement in March 2005, CD2 gave law enforcement officers consent to search his apartment. Seized from inside the apartment were, among other things, a cardboard box containing a stack of aluminum trays. CD2 identified the trays as the ones containing the approximately 100 pounds of marijuana that made up the second smuggled load of drugs.

208.   After receiving the first two shipments of drugs, at Ivan Myint's direction, CD2 delivered the drugs to Ivan Myint's customers and to other members of Ivan Myint's crew for delivery to customers. CD2 also collected debts owed to Ivan Myint by Ivan Myint's customers.

[2]   Border records confirm the crossing of Ivan Myint into the United States from Canada on November 4, 2004

209.   CBP border crossing records verify that, on November 4, 2004, at approximately 5:58 a.m., a vehicle bearing Illinois license plate 607 0805 crossed into the

-96-

United States from Canada at the Ambassador Bridge POE in Detroit, Michigan.

210.    ISOS records verify that Illinois vehicle registration 607 0805 was then assigned to a 2000 Chevrolet Carryall in the name of Ivan Myint at an address in Waukegan, Illinois.

[3]    Two controlled buys of approximately 500 MDMA pills by CS1 from Ivan Myint and ROBERTO VALDEZ

211.    On November 19, 2004, CS1 contacted CS1's handling officers and stated that CS1 had heard from SEJIN OH that Ivan Myint was then being supplied with MDMA from the same source that had previously supplied SEJIN OH. SEJIN OH had also told CS1 that SEJIN OH was no longer dealing MDMA.

212.    On November 22, 2004, CS1 informed me that Ivan Myint had attempted to contact CS1 at his workplace and that CS1 believed that Ivan Myint would be calling CS1 in order to sell MDMA to CS1. CS1 warned that Ivan Myint would likely used code terms during his negotiations with CS1.

213.    Later on November 22, 2004, at approximately 3:05 p.m., CS1 placed a consensually recorded telephone call to Ivan Myint. In that call, Ivan Myint indicated that Ivan Myint had learned that CS1 was interested in purchasing MDMA from Ivan Myint. During the call, Ivan Myint said it was "urgent" that they meet and that it would be "good for both of us" to meet. After a brief conversation, CS1 agreed to meet with Ivan Myint in Waukegan, Illinois, near Ivan Myint's cell phone store.

214.    On November 22, 2004, at approximately 4:00 p.m., CS1 met with Ivan Myint in Waukegan, Illinois. As a safety precaution, CS1 was not outfitted with a body recording device. However, CS1 was outfitted with a transmitter, which allowed agents to listen

CS1's conversation with Ivan Myint in real time and to record the conversation.

215.  During the conversation, Ivan Myint, using code terms, offered to sell MDMA to CS1 ("Well, you need some accessories, that's why I'm calling you"). Ivan Myint asked CS1 how much he was paying for MDMA ("What you thinking right now for that leather cases?"). CS1 responded by saying that CS1 is paying the same price as HUERTA ("Five, I'm paying five for the leather cases, the same as Jorge is paying for his store") and said that Ivan Myint would have to give a better price ("Well, you gotta beat five"). Ivan Myint then asked, "Why, nobody else got it?" CS1 suggested that SEJIN OH "is getting it." Ivan Myint responded, "He won't get it no more. Leave it to me though. I can get it right now"). CS1 asked, "For real?" Ivan Myint responded by stating, "You can bank on it, you can bank on it." CS1 asked about the quality of the MDMA and Ivan Myint stated that the pills were more potent ("It's better, the case has a lot more genuine leather. Okay?"). CS1 later stated that CS1 understood Ivan Myint's reference to "a lot more genuine leather" to mean that the MDMA that Ivan Myint could procure was a more highly valued product that was easy to resell. I can identify the voice of Ivan Myint because, as further set forth below, I have had numerous conversations with Ivan Myint and because I personally observed CS1 meeting with Ivan Myint while I was listening to their conversation in real time.

216.  Also during the consensually recorded conversation from November 22, 2004, Ivan Myint informed CS1 that CS1 would have to deal with VALDEZ (whom Ivan Myint referred to as "Rob") from that point forward and that, if CS1 encountered a problem with VALDEZ then Ivan Myint would resolve it ("You will never have a problem with him, I'll take care of it" and "You relay it to him, I'll take care of it, okay"). Ivan Myint gave to CS1 the phone number for VALDEZ.

217.    Also during that same conversation, Ivan Myint offered to give CS1 500 MDMA pills that day ("Right now, you know what, if you want I got, I got 500 boxes worth of them, just pick it up"). CS1 asked to confirm that Ivan Myint was talking about MDMA ("500 worth of cases"), and Ivan Myint confirmed that understanding ("Yeah" and "I got 500 cases"). CS1 agreed to buy the MDMA ("Oh, Okay"). Ivan Myint then instructed CS1 to get the MDMA from VALDEZ and to pay VALDEZ ("Pick it up and give him the paperwork"). CS1 stated that he would need to pay for the MDMA the next day ("Umm, I'll have paperwork tomorrow for that"). Ivan Myint responded by saying "Okay," and directing CS1 to "pick it up." Ivan Myint further stated that VALDEZ was located "at Cicero and Lawrence." When CS1 asked if the MDMA was good ("What kind are they, they gotta, they gotta be good"), Ivan Myint responded by saying, "Bro, I wouldn't have 50,000 of them if they wasn't, okay, I tell you right now."

218.    On November 22, 2004, at approximately 4:38 p.m., the CS1 placed a consensually recorded telephone call to VALDEZ, who instructed CS1 to meet VALDEZ at the car wash located on Lawrence Avenue, and just past Cicero Avenue, in Chicago. VALDEZ further instructed CS1 to call VALDEZ when CS1 got near the intersection of Cicero and Lawrence.

219.    On November 22, 2004, at approximately 6:06 p.m., CS1 received a consensually recorded telephone call from VALDEZ, who asked CS1 about CS1's location. VALDEZ again instructed CS1 that, when CS1 reached the intersection of Cicero and Lawrence, CS1 was to go to the first car wash located just after the intersection on the north side of the street.

220. Immediately upon completion of the aforementioned telephone call and in anticipation of the purchase of 500 MDMA pills from VALDEZ, officers searched CS1's person and vehicle for contraband with negative results. In addition, CS1 was fitted with a recording device in order to record CS1's conversations with VALDEZ. CS1 then drove in his vehicle under law enforcement surveillance to the Wee Wash car wash located at 4660 West Lawrence Avenue in Chicago.

221. At approximately 6:13 p.m., surveillance units observed CS1 arrive at the "Wee Wash" located at 4660 West Lawrence Avenue, Chicago, Illinois. Approximately two minutes later, surveillance observed a male approach and enter CS1's vehicle. CS1 then drove the vehicle to a street adjacent to the car wash. Inside the car, VALDEZ and CS1 engaged in conversation. The conversation was not recorded due to technical difficulties. After approximately three minutes, the male exited CS1's vehicle and returned to the car wash business. Law enforcement then maintained a continuous mobile surveillance of CS1 to a pre-determined location, at which CS1 gave agents a plastic bag containing 500 pills of suspected MDMA. Officers again searched CS1's person and vehicle with negative results. CS1 stated that VALDEZ instructed CS1 to pay for the pills the next day (November 23, 2004), at which time CS1 was to meet with VALDEZ to purchase an additional 500 MDMA pills.

222. CS1 later identified a photograph of VALDEZ as the person who gave the MDMA pills to CS1 at the Wee Wash.

223. The pills that VALDEZ gave to CS1 on November 22, 2004, were later inventoried and subjected to laboratory testing. There were 497 blue tablets containing an omega logo, three yellow pills containing a airplane logo and five blue tablets containing

-100-

a Christmas tree logo. The blue omega and yellow airplane tablets were positive for MDMA and methamphetamine. The five blue Christmas tree pills were positive only for methamphetamine. The weight of all the pills combined was over 112 grams.

224. On November 23, 2004, at approximately 10:50 a.m., CS1 placed a consensually recorded telephone call to VALDEZ. In that conversation, CS1 and VALDEZ agreed to meet in the afternoon so that CS1 could receive another 500 MDMA pills from VALDEZ and pay VALDEZ for all 1,000 MDMA pills delivered by Ivan Myint and VALDEZ to CS1 over the last two days. CS1 stated that VALDEZ instructed CS1 to call VALDEZ when CS1 was near the area of Cicero Avenue and Lawrence Avenue in Chicago.

225. On November 23, 2004, at approximately 2:20 p.m., in anticipation of the purchase of the remaining 500 MDMA pills from VALDEZ, officers searched CS1's person and vehicle for contraband with negative results. CS1 was given $5,000 in government funds in order to complete the purchase of MDMA. In addition, CS1 was fitted with a recording device in order to record CS1's conversations with VALDEZ. CS1 then drove in his vehicle under law enforcement surveillance to the Wee Wash car wash located at 4660 West Lawrence Avenue in Chicago.

226. When CS1 reached the 4600 block of West Lawrence Avenue, CS1 received a telephone call from VALDEZ. In that call, which was recorded, VALDEZ instructed CS1 to drive to the 5100 block of West Leland Avenue in Chicago. Under surveillance, CS1 then drove to the new location as instructed by VALDEZ. At approximately 2:37 p.m., surveillance observed CS1 arrive at the 5100 block of West Leland Avenue and meet with VALDEZ. Surveillance then observed VALDEZ enter CS1's vehicle and speak with CS1. Surveillance then observed VALDEZ exit CS1's vehicle and walk to the rear of another

vehicle being driven by an unknown male. Surveillance observed CS1 and VALDEZ in a brief conversation at the rear of that vehicle and then CS1 reached behind the vehicle and picked up an object wrapped in newspapers.

227. CS1 then returned to CS1's vehicle and departed from the area under continuous mobile law enforcement surveillance to a pre-determined location at which CS1 provided the agents with the object wrapped in newspaper. Inside the newspaper was a plastic ziplock baggie containing approximately 500 pills of suspected MDMA. Officers again searched CS1's person and vehicle with negative results. CS1 stated that, inside the car, CS1 gave VALDEZ the $5,000 in official government funds and that, after getting out of the car, VALDEZ indicated that the MDMA was wrapped in the newspaper lying on the ground.

228. The pills that VALDEZ gave to CS1 on November 23, 2004, were later inventoried and subjected to laboratory testing. There were 503 greenish blue tablets containing an omega logo. The pills were positive for MDMA and methamphetamine. The weight of all the pills combined was over 107 grams.

[4]    Evidence establishing the second load of 30,000 MDMA pills in late December 2004

229. In his debriefings and under oath, CD2 stated LUONG delivered a second shipment of MDMA to Ivan Myint in approximately late 2004 during the Holiday season. CD2 knew from Ivan Myint that the third load of drugs was for 30,000 MDMA pills. CD2 was not supposed to store these pills, but CRUZ and VALDEZ brought the pills to CD2's apartment anyway. CD2 refused to let CRUZ and VALDEZ into his apartment because CD2 had visitors at his apartment. Ivan Myint later told CD2 that the pills were being stored

at MICHAEL MYINT's condominium in downtown Chicago.

230.   CD2 stated that the MDMA pills stayed at MICHAEL MYINT's condominium for several days. On several occasions over those days, Ivan Myint instructed CD2 to pick up several thousand MDMA pills from MICHAEL MYINT's condominium. On the first occasion, Ivan Myint told CD2 to pick up a couple thousand pills from MICHAEL MYINT's condominium. However, MICHAEL MYINT left the MDMA pills sitting on top of the garbage just outside his condominium. On the next two occasions, CD2 picked up the MDMA directly from MICHAEL MYINT.

231.   Based upon his conversations with Ivan Myint, CD2 knows that, after SEJIN OH and TOMMY LO were arrested in December 2004, Ivan Myint ordered that the MDMA be moved from MICHAEL MYINT's condominium to CD3's residence.[14]

232.   CD2 also stated that, while delivering drugs or picking up money for Ivan Myint, CD2 often carried the MDMA and money in a silver colored steel briefcase. CD2 was also holding two guns for Ivan Myint, namely, a 9 millimeter Beretta and a .38 caliber revolver. In late December 2004, during the period that MDMA was being stored at MICHAEL MYINT's condominium, Ivan Myint instructed CD2 to give the two guns and the drug ledgers to MICHAEL MYINT. CD2 gave the steel briefcase to MICHAEL MYINT. At the time that CD2 gave the steel briefcase to MICHAEL MYINT, the steel briefcase contained the 9 millimeter Beretta, the .38 caliber revolver and drug ledgers.

---

[14] Information from CPD has confirmed that, on December 29, 2004, SEJIN OH and TOMMY LO were arrested by CPD for the possession of more than 500 grams of marijuana. The arrest came after a traffic stop that resulted in officers locating within the car four vacuum sealed plastic bags that each contained one pound of marijuana. The car in which TOMMY LO and SEJIN OH were driving was a BMW registered with ISOS to SEJIN OH.

233. CD2 also stated that, after the MDMA was moved from MICHAEL MYINT's condominium to CD3's house, Ivan Myint instructed CD2 to pick up MDMA on multiple occasions from CD3 and to deliver the pills to various customers. On a couple of occasions, at Ivan Myint's instruction, CD2 obtained 2,000 MDMA pills from CD3 and then gave the MDMA to VALDEZ.

234. In his debriefings and testimony before the grand jury, CD3 stated that his main job for Ivan Myint consisted of storing Ivan Myint's MDMA and occasionally delivering the MDMA to CD2 and VALDEZ ("Rob") for delivery to Ivan Myint's customers. CD3 stated that the amounts of MDMA he gave to CD2 and VALDEZ usually were in amounts of 1,000 pills, although CD3 often kept some of the pills for himself before delivering the pills to CD2 and VALDEZ. CD3 also personally delivered smaller amounts of MDMA for Ivan Myint. CD3 also provided "security" for Ivan Myint so that Ivan Myint would not get robbed of the MDMA pills and collected money that was owed to Ivan Myint by Ivan Myint's customers.

235. CD3 has further stated that, on a night in approximately late December 2004, Ivan Myint told CD3 that SEJIN OH ("Sejin") and TOMMY LO ("Tommy") had been arrested on a State cannabis charge and that Ivan Myint wanted CD3 to start storing the MDMA at CD3's residence. Ivan Myint further instructed CD3 to contact MICHAEL MYINT, who, according to Ivan Myint, was the person then storing Ivan Myint's MDMA. CD3 then met with MICHAEL MYINT at MICHAEL MYINT's condominium on the near West side of Chicago and, inside the condominium, MICHAEL MYINT gave to CD3 approximately 16,000 MDMA pills in a shopping bag. As directed by Ivan Myint, CD3 then took those MDMA pills back to his residence and stored them. Ivan Myint told CD3 that the pills were in packages of 1,000 each.

-104-

[5]    The controlled buy of 1,000 MDMA pills by CS1 from Ivan Myint and
CD3

236.    On December 17, 2004, CS1 placed a consensually recorded telephone call
to Ivan Myint. The purpose of the call was to determine whether Ivan Myint was willing to
sell 10,000 MDMA pills to the CS1. During the conversation, after the CS1 initially
broached the topic of purchasing MDMA from Ivan Myint, Ivan Myint instructed CS1 to use
code terms ("I mean, ahh, try to be, you know just talk to me holidays, you know"). CS1
then stated that he wanted to buy MDMA but wanted to know if Ivan Myint could supply it
("I'm trying to buy all these Christmas presents, but I don't think, I have to wait to after
Christmas sale, you know, ahh, I just wanted to make sure you gonna be ready."). Ivan
Myint then twice responded that his supply of MDMA was stable ("it's never ending"). CS1
indicated that he wanted to buy 10,000 MDMA pills ("I got to buy for like ten kids"). Ivan
Myint responded, "Don't worry about it, it's never ending." Ivan Myint further instructed
CS1 to arrange the deal with VALDEZ ("you just talk to Rob").

237.    On January 9, 2005, at approximately 12:20 a.m., CS1 received an incoming
consensually recorded telephone call from Ivan Myint. In that conversation, Ivan Myint
asked to meet with CS1 later that day on the north side of Chicago.

238.    Later on January 9, 2005, at approximately 5:20 p.m., and in anticipation of
the arranged meeting between Ivan Myint and CS1, officers searched CS1's person and
vehicle with negative results. CS1 was outfitted with a transmitter. CS1 then drove under
law enforcement surveillance to the intersection of California Avenue and Peterson Avenue
in Chicago. At approximately 5:40 p.m., law enforcement surveillance observed CS1
meeting with Ivan Myint and another individual later identified as CD3. CS1 got into a

-105-

Black GMC Yukon with Ivan Myint and CD3. Inside the Yukon, Ivan Myint asked CS1 how much MDMA CS1 wanted to buy ("What are you looking at?") and CS1 expressed an interest in buying 10,000 MDMA pills at a time ("Ten at a time"). Ivan Myint asked CS1 if CS1 would be "ready in an hour," and CS1 asked if he could get the MDMA "on a front." Ivan Myint then told CS1 that he would give CS1 some MDMA on a front ("What I want you to do is follow me and I'll let you take a leather case"). CS1 then asked about the logo ("What is it?") and Ivan Myint replied "pink hearts." Later, Ivan Myint twice reiterated that he wanted CS1 to buy some of the MDMA ("I want you to take it"). Ivan Myint also indicated that he had "one-fifty coming." Based upon the evidence gathered throughout the investigation, I believe that Ivan Myint was referring to a load of MDMA worth $150,000, which would be equivalent to 30,000 MDMA pills at $5 per pill.

239.  CS1 then went back to his vehicle and began following Ivan Myint in the black Yukon. At approximately 6:07 p.m., surveillance units observed Ivan Myint's Yukon followed by CS1's vehicle arrive in the 4900 block of North Keystone Avenue, Chicago, Illinois. Ivan Myint's vehicle stopped at approximately 4928 North Keystone Avenue and CD3 got out of the vehicle. CD3 was seen to walk to the driver's side of a Chevrolet Tahoe, which is registered with the ISOS to Ivan Myint. CD3 was seen to retrieve a black object from the Tahoe, walk over to CS1's vehicle and hand the black object to CS1 through the passenger side door of CS1's vehicle.

240.  CS1 then departed from the area under continuous mobile law enforcement surveillance to a pre-determined location at which CS1 provided the agents with a dark knit cap holding a zip lock baggie containing approximately 1,000 pills of suspect MDMA. Officers again searched CS1's person and vehicle with negative results.

241. The pills that Ivan Myint and CD3 gave to CS1 on January 9, 2005, were later inventoried and subjected to laboratory testing. There were 918 pink pills containing a strawberry logo and four green pills containing a strawberry logo. The pills were positive for MDMA. The weight of all the pills combined was over 199 grams.

242. In his debriefings and under oath, CD3 has admitted that he was the individual who handed the MDMA to CS1 on January 9, 2005. CD3 further admitted that he packaged the MDMA for sale to CS1 earlier that same day at the direction of Ivan Myint. Ivan Myint further instructed CD3 to drive Ivan Myint's Chevrolet Tahoe (which CD3 was then using) and park it in front of CRUZ' house on North Keystone Avenue with the MDMA in it.

243. On January 11, 2005, CS1 informed officers that Ivan Myint was pressuring CS1 to pay Ivan Myint back for the approximately 1,000 MDMA pills that Ivan Myint and CD3 had delivered to CS1 on January 9, 2005. UCO1 and UCO2 then arranged to meet with CD2 to pay back the money. Later that day, the two officers met with CD2 in the parking lot of a business in Des Plaines, Illinois. The officers provided CD2 with $5,000 in funds to pay for the MDMA pills, but also showed CD2 an additional $45,000 and claimed that they (the officers) were expecting to get the remaining 9,000 MDMA pills from the 10,000 MDMA pill deal that CS1 was attempting to set up with Ivan Myint. CD2 later called the officers and told them that he had talked to his "friend" (Ivan Myint) who said that he could give the officers a better price for MDMA than the officers were getting from CS1.

244. In his debriefings and under oath, CD2 admitted that he was directed by Ivan Myint to collect the money from the officers as payment for 1,000 MDMA pills sold to CS1 two days earlier. CD2 also admitted to telling Ivan Myint about seeing the $45,000 and that

Ivan Myint directed CD2 to try to set up more drug deals with the two undercover officers.

[6]    Recorded meetings between CS1 and Ivan Myint, CRUZ and VALDEZ on January 12, 2005, in anticipation of completing a 10,000 MDMA pill buy from Ivan Myint and his crew

245.   On January 12, 2005, at the direction of law enforcement officers, CS1 was outfitted with a recording device for the purpose of recording an in-person meeting with Ivan Myint. CS1 was instructed to engage Ivan Myint in a discussion about selling MDMA to the two undercover officers who had paid CD2 the $5,000 for CS1 on January 11, 2005.

246.   At approximately 2:37 p.m. that day, CS1 entered a restaurant on North Lincoln Avenue in Chicago and met with Ivan Myint and CRUZ. During the conversation, CS1 stated that the UCOs disliked CD2 ("[t]hose guys hated [CD2]") in part because CD2 asked the UCOs if they were police. Ivan Myint acknowledged that CD2 handled the UCOs poorly and admitted that he instructed CD2 to call the UCOs to make things right with them ("Well, I know, I even had him call 'em back and have 'em straighten that shit out"). Ivan Myint stated that he was going to discharge CD2 from his crew ("he's fired"). Ivan Myint also complained about having to take responsibility for members of his crew ("I got a whole crew to take of"). Later in the conversation Ivan Myint told CS1 that they wanted to complete the 10,000 pill deal and that CS1 should work through CRUZ, who was second in command of Ivan Myint's drug operation.

247.   Later in the conversation, CRUZ instructed CS1 to talk to VALDEZ to complete the 10,000 pill deal. In the conversation, CRUZ stated that he liked VALDEZ ("He's a good guy. He's a real good guy. He's the kind of guy you want by you when it comes down to it."). CS1 responded by noting that VALDEZ was not the second-in-command of Ivan Myint's drug operation ("I mean, I understand, He's just not the number

two guy."). In response, CRUZ stated that he (CRUZ) was the second in command of Ivan

Myint's operation ("No, no, no, I am"). CRUZ then gave VALDEZ' phone number to CS1.

CS1 then engaged in an unrecorded call to VALDEZ in which, according to CS1, VALDEZ

told CS1 to meet VALDEZ in Chinatown and that he (VALDEZ) did not want the money and

drugs in the same location. CS1 agreed to drop off CS1's car to VALDEZ, who would then

return the car with the 10,000 MDMA pills. CS1 would then have to produce the money.

Ivan Myint and CRUZ were participants in this conversation about how to conclude the

deal.

248. At approximately 6:53 p.m., CS1 received an incoming call from Ivan Myint

that was consensually recorded. During the call, CS1 told Ivan Myint that "a little time

problem came up" and Ivan Myint instructed CS1 to call CRUZ about what the problem

was ("Talk to Mike, he'll take care of it").

249. At approximately 8:10 p.m., CS1 received an incoming call from CRUZ from

a blocked number. During the call, CRUZ makes reference to the fact that CS1 had told

Ivan Myint that CS1 was delayed ("This guy called me, said you had a little delay"). CS1

responded that the prospective buyers had "car problems." CRUZ then instructed CS1 to

reassure the UCOs that the deal would be concluded without problems ("Oh, okay, just

reassure them you know, that their ride is gonna be smooth, ain't gonna be no bumpy road,

you know"). CRUZ also instructed CS1 to call VALDEZ when the UCOs and CS1 were

ready to conclude the 10,000 pill deal and that CS1 should take his time ("But, uh, we're

patient, so we have nothing but time"). CRUZ also stated that Ivan Myint's crew wanted

to complete the deal that day ("Okay, try to make it happen today though. Do me a favor

(unintelligible), just say yeah or nay, okay, whatever, just give Rob a call and say yeah

-109-

we're still on").

250. At approximately 8:34 p.m. CS1 received a consensually monitored incoming telephone call from VALDEZ verifying the place and procedure for concluding the 10,000 MDMA pill deal. For several hours thereafter, however, CS1 received no contact regarding the transaction.

251. At approximately 10:20 p.m., while law enforcement officers were conducting surveillance at Ivan Myint's residence at 6241 Formoor Lane, Gurnee, Illinois, officers were informed that Ivan Myint called the Gurnee Police Department with respect to a suspicious vehicle on his street. Ivan Myint admitted to the Gurnee police officer that Ivan Myint asked a relative who is a suburban Chicago police officer to run the license plate of the suspicious car in the police database. A Gurnee police officer also saw Individual E arrive at Ivan Myint's residence and pull into Ivan Myint's driveway. The car that Ivan Myint determined to be suspicious was a law enforcement surveillance vehicle that was participating in the attempted purchase of 10,000 MDMA pills from Ivan Myint's crew.

252. At approximately 10:30 p.m., CS1 received an incoming call from Ivan Myint that was consensually recorded. During the call, Ivan Myint told CS1 that Ivan Myint believed that somebody was preparing to rob his house, but that the police had captured the individual. Ivan Myint told CS1 that Ivan Myint had determined the plate came from a south side address ("I got the license plate and just ran it, he's all the way from 64th in Chicago"). Ivan Myint also told CS1 that Ivan Myint had told SEJIN OH to call CS1 to cancel the deal until at least the next day because people were watching Ivan Myint's house. This reference to SEJIN OH by Ivan Myint suggests that SEJIN OH was involved in the proposed sale of MDMA to the UCOs.

253.   In his debriefings and under oath, CD3 stated that, on January 12, 2005, CD3 met with Ivan Myint, CRUZ and VALDEZ at a Korean restaurant on North Lincoln Avenue in Chicago to discuss completing a 10,000 pill MDMA deal with CS1. Ivan Myint instructed CD3 to prepare the 10,000 MDMA pills for sale to CS1. CD3 followed Ivan Myint's instructions and prepared the pills. Later, CRUZ came to CD3's apartment to get the pills. CRUZ saw the pills (which were in plastic bags) and instructed CD3 to remove his fingerprints from the plastic bags. CRUZ told CD3 that Ivan Myint was intending to "front" the pills to CS1. Before CD3 relinquished possession of the pills, however, Ivan Myint called CRUZ and told CRUZ that the deal was off because Ivan Myint thought the police were watching him.

254.   On January 18, 2005, law enforcement officers effected the probable cause arrest of Ivan Myint for his participation in MDMA trafficking offenses, particularly the distribution of MDMA to CS1 from November 22, 2004, through January 9, 2005.

255.   Also on January 18, 2005, law enforcement officers executed a search warrant of Ivan Myint's residence located at 6241 Formoor Lane in Gurnee, Illinois. During the search of Ivan Myint's residence, law enforcement officers located and seized, among other things, the following items: (a) based upon a matching serial number, one of the $100 bills used to pay Ivan Myint for the 1,000 MDMA pill purchase by CS1 on January 9, 2005; (b) two suspected drug ledgers containing numerous names and dollar amounts associated with the names (including entries for "Andy," "Sejin" and Individual D) that collectively indicate a total debt of $87,800; (c) a money counting machine; (d) an empty Beretta gun box; and (e) a white plastic bag containing numerous currency bill straps.

256.   Thereafter, Ivan Myint was charged with federal criminal offenses in a criminal complaint. The criminal complaint, which was placed under seal at the time of filing, charged Ivan Myint with the offense of conspiracy to distribute and possess with intent to distribute MDMA between November 22, 2004, and January 9, 2005. Ivan Myint was then released under strict bond conditions.

G.   Ivan Myint Becomes a Fugitive but Attempts to Continue His Drug Trafficking Operation Going in the United States Through CD3

257.   On or about January 26, 2005, I learned that Ivan Myint had failed to comply with the terms of his release conditions. Further attempts to contact Ivan Myint by telephone or in person were unsuccessful.

[1]   Information provided by CD3 about Ivan Myint becoming a fugitive in Mexico

258.   In his debriefings and under oath, CD3 stated that he was aware that Ivan Myint was attempting to sell 10,000 MDMA pills to two white buyers (the UCOs) and that the deal did not go through. However, several days after the 10,000 pill deal was called off by Ivan Myint, MICHAEL MYINT called CD3 and told CD3 to meet with MICHAEL MYINT. CD3 then met in-person with MICHAEL MYINT, who informed CD3 that Ivan Myint had gotten arrested. Later, CD3 met with CRUZ, VALDEZ and HUERTA in a pool hall in Chicago. Ivan Myint entered the pool hall. Ivan Myint then walked up to CD3, hugged him, and whispered in CD3's ear not to say anything. A few days after the pool hall meeting, Ivan Myint called CD3 to a meeting at a Burger King restaurant. Present at the Burger King were CRUZ, VALDEZ, MICHAEL MYINT and Ivan Myint's wife, Individual F, who was visibly upset. Inside the Burger King, Ivan Myint told CD3 and the others that CS1, SEJIN

OH and CD2 were cooperating with law enforcement.[15] The participants then developed a plan to help Ivan Myint flee to Mexico to avoid prosecution. Ivan Myint instructed CD3 to continue to sell the MDMA and marijuana and that CRUZ and CD3 would be getting more drugs from LUONG to keep selling. CD3 also gave $700 to Ivan Myint in order to assist him in his flight from prosecution. Ivan Myint then fled directly to Mexico from the Burger King, accompanied by CRUZ and VALDEZ. MICHAEL MYINT gave to Ivan Myint his Illinois driver's license so that Ivan Myint could assume MICHAEL MYINT's identity if necessary to avoid law enforcement.

259. CD3 has further testified that, shortly after Ivan Myint fled to Mexico, MICHAEL MYINT called CD3 and told CD3 to drive Ivan Myint's Chevy Tahoe to the intersection of Grand and Damen in Chicago and to leave the keys in it. CD3 understood that the purpose of this was to hide the Tahoe so it would not beseized by federal agents. As instructed by MICHAEL MYINT, CD3 left the Chevy Tahoe at Grand and Damen.

260. CD3 has further testified that, after Ivan Myint fled to Mexico, CD3 kept in contact with Ivan Myint by cell phone. At Ivan Myint's direction, CD3 sold the remaining MDMA he was storing for Ivan Myint, which generated several thousand dollars in drug proceeds. CD3 visited Ivan Myint in Mexico, primarily to provide Ivan Myint with $6,000 in drug proceeds. Prior to the trip, CD3 had wired approximately $5,000 to Ivan Myint. CD3 also went to determine what Ivan Myint's plans were for continuing the drug operation. CRUZ and VALDEZ were still with Ivan Myint when CD3 arrived in March 2005. Ivan Myint also told CD3 that Ivan Myint gave MICHAEL MYINT's driver's license to a police officer

---

[15] In fact, at the time of the Burger King meeting, only CS1 was cooperating with law enforcement.

who had pulled over the three men in Texas. While in Mexico, Ivan Myint gave a drug ledger to CD3 listing the debts owed to Ivan Myint by several of his drug customers. Ivan Myint instructed CD3 to collect the money with the hope of continuing Ivan Myint's drug trafficking operation. Ivan Myint instructed CD3 to contact LUONG in an attempt to continue his drug trafficking with LUONG. CD3 then returned to the United States.

261.    CBP border crossing records show that, on March 25, 2005, CD3 entered the United States from Mexico at the Los Angeles International Airport POE. During an inspection of CD3's luggage, officers discovered the drug ledger Ivan Myint had given to CD3 in Mexico and made a photocopy of the ledger. CD3 has identified a copy of that ledger as a copy of the one Ivan Myint had given to CD3 in Mexico.

262.    CD3 further stated that, upon his return to the United States, CD3 contacted LUONG. CD3 then traveled to meet LUONG in Canada but CD3 had not collected any money from Ivan Myint's customers and provided no money to LUONG, who was upset that CD3 did not pay off any of Ivan Myint's existing drug debt, which was more than $100,000. LUONG refused to front any more drugs to Ivan Myint until Ivan Myint paid approximately one-half of Ivan Myint's existing drug debt.

263.    CBP border crossing records show that, on April 8, 2005, at approximately 4:03 p.m., CD3 crossed in a vehicle from Canada into the United States at the Ambassador Bridge POE in Detroit, Michigan.

[2]    Admissions by MICHAEL MYINT concerning his assistance to Ivan Myint while Ivan Myint was a fugitive

264.    In late January 2006, law enforcement officers twice interviewed MICHAEL MYINT concerning Ivan Myint's whereabouts after Ivan Myint failed to comply with his

-114-

release conditions. At that time, MICHAEL MYINT claimed that he did not know where Ivan Myint had gone and, at times crying, MICHAEL MYINT stated that Ivan Myint may have been harmed by unknown persons because CRUZ had told MICHAEL MYINT that some people approached CRUZ and his daughter and made threatening overtures toward them both. MICHAEL MYINT never mentioned to officers the meeting with CD3 and others at the Burger King restaurant or the fact that MICHAEL MYINT provided Ivan Myint with MICHAEL MYINT's Illinois driver's license.

265.   On August 22, 2006, I and other law enforcement officers interviewed MICHAEL MYINT at his residence in Chicago. I informed MICHAEL MYINT that he was not under arrest but that agents knew he had hidden evidence related to this investigation and was sending money to Ivan Myint in Mexico. MICHAEL MYINT stated that he did not want to incriminate himself but was willing to answer other questions. I informed MICHAEL MYINT to let me know during the interview if he wished to not answer any questions. At the outset of the interview, MICHAEL MYINT admitted that he possessed in the apartment two firearms. MICHAEL MYINT claimed that he was holding the guns for his father. Officers secured the firearms and took possession of them. During the interview, MICHAEL MYINT acknowledged that Ivan Myint was a drug dealer and identified photographs of several members of Ivan Myint's crew, customers and associates. In particular, MICHAEL MYINT said that Individual E provided "muscle" for Ivan Myint and that CD2 delivered drugs and picked up money for Ivan Myint. MICHAEL MYINT identified MICHAEL CRUZ' job as mainly supplying protection for Ivan Myint. MICHAEL MYINT further acknowledged that one of the firearms located in MICHAEL MYINT's residence was a firearm that Ivan Myint regularly carried on his person at Ivan Myint's cell phone store.

In particular, MICHAEL MYINT identified HUERTA and SEJIN OH as persons with whom Ivan Myint engaged in drug trafficking. During the interview, MICHAEL MYINT admitted sending money to Ivan Myint in Mexico and that he knew other people had done likewise. MICHAEL MYINT also admitted that he communicated with Ivan Myint in Mexico by e-mail and telephone. When asked if MICHAEL MYINT had any drug ledgers in his possession related to Ivan Myint's drug trafficking, MICHAEL MYINT responded by stating that he had thrown out the drug ledgers several months prior to the interview.

266. Also on August 22, 2006, MICHAEL MYINT gave officers consent to search his condominium. During the search, officers located and seized multiple pieces of evidence, including a birth certificate, Ivan Myint's Illinois driver's license and citizenship papers for Ivan Myint. When asked why he had Ivan Myint's birth certificate, driver's license and citizenship papers, MICHAEL MYINT admitted that he had gathered those documents at Ivan Myint's request so that Ivan Myint could obtain new identification in Mexico. MICHAEL MYINT also admitted that, in August 2006, he had visited Ivan Myint in Mexico and identified a bank receipt from Mexico bearing MICHAEL MYINT's signature as having been generated during that trip.

[3]    Information from Individual G regarding Ivan Myint's fugitive status in Mexico

267. On June 7, 2005, at approximately 8:30 p.m., law enforcement officers conducted a secondary inspection and interview of Individual E and Individual G as they arrived from Mexico into the United States at the O'Hare International Airport POE in Chicago, Illinois.

268.    Individual G was given his Miranda warnings and interviewed about the purposes of his trip to Mexico. A portion of what Individual G said to interviewing officers is set forth herein. Individual G admitted that he and Individual E traveled to Mexico to visit Ivan Myint. Individual G knew that Ivan Myint was a fugitive who had been arrested for selling MDMA and marijuana. Individual G stated that the airline tickets for his trip and Individual E's trip were paid for by MICHAEL MYINT and that, prior departing for Mexico, Individual G met with Ivan Myint's wife, Individual F, who provided Individual E with various personal items (including clothing, a compact disk and a Bible) that belonged to Ivan Myint. Individual G stated that Ivan Myint admitted to Individual G that Ivan Myint obtained MDMA 30,000 pills at a time. Individual G stated that he did not bring any money to Ivan Myint on this most recent trip but that, in the past, Individual G had wired approximately $1,500 to Ivan Myint. The $1,500 that Individual G had wired to Ivan Myint in the past was given to Individual G for that purpose by MICHAEL MYINT.

H.    The Arrest and Cooperation of Individual A Against LUONG and Others

269.    In early 2005, law enforcement officers effected the probable cause arrest of Individual A for drug trafficking offenses associated with Individual A's role as a member of Ivan Myint's drug trafficking crew.

270.    Individual A thereafter agreed to cooperate with law enforcement officers in this investigation. In particular, Individual A acknowledged knowing LUONG and that Individual A was responsible for paying Ivan Myint's drug debt to LUONG. Individual A agreed to recorded calls to LUONG and several of Ivan Myint's drug customers.

271.    In particular, in January 2005, Individual A placed a consensually recorded telephone call to LUONG. During the call, LUONG asked Individual A for the current tally

of Ivan Myint's drug debt ("Yeah, so what's up?  What's up? What are we up to now?").

Individual A stated that he had attempted without success to obtain payments from Ivan

Myint's customers ("You know, I made some rounds and went to talk to some people, I'm

trying to do my best, but as of right now they said that they were (unintelligible), see what

they can do for me in the next couple of days").  The following exchange then occurs

between Individual A and LUONG:

| | |
|---|---|
| LUONG: | So you, you don't know what you can do for now. |
| Ind. A: | Yeah, I don't know what I can do for now bro. |
| LUONG: | You don't know what you can do for right now, cause I, the thing, I talked to my buddy, the thing if you want to come again when anything is ready, you got to turn in some stuff, you know, the thing is stuck.  I can't do anything for that. |
| Ind. A: | Did you tell, he don't have to give me that much credit this time you know. |
| LUONG: | You have to give back at least a half, man you come back with nothing, you know, it's pretty hard to do anything. |
| Ind. A: | I'm gonna keep trying. |
| LUONG: | Either way, you still have to pay the thing man. |
| Ind A: | I know, I know. |
| LUONG: | You pay a hundred and I can come down with a hundred, you know. I give you time to pay it, but either way . . . cannot all go to one guy man. |
| Ind. A: | You remember I asked you that, you were rushing me. |
| LUONG: | You on credit and you fucked up your credit. |
| Ind. A: | You know that's my first mistake you know, bro, and at the same time I was trying to make sure I was coming back to you correct. |

LUONG:    I don't know.

Ind A:    Well, like I said, I'm gonna first recoup some of this man, but you keep talking to them, see if they can give me, even with the other thing just a little bit.

LUONG:    No, no, I don't think so. Not even a chance of that man.

Ind. A:    Yeah.

LUONG:    You have to pay it first man, we will trust you again if you pay it first.

Ind. A:    I know you have been waiting, I appreciate your patience .

Based upon my experience and training and the other evidence in this case, I believe that in this conversation LUONG threatened not to send any more drugs to Ivan Myint unless and until Individual A paid at least one-half of his existing drug debt with LUONG.

272.    Further into the same recorded conversation between Individual A and LUONG, LUONG chastised Individual A for his failure in being able to locate Ivan Myint's drug customers ("You should know where they live before you do anything"). LUONG further complained about Individual A's failure to timely pay Ivan Myint's drug debt to LUONG:

LUONG:    My partner is always asking me to say when, to give you time line to finish it back, you know. You tell me there was a time line, there's always how much for this.

Ind. A:    Right, right, maybe a few days. I'm gonna need a few days. You know, you know I'm good for it. All the monies I owed you before I always paid you back , you know

LUONG:    Mm-huh

Individual A again reiterated that he would try to gather a payment for LUONG in the next couple days. LUONG agreed to send another load of drugs right away once Individual A

-119-

made the payment ("but the come down part, once you, you finish today, I have it down tomorrow you know, that's how easy it is, but the thing is when you're stuck with it, you stuck with it you know" and "You have to come back with something in the next couple of days").

I.    The Cooperation of CD3 and the Investigation Against LUONG and the Others

273.   On April 13, 2005, law enforcement officers approached CD3 for a voluntary interview concerning his role in the trafficking of MDMA and marijuana from Canada into the United States.   As noted above, CD3 thereafter began to cooperate with law enforcement in the instant investigation.  As part of that cooperation, CD3 made multiple recordings of conversations (telephonic and in-person) between CD3 and other persons, including Individual A, MICHAEL MYINT and LUONG.

[1]    Recorded conversation between CD3 and MICHAEL MYINT on May 19, 2005

274.   On May 19, 2005, CD3 recorded via a recording device placed on CD3's person an in-person meeting between CD3 and MICHAEL MYINT at a pool hall located near Halsted and Washington in Chicago.  The purpose of the meeting was to determine the current status of Ivan Myint's drug trafficking operation.

275.   Under law enforcement surveillance, CD3 then drove to meet with MICHAEL MYINT at the pool hall.  The two then drove to a nearby restaurant and continued their conversation.  During the conversation in the restaurant, CD3 told MICHAEL MYINT that CD3 had recently spoken to Ivan Myint ("I talked to our friend down south last week"). MICHAEL MYINT responded, "Yeah, I told him he needed to take care of himself. CD3 stated that Ivan Myint was "broke." MICHAEL MYINT responded by saying that Ivan Myint

"wants to get the big life."

276.   Also during that conversation, MICHAEL MYINT mentioned Ivan Myint's Chevy Tahoe which, at Ivan Myint's direction, CD3 had given to MICHAEL MYINT in order to prevent law enforcement authorities from seizing the car. In particular, the following exchange took place between CD3 and MICHAEL MYINT during the meeting:

M.MYINT:    Hey, the car, I have to move it.

CD3:    You still have it?  You don't drive it?  Why don't you buy it out? You fuck his credit.  It's in his name right?  A lot of people want their money still.

M.MYINT:    Yeah, make sure you got the, it settles it though, make sure the car is fixed up.

CD3:    A lot of tickets on it . . .

M. MYINT:    Yeah.   He said that it's evidence.   They might want it. Confiscate it.

CD3:    We can work the car out......

Based upon my experience and training and the other evidence in this case, I believe that MICHAEL MYINT is informing CD3 that MICHAEL MYINT wants CD3 to take possession of the car because Ivan Myint told MICHAEL MYINT that officers might attempt to seize the car as evidence ("He said that it's evidence.  They might want it.  Confiscate it.").

277.   Later in the conversation, CD3 also stated that the Canadians ("north side") wanted a payment of half of Ivan Myint's drug debt before they would provide more drugs to Ivan Myint's crew ("north side wants 50 large"). In response, MICHAEL MYINT stated, "Before he does anything." CD3 also complained that Ivan Myint was buying marijuana for $2,500 per pound of marijuana ("your brother got me a lot of deals, he got it for 25 each, it got a lot of people in trouble though").  MICHAEL MYINT then stated that Ivan Myint

charged MICHAEL MYINT $3,200 per pound of marijuana ("he sold it me for 32"). CD3

asked, "He told you 32 each, too?" MICHAEL MYINT responded by saying, "Yeah."

Thereafter, the following exchange occurred between CD3 and MICHAEL MYINT:

| | |
|---|---|
| M.MYINT: | How do you know he was pickin' this up? |
| CD3: | I went to Canada, remember? |
| M.MYINT: | Oh, yeah. |
| CD3: | Yeah! And then hundred, I made a dollar each then. |
| M.MYINT: | I thought it was the same thing? |
| CD3: | You shipped the money too, right? Fuckin' asshole. The guy's name is Kenny. He's a fucking millionaire. |
| M.MYINT: | Is he the small guy? |
| CD3: | No, he's your height. Your brother lied to fucking both of us. . . . They didn't get the brass ring. They didn't get Kenny. My lawyer said there is a charge for ecstasy. She said they got me (unintelligible) with a thousand. |
| M.MYINT: | My buddy got caught with three thousand. |

Based upon my experience and training and the other evidence in this case, I believe that

in the foregoing portion of the conversation, MICHAEL MYINT acknowledged his

understanding that Ivan Myint was distributing MDMA and that CD3 was part of Ivan

Myint's operation.

278. CD3 and MICHAEL MYINT then drove to the location of Ivan Myint's Chevy

Tahoe. MICHAEL MYINT directed CD3 to the Tahoe. During this time, the following

exchange occurred between CD3 and MICHAEL MYINT:

| | |
|---|---|
| CD3: | How long has it been sitting here? |
| M.MYINT: | A week. |

-122-

| | |
|---|---|
| CD3: | Fuckin' headache. |
| M.MYINT: | Yeah. |
| CD3: | They still sweatin' your mom and dad? |
| M.MYINT: | They're still watching their house. |
| CD3: | Have you tried talking to anyone else? |
| M.MYINT: | I don't know. |
| CD3: | They haven't grabbed Mike yet, haven't grabbed Rob yet, just grabbed me and I have the least amount of shit. |
| M.MYINT: | Or maybe they did and you just don't know. |

Based upon my experience and training and the other evidence in this case, I believe that in the foregoing portion of the conversation, MICHAEL MYINT acknowledged his awareness that the Tahoe had been relocated to its then current spot for approximately one week. MICHAEL MYINT also believed that law enforcement had surveillance on his parents' residence. Also, MICHAEL MYINT speculated that CRUZ ("Mike") and VALDEZ ("Rob") may have been arrested by law enforcement.

        [2]    <u>Recorded telephone call between CD3 and LUONG on August 22, 2005</u>

279. On August 19, 2005, CD3 contacted me and told me that CD3 had just received a call from LUONG ("Kenny") who wanted to talk to CD3 about arranging a future delivery of MDMA to CD3.

280. On August 22, 2005, CD3 received an incoming call from LUONG that was consensually recorded. During the conversation, CD3 told LUONG that CD3 might be able to come up with some money in order to obtain a load of drugs ("But if you get me workin', I got some cash for you"). LUONG then asked if CD3 wanted to pick up the drugs in

Canada ("Uh, so, you want, you want to send people down, send people down to pick it up?"). CD3 then stated that he wanted to pay Ivan Myint's debt ("I wanna pay his debt") but that he did not want to cross the border to get the drugs. LUONG then agreed to get the drugs over the border ("I'm gonna send people down") but complained that, given the amount of drugs, CD3 would need to arrange to pick it up. CD3 then asked LUONG if CD3 would have to get the MDMA in Detroit ("I gotta go to D to pick it up?"). LUONG responded affirmatively ("Yup. . . . He's gonna be, he's gonna be over that, to the border and then you can just pick it up"). CD3 then asked LUONG how much CD3 owed to LUONG on Ivan Myint's debt ("How much do I need to start with, how much, how much do I owe, how much?"). LUONG then suggested that CD3 should pay a portion of Ivan Myint's existing drug debt with LUONG ("Well, what'd you pay last time. Fifty-six? So you get twenty, twenty-five, whatever you have (unintelligible) it's nothing under that, you can't do anything. Fifty, sixty (unintelligible) not a big amount, you know."). Based upon my experience and training and the other evidence in this case, I believe that LUONG informed CD3 that LUONG would sell MDMA and marijuana to CD3 if CD3 paid a portion of Ivan Myint's drug debt to LUONG in the amount of $50,000 or $60,000.

[3]   CD3 introduces UCO1 to LUONG and they arrange for a delivery of 30,000 MDMA pills from LUONG to UCO1

281.   Over the next several months, CD3, at the direction of law enforcement officers placed multiple consensually recorded telephone calls to LUONG in furtherance of arranging the purchase of a large load of MDMA from LUONG. During these calls, CD3 informed LUONG that CD3 had located a purchaser who wanted to buy a large load of MDMA from LUONG. In fact, UCO1 was going to pose as the purchaser of the MDMA

located by CD3.

282.   On December 1, 2005, RCMP, pursuant to an order of a Canadian court, began to intercept and record the wire communications made by LUONG over telephones associated with him.  Several of the intercepted calls consisted of discussions between LUONG and Ivan Myint in which Ivan Myint and LUONG discussed the continued trafficking of MDMA from Canada to the United States and to Mexico.

283.   Eventually, LUONG agreed to meet CD3 and UCO1 in Windsor, Canada, to discuss the purchase.  Working jointly with RCMP and with the permission of Canadian law enforcement officials, CD3 and UCO1 were allowed to conduct law enforcement operations in Canada for the purposes of this investigation.  A RCMP undercover officer ("UCO4") posing as UCO1's associate also participated in the operation.

284.   On December 13, 2005, at approximately 3:00 a.m., law enforcement officers from ICE, DPCSO, ISP and the RCMP participated in an operation that resulted in the introduction of UCO1 and UCO4 to LUONG inside the Windsor Casino.

285.   At the outset of the meeting, CD3 met with LUONG inside a restaurant at the Windsor Casino.  The conversation was recorded via a recording device place upon CD3 by RCMP officers.  In reference to MDMA, LUONG stated that he was still trafficking a lot of MDMA to Chicago ("You know in Chicago, people, we got lots of business in Chicago").  CD3 then stated that the debt Ivan Myint owed LUONG was Ivan Myint's problem ("the debt Ivan owes you, that's on him").  LUONG responded, "I know."  LUONG also stated that he remembered CD3 from the time that CD3, CD2 and CD3's friend brought cash drug proceeds ("the paper") to LUONG for Ivan Myint ("Remember last time you bring the paper back").  Shortly thereafter, LUONG stated that he could have 10,000 MDMA pills of varying

colors and logos ("So, whatever, we can have 10,000 of each type ready . . . You put in it whatever you want, the colors (unintelligible)"). CD3 asked if the logo could be his initials ("Put my initials?"), and LUONG responded, "You can do anything you like." After CD3 said that option was "sweet," the following exchange occurred:

> LUONG: Yeah, you can just order, you know. That's why if you tell me, tell me what you want, so I might tell you I have, the thing you tell me, I might not have, but I have five to seven logos, I can change the color. So, you know, I might, the first time I try this, try a variety of stuff. B, A, A+, whatever or whatever you can. B+, A, A- good, plus takes time.
>
> CD3: How much for B?
>
> LUONG: B or B-plus?
>
> CD3: B-plus.
>
> LUONG: B is the lowest
>
> CD3: Still Hydro, right?
>
> LUONG: Oh, everything Hydro, Hydro, everything Hydro

Based upon my experience and training and the other evidence in this case, I believe that LUONG presented CD3 with his options in terms of buying different MDMA pills ("I have five to seven logos, I can change the color") and different qualities of marijuana ("B, A, A+" and "B+, A, A-"). I know from my experience and training that the relative potency of hydroponic marijuana is often identified by marijuana dealers with a grades such as those given by LUONG.

286. Further into the conversation between CD3 and LUONG, the two discussed Ivan Myint's debt to LUONG. During that conversation, the following exchange occurred:

> LUONG: He told us 33,000. He told me he would have a 100, 100 and, 200, he told me he'd pay half, he payin' half. My driver is

> waiting for three days, one day only got 17,000. That's not even percent.

CD3:      He's a good talker.

LUONG:      No , but he's pay everything. He owes me like a hundred and something, basically he owe me whatever I send in the past shipment. No cash, after Ivan. I ship 150 to one guy, he told me it is one of the restaurant owner and he said he had a million, and he said this and he said that, and then he say he would take care of this in two days. When I ship it down, it goes down and when I ship it down, the guy have nothing. Just the fucking restaurant. No nothing you know.

Based upon my experience and training and the other evidence in this case, I believe that in this portion of conversation, LUONG acknowledged his past shipments of drugs to Ivan Myint and that Ivan Myint has an outstanding debt with LUONG ("He owes me like a hundred and something"). Also during this conversation, LUONG acknowledged personally collecting drug proceeds from Chicago and spent or lost through gambling substantially all of it during a trip to Las Vegas ("Last time I was, uh, finished in Chicago, I flew to Las Vegas and brought three people, brought my fiancé. She, we finished there, we brought the paper from Chicago, $120,000, coming back to Canada, two thousand left").

287.    After this portion of conversation, at approximately 3:56 a.m., CD3 escorted LUONG to a hotel room at the Windsor Casino and introduced LUONG to UCO1 and UCO4. The conversation between CD3, LUONG, UCO1 and UCO4 was recorded via a recording device located inside the hotel room.

288.    During the conversation, CD3 stated that he had spoken with LUONG about exchanging the money for the drugs at the same time in Chicago ("I talked to him about handing over at the same time in Chicago. You know, you hand me that and I hand you that"). UCO1 responded affirmatively. LUONG then suggested that he would be ready in

-127-

2-3 days if the UCOs picked up the drugs in Canada ("Maybe if you come up with the people you know, maybe we can do it in two-three days"). UCO1 then showed LUONG $75,000 in United States Currency that the UCOs had brought with them to the hotel room. UCO1 stated that the $75,000 represented a substantial amount of money ("That's a lot, a lot of paper"). LUONG agreed and suggested that was the reason he wanted one-half of the purchase money paid first since, after the MDMA was transported over the border, he could not get it back, which was the problem he encountered dealing with Ivan Myint ("That's why we have to go half and half. When the paper is there, bring the stuff down, when the stuff is across I cannot bring it back, you know. That's what happened the last time."). In further conversation, LUONG reiterated that he wanted one-half of the purchase money paid before he released the MDMA shipment. LUONG also expressed concern about difficulties getting the drug shipment over the border near the Holidays. UCO1 expressed a desire to buy an initial load of 20,000 MDMA pills. LUONG, however, stated that the minimum order for the first load of MDMA would be 30,000 pills ("it's a minimum like at least 30,000 we can do the first time you know"). In further conversation, LUONG stated he had a friend in Detroit who might be able to smuggle the MDMA over the border. LUONG eventually agreed to ship the pills to Chicago and release them upon payment of the $75,000 in United States Currency. LUONG stated that because the pill order was so small (20,000 pills) and that he usually ships only orders of a minimum 30,000 pills, he could take the risk.

289. Later on December 13, 2005, CD3 received an unrecorded and unmonitored call from LUONG in which LUONG expressed hesitation about completing the deal with UCO1.

290.  On December 14, 2005, UCO1 placed a monitored and recorded telephone call to LUONG in Canada. UCO1 stated that he heard from CD3 that LUONG was "having second guesses" about completing the deal. LUONG admitted that they should "get more comfortable each other first." However, LUONG also told UCO1 that he (LUONG) may have arranged for UCO1 to get the drugs from another source ("I think I got something somewhere from buddy you can pick up and pay them" and "You go and grab it and then you pay him and done"). LUONG then suggested that they meet to talk more and suggested they start with a smaller delivery ("so we can, we can do the other way where you just give me ten and I go, you know, done, and then, and you get them and then I send people down, pick up whatever and done").

[4]     Intercepted wire communications involving LUONG

291.    On December 17, 2005, RCMP intercepted a conversation between LUONG and Ivan Myint. During the call, LUONG asked about Ivan Myint's pending case and, in particular, whether other people had been arrested. Ivan Myint told LUONG that Ivan Myint had heard from CRUZ ("Michael, the tall skinny guy, the bald guy, that was here with me") that others had been arrested. Ivan Myint also said that SEJIN OH and his crew fled to the Philippines ("Sejin and all of his guys are supposedly in the Phillippines right now, they took off to the Philippines"). Ivan Myint also described CD3 ("he was the one holding the equipment and he was supposed to take care of getting rid of it") and suggested that CD3 was working with law enforcement ("now he's working with them"). LUONG asked, "Oh, he undercover? You mean working with, he's working with the cops?" Ivan Myint responded, "Yeah." LUONG then expressed anger that Ivan Myint had sent CD3 up to meet Ivan Myint ("He got picked up too. So, why you send the guy over when he got

picked up to talk to me man?"). Ivan Myint then told LUONG that CD3 "got picked up after he left you." Also in the conversation, Ivan Myint tells LUONG that Mexico is an "open market" and suggests they should start moving MDMA to Mexico ("I can help you and you can help me").

292. In another call intercepted on December 17, 2005, LUONG and Ivan Myint continued to discuss trafficking MDMA to Mexico. In particular, the following exchange occurred:

Ivan Myint: I think I can help you and you can help me, bro, you know. And I really need your help. But the thing down here bro is that nobody's got what we can do down here. Nobody's got it. But everybody wants it bro. I've been going to all the rave parties. But you can get it to Houston for me right?

LUONG: Yeah.

Ivan Myint: Everybody likes it, but nobody got it. The ones that do have it, it's not as good. It's not as good at all man. Just need a, another year for my whole case to be, so they don't have nothing no more. I'll cop out, you know what I mean. So, instead of losing in trial, I'll take a plea agreement, one or two years, I'll go back and finish up and I'll be done. No, I need five of the little one. Not the apples and the bananas, the other one.

LUONG: You want the strawberry?

Ivan Myint: The strawberry. Yeah, there you go, cause those are what they're looking for down here.

LUONG: So, how many do you want 5? Five, right?

Ivan Myint: There's junk over here. I don't want junk over here you know. The ones you used to send me over there, man. The one I used to take myself and I love it.

Based upon my experience and training and the other evidence in this case, I believe that Ivan Myint is trying to induce LUONG to deliver a load of MDMA to Mexico because there

-130-

is a shortage of good MDMA in Mexico ("The ones that do have it, it's not as good"), a fact known to Ivan Myint because Ivan Myint attends "rave" parties. I know that MDMA is a common drug distributed at "rave" parties, which are intense parties, mostly attended by teenagers or young adults, that often last several nights in a row. Ivan Myint particularly asks LUONG to send him the MDMA pills with the "strawberry" logo that LUONG previously sold the Ivan Myint. LUONG acknowledges that he could smuggle the MDMA at least to Houston.

293. On January 4, 2006, RCMP intercepted a conversation between LUONG and Ivan Myint in which they continued to discuss the possibility of LUONG trafficking MDMA to Ivan Myint in Mexico. In that conversation, Ivan Myint again asks to be supplied with the MDMA bearing the strawberry logo ("I need the strawberry, cause over here that thing is like a dime a dozen, everybody got it, there's no money to be made"). LUONG then offered to sell the MDMA to Ivan Myint for $4 per pill ("it's 4 for 1 man . . . the best I can do is 4 for 1").

294. On January 20, 2006, RCMP intercepted a call between Ivan Myint and LUONG in which Ivan Myint asked LUONG to send him a "sample" of "B+" marijuana ("the green") because Mexicans did not have access to the highly potent hydroponic marijuana trafficked by LUONG and Ivan Myint:

Ivan Myint:  No, just one, just one, because they've never seen one. So I can show these people. They don't even know what it is man. . . . No, No, no, the green.

LUONG:  They don't know? They have a lot of the green over your place, man.

Ivan Myint:  Yeah, but not the one we have. They don't have it here.

| LUONG: | Oh, they don't have top quality stuff right, is that what you mean? |
|---|---|
| Ivan Myint: | Yeah. |
| LUONG: | They don't have the double, is that what you mean? |
| Ivan Myint: | Yeah, they got the cheap shit man. |
| LUONG: | Oh, okay, okay. I bring by when I come by your place. Yeah, I bring a sample down when I come down man, don't worry. |

Based upon my experience and training, and the other evidence in this case, Ivan Myint informed LUONG that there was a shortage of hydroponic marijuana ("the top quality stuff") and that, instead, field grown marijuana was available ("the cheap shit"). LUONG also expressed his willingness to bring a sample of hydroponic marijuana when LUONG visited Ivan Myint in Mexico.

[5]   <u>LUONG delivers approximately 30,000 MDMA pills to UCO4 in March 2006 in exchange for $75,000 cash</u>

295.   Negotiations between UCO1 and LUONG with respect to a 30,000 MDMA pill deal continued into March 2006. On March 22, 2006, UCO1 placed a consensually recorded telephone call to LUONG in order to arrange for the delivery of the 30,000 MDMA pills to UCO4. In particular, during the call, UCO1 inquired as to whether LUONG would travel to meet UCO1 ("Can you come see me?"), but LUONG refused ("No, not at that place, man."). However, LUONG asked about the possibility of meeting UCO4 ("You're gonna set up for me to see your buddy?"). UCO1 agreed to have UCO4 meet with LUONG ("the guy that you saw last time that was up there with me"). LUONG agreed to meet in Windsor ("but just call your buddy in Windsor and we just have a meeting there man"). UCO1 agreed to call LUONG back with UCO4's telephone number.

296. UCO1 and UCO4 then agreed that UCO4 would continue the negotiations with LUONG and transact the exchange of $75,000 for 30,000 MDMA pills. UCO1 provided LUONG with UCO4's telephone number.

297. On March 24, 2006, UCO1 placed a consensually recorded telephone call to LUONG. During that call, LUONG acknowledged that he had been in contact with UCO4 ("Yeah, okay. I just talked to your buddy. It should be everything take care by Sunday okay.").

298. Based upon information obtained from RCMP, on March 24, 2006, at approximately 9:50 p.m., UCO4 met with LUONG at a restaurant in Woodstock, Ontario, Canada, to negotiate the delivery of 30,000 MDMA pills to UCO4. During that meeting, LUONG agreed to sell 30,000 MDMA pills to UCO1 and UCO4 for $2.50 per pill (in United States Currency). LUONG agreed to deliver the pills on March 26, 2006.

299. Based upon information obtained from RCMP, on March 26, 2006, at approximately 3:57 p.m., UCO4 met with LUONG at a fast food restaurant in Windsor, Ontario, Canada, in order to conclude the sale of 30,000 MDMA pills to UCO1 in Chicago, Illinois. Inside the restaurant, a second individual (Individual I) arrived at the restaurant. LUONG then handed to UCO4 a package of suspect MDMA pills. UCO4 then gave $75,000 in United States Currency to LUONG who, in turn, gave the money to Individual I. After the meeting, surveillance followed Individual I for several miles. A traffic stop was effected on the vehicle for a speeding violation. Individual I was found to be in possession of marijuana. During a search of the vehicle incident to arrest, officers discovered the $75,000 in cash provided by UCO4 to LUONG. Individual I claimed the money was from a friend who owned a restaurant in Detroit.

300. On March 27, 2006, at approximately 12:30 p.m., UCO1 engaged in a consensually recorded phone call to LUONG concerning the 30,000 MDMA pill transaction. LUONG stated that UCO1 had given LUONG too much money for the MDMA ("about the little stuff . . . you gave me a bit extra for that thing"). UCO1 then asked, "You told me 75, right?" LUONG then clarified that he had meant 75,000 Canadian dollars ("Yeah, its 75 of my, my, my dollars, not your dollars"). LUONG agreed that UCO1 had a "credit" with LUONG.

[6] Arrest of LUONG on June 20, 2006, and additional drug and asset seizures in Canada

301. Based upon information received from RCMP, on June 20, 2006, RCMP secured a court ordered arrest warrant for LUONG based upon Canadian charges related to drug trafficking. In addition, the RCMP secured a search warrant for LUONG's residence. RCMP executed both the arrest warrant and search warrant on June 20, 2006 and seized multiple items of evidence. Inside of LUONG's wallet, which was located in LUONG's house at the time of his arrest, officers located and seized a check drawn on the account of Ivan Myint and Individual F (the check had the word "VOID" written on its face). Officers also located and seized another document purporting to be a "diamond guarantee" that bore the name "Ken Luong" and listed an address and telephone number for LUONG. The same phone number was given by LUONG to Ivan Myint, CD2, CD3 and SEJIN OH.

302. Also on June 20, 2006, RCMP executed multiple search warrants based upon the evidence gathered during the course of the joint investigation. Officers located and seized, among other things, approximately 150,000 MDMA pills, a hydroponic marijuana growing operation involving approximately 3,000 marijuana plants,

approximately 100 pounds of processed and packaged marijuana, approximately two kilograms of cocaine, approximately 200 grams of heroin, approximately $100,000 in United States Currency and approximately $200,000 in Canadian Currency.

J.    Additional Evidence Against the Canadian Suppliers and HENRY CHUN

[1]    Additional evidence against Individual B and YVONNE LAW

303.    CD1 stated in debriefings and under oath that, after SEJIN OH and CHAE received the initial load of MDMA and marijuana from Individual B in March 2004, SEJIN OH and CHAE continued to buy drugs from Individual B. In particular, CD1 stated that, after SEJIN OH and CHAE sold the drugs from the March 2004 shipment, Individual B returned to Chicago to deliver another 20 pounds of marijuana, which SEJIN OH and CHAE bought for $2,700 per pound. Individual B waited in Chicago for two days while SEJIN OH and CHAE sold approximately six pounds of the marijuana. They paid Individual B $14,000 to $15,000 at the Chicago Lodge Motel before he left for Canada. Individual B then left the remaining 14 pounds of marijuana with SEJIN OH and CHAE in Chicago. SEJIN OH and CHAE sold the marijuana over the next couple weeks but again failed to pay Individual B all the money that they owed Individual B for the marijuana. After that, Individual B or individuals whom CD1 described as Individual B's "runners" made four more deliveries of fronted marijuana to SEJIN OH and CHAE in amounts of approximately 15-25 pounds. The loads arrived in intervals of approximately two weeks. SEJIN OH and CHAE paid for the drugs by occasionally giving the money to the runners. CD1 said one of the runners was named "Yvonne." CD1 was present at some of the repayments to "Yvonne." CD1 has identified a photograph of YVONNE LAW as the person he knew as "Yvonne."

304.   CD1 further stated that, after these loads of marijuana, SEJIN OH and CHAE had a falling out with SEJIN OH about how they were paying Individual B. In particular, CHAE began to handle his money the right way by reserving some of the money to pay Individual B whereas SEJIN OH was wasting a substantial portion of the drug proceeds by going to night clubs or buying drugs for his personal consumption, especially cocaine that SEJIN OH used in the form of crack cocaine. As a result, CHAE began purchasing marijuana directly from Individual B without SEJIN OH. In total, CD1 believed that CHAE received from Individual B and resold approximately 90 pounds of marijuana over a period of a few months. Payment for the marijuana was made to LAW or another of Individual B's runners.

305.   On September 26, 2004, CS1 informed law enforcement that CS1 and SEJIN OH had just met with SEJIN OH's MDMA and marijuana source from Canada. CS1 told officers that, earlier in the day, CS1 asked CS1 to drive with SEJIN OH to meet with a courier who was bringing MDMA from Canada. CS1 and SEJIN OH then drove to the meet the courier at a fast food restaurant near the Weber Road exit off Interstate Highway 55 (near Joliet, Illinois). CS1 saw SEJIN OH give a large amount of United States Currency to an Asian female, who took the money. CS1 recorded the Canadian license plate of the car that the female was driving as ASHJ 397. SEJIN OH told CS1 that the female's boyfriend was a race car driver and that the drugs were smuggled into the United States in race cars.

306.   Based upon the information provided by CS1, law enforcement officers determined that license plate ASHJ 397 was registered to Individual J at a residence in Ontario. CBP records verify that on September 26, 2004, at approximately 1:02 p.m., the

vehicle bearing the Ontario plate ASHJ 397 crossed from Canada into the United States at the Detroit/Windsor Tunnel POE in Detroit, Michigan.

307.    On July 3, 2005, Individual J was arrested by CBP officers at the Detroit/Windsor Tunnel POE in Detroit, Michigan, after CBP officers discovered approximately 15 pounds of hydroponic marijuana secreted in Individual J's vehicle, which was a Pontiac Sunbird bearing Ontario plate ASHJ 397. After being given his Miranda warnings, Individual J agreed to be interviewed. During the interview, Individual J admitted that, on three previous occasions, he had crossed into the United States from Canada in the Pontiac Sunbird bearing Ontario plate ASHJ 397 with a large quantity of marijuana secreted in his vehicle. Individual J stated that, after each crossing, he met with YVONNE LAW outside of Detroit. Individual J stated he would give the marijuana to LAW and then he and LAW would drive to the Chicago, Illinois, area. Individual J stated that, in Chicago they would deliver the marijuana to buyers and would then be paid a large amount of United States Currency for the marijuana. Individual J stated this money pick-up occurred outside of Chicago in November of 2004. Individual J stated he and LAW would then drive back to the Detroit area, where they would secrete the money in his vehicle and he would then drive back to Canada with the money in his vehicle. Individual J stated he met LAW at a mushroom factory near Toronto and that LAW served as a "spotter" at the United States border crossings. By "spotter," Individual J meant that LAW watched from a distance to see whether Individual J's car with the drugs made it past United States border officials or whether the drugs were interdicted.

308.    On September 6, 2007, I and other law enforcement officers interviewed YVONNE LAW concerning her involvement in drug trafficking on behalf of Individual B.

LAW agreed to be interviewed. LAW stated that in 2004 she began trafficking drugs for Individual B, whom she knew as "Tony" or "Huong," although she remembered hearing some "Chicago guys" refer to him as "Lam." LAW identified a photograph of Individual B for agents as the person she knew as "Tony" and "Huong." LAW admitted making multiple trips to Chicago with Individual J to deliver marijuana. LAW identified photographs of SEJIN OH ("Sejin"), TOMMY LO ("Tommy") and CD1 as some of Individual B's drug customers to whom she delivered marijuana and received payment for the marijuana that she returned to Individual B. LAW stated that the marijuana was hidden by Individual B in Individual J's vehicle, which LAW identified as a Pontiac "Sunfire." She claimed to not have actually seen the marijuana until her fourth trip to Chicago, at which time she saw SEJIN OH remove the marijuana from a compartment behind the headlights of the car. On that occasion, SEJIN OH gave to LAW $16,000 in money as a drug payment for Individual B. Law further stated that she believed that she made a total of 13 trips to Chicago for Individual B in order to deliver drugs and that she met with SEJIN OH, TOMMY LO and CD1 on at least 9 of those trips. LAW made most of the trips with Individual J, although LAW made at least two trips by herself to just collect money. LAW believed that, of the 13 trips down with drugs, she only received a payment on four of those occasions. She remembered especially having to get a hotel on a couple occasions because TOMMY LO was always late getting the payment to her. On each trip involving both the delivery of drugs and the return of money, Individual B paid LAW $3,000, none of which she shared with Individual J, although LAW paid the expenses of the trip. LAW also stated that she never actually saw any MDMA pills but was aware that Individual B was occasionally secreting MDMA pills in the shipments of marijuana that she would take to Chicago. LAW

stated that she knew this because TOMMY LO told her that Individual B would place MDMA pills in with the loads of marijuana from time to time. LAW stated Individual B would not tell her about the MDMA pills because Individual B was supposed to pay her more money if she took MDMA across the border to Chicago. LAW stated the reason that Individual B was supposed to pay more for the transport of MDMA was because the risk was greater if you were caught with MDMA pills. LAW stated that when she initially met Individual B, he told her that he had sold only MDMA pills in the past, but had recently changed his business to mostly marijuana. LAW claimed to have stopped working for Individual B on July 3, 2005, when Individual J was caught at the border with 15 pounds of marijuana in his car.

309. In two later interviews, LAW admitted to having smuggled MDMA over the border into the United States for Individual B on at least two occasions. LAW admitted that, on one occasion, she delivered approximately 2,000 MDMA pills to a male individual in Chinatown. LAW's physical description of the male was consistent with TOMMY LO's physical features. LAW identified a photograph of TOMMY LO as the male she met in Chinatown. On another occasion, she delivered a gift bag containing MDMA to SEJIN OH. Individual B gave LAW the gift bag and told LAW that the bag contained MDMA and was for SEJIN OH.

[2]    Additional evidence against LUONG, SU JUNG CHEN and SUSAN CHEN

310. After Individual A was arrested in 2005, Individual A agreed to provide information with respect to the smuggling of cash drug proceeds from the United States into Canada. Individual A stated (under proffer protection) that LUONG used two female

money couriers to bring cash proceeds from the United States into Canada. Based upon information from Individual A, agents were able to identify the couriers as SUSAN CHEN, a/k/a "Sue Chen" (hereinafter "SUSAN") and her sister SU JUNG CHEN, a/k/a "Tina" (hereinafter "TINA").

311.   In debriefings and under oath, CD2 stated that he helped traffic cash drug proceeds back to LUONG as payment for the drugs that Ivan Myint purchased from LUONG. CD2 stated that one of the ways he made payment to LUONG was to meet "two older Chinese ladies" from the area of Skokie, Illinois. CD2 knew one of the ladies was named "Sue" and the other lady was Sue's sister. CD2 identified photographs of SUSAN and TINA as the "two older Chinese ladies" to whom he delivered drug proceeds. CD2 stated that he provided drug proceeds to SUSAN and TINA on three separate occasions, each was at the direction of Ivan Myint. CD2 remembered that, on each occasion, SUSAN and TINA drove a minivan. On the first occasion, CD2 met SUSAN and TINA at the "Skokie Swift" train station. On the second occasion, CD2 met SUSAN and TINA at a Home Depot store in Skokie, Illinois. On the third occasion, CD2 remembered giving $20,000 in United States Currency to either SUSAN or TINA at CD2's apartment. The $20,000 was given to CD2 by Ivan Myint in order pay Ivan Myint's drug debt to LUONG.

312.   On March 31, 2005, at the request of the RCMP, a Nissan Maxima bearing Illinois license plate QY 6524 was stopped by the Canadian Customs Service at the border between the United States and Canada in Windsor, Ontario. SUSAN and TINA were the occupants of the car. After SUSAN and TINA declared that they were not carrying any monies in excess of $10,000, officers discovered approximately $110,000 in United States Currency secreted in a gift-wrapped United States Postal Service box. TINA claimed that

she had been told by her husband to pick up a package in Chicago and bring the package back to a friend named "Tong" in Toronto. The $110,000 in United States Currency was subsequently seized by Canadian officials on the grounds that both SUSAN and TINA failed to properly declare the currency to Canadian Customs officials. To date, nobody has filed a claim seeking return of the seized United States Currency.

      313.    On Wednesday, January 25, 2006, TINA and her husband entered the United States at the Lewiston Bridge POE in Buffalo, New York. The two were placed under surveillance as they rented a car in Buffalo, New York, and then drove to Orlando, Florida. Further surveillance observed two Asian individuals carrying a shopping bag enter the hotel room occupied by TINA and her husband. On January 29, 2006, a traffic stop was effected in Florida on the vehicle that TINA and her husband were driving. A search of the vehicle resulted in the discovery of approximately $86,000 in United States Currency in the rear panel of the minivan. TINA and her husband were then interviewed after being given their Miranda warnings. During her interview, TINA admitted that she started picking up money for an Asian male (Individual K) in late November 2004. She stated at that time that Individual K was a businessman and that she was unsure of what Individual K's business was. She admitted that she and her sister SUSAN collected money from a white male at the Skokie train station on two occasions and that the white male gave her a bag with approximately $30,000 to $40,000 dollars in United States Currency. TINA stated that she and her sister eventually dropped off the money to an Asian individual near Argyle Street in Chicago. TINA also stated that the $110,000 she was caught with in March 2005 was for Individual K and that she received the money from an Asian male who owned a cell phone store in Chicago. TINA stated that she provided Individual K, at his request, with

a receipt verifying the seizure of the money. TINA also stated that, on a money pick-up trip to Houston, Texas that she did for Individual K in February 2005, Individual K agreed to give her a 2% fee on the amount of money that she collected, in addition to the reimbursement for gas, food and lodging. TINA said that she and SUSAN then picked up $100,000 in Texas and drove the money straight to Individual K in Canada. TINA also admitted that, during one trip in October 2005, she drove to pick up money for Individual K in New Orleans, Houston and Minneapolis before driving to New York and dropping off the money with an individual in New York. The total money collected during that trip (no money was received in Houston) was approximately $88,000.

314. On June 6, 2006, TINA was interviewed by me and another law enforcement officer. During the interview, TINA stated that she and her sister conducted several money pick-ups in the Chicago area. TINA admitted that she knew she was transporting large amounts of cash from the United States to Canada. TINA said that she was asked by Individual K to pick up money for Individual K. Contrary to her initial interview, TINA admitted that she knew Individual K was a drug dealer. TINA stated on two occasions they met with an unknown Asian individual near her sister's house in Skokie, Illinois, and on both occasions, this individual handed them a large amount of United States Currency, which was approximately $30,000 to $40,000. TINA further stated that, on three occasions they met with an unknown white male (believed to be CD2) who worked with the Asian male. The white male also gave them a large amount of United States Currency. TINA stated that the first meeting with the white male was at a train station, the second meeting was at a hardware store in Skokie and the third meeting was at the white male's apartment and was very late at night. TINA stated on all three occasions, the unknown white male

handed them a plastic bag containing a large amount of United States Currency. TINA further stated that SUSAN and TINA were instructed to pick up money by Individual K who directed them where to go to pick up money from various customers. TINA admitted that, in February 2005, SUSAN and TINA picked up $70,000 in United States Currency from a person at Bush International Airport in Houston, Texas, and that they then drove straight to Canada to deliver the money. TINA stated that she and her sister drove straight back to Canada and gave the money to Individual K. TINA further acknowledged being stopped at the Canadian border on March 31, 2005, with a package full of money at the border. TINA stated that she and SUSAN had picked up the package at a cell phone store at the direction of Individual K and that she knew it contained money. TINA admitted that neither she nor SUSAN truthfully told the border officials that they knew the package in the car contained cash drug proceeds. TINA also stated that, in May 2005, she asked SUSAN to pick up approximately $65,000 in cash drug proceeds in Chicago. SUSAN agreed to do so. SUSAN then picked up the money and deposited it into a bank account. SUSAN eventually wired $38,000 of the money to TINA and sent to TINA a personal check for $27,500. TINA then occasionally withdrew the money from her bank account in Canada and provided that cash to Individual K.

315. Bank records from LaSalle Bank received via grand jury subpoena show that, on May 9, 2005, SUSAN deposited $20,000 in cash into a bank account in her name. On May 10, 2005, SUSAN wire transferred $19,800 of the cash to an account held by TINA at the Toronto-Dominion Bank in Ontario, Canada. On June 24, 2005, SUSAN also made a cash deposit of $38,000 into her LaSalle bank account and, later that same day, wire transferred $38,000 of that money to TINA's Toronto-Dominion Bank account. On July 14,

2005, SUSAN made a deposit of $21,500 into her account using two checks. The day previous to that, on July 13, 2005, SUSAN sent a check drawn on SUSAN's LaSalle bank account in the amount of $27,500 and made payable to TINA. That check was deposited in TINA's bank account at the Toronto-Dominion Bank.

316.    On July 20, 2006, I and other agents interviewed SUSAN at her home in Skokie, Illinois. SUSAN stated that she generally understood English but occasionally had some trouble understanding English. She was told that she was not under arrest and did not have to answer any questions. SUSAN agreed to answer the agents' questions. SUSAN admitted to picking up money with her sister on one trip to Texas in February 2005. Agents ended the interview due to a concern that SUSAN may have had trouble understanding the English language.

[3]    HENRY CHUN's admissions regarding his role in trafficking MDMA and marijuana with SEJIN OH and others

317.    Between August 2, 2006, and April 26, 2007, law enforcement officers have interviewed defendant HENRY CHUN ("CHUN") on five separate occasions with respect to his involvement with SEJIN OH and others in the trafficking of MDMA and marijuana. These interviews were conducted after other information generated during the course of the investigation suggested that CHUN was a participant in MDMA and marijuana trafficking with SEJIN OH.

318.    CBP border crossing records show that, on April 7, 2005, at approximately 2:05 a.m. (ET), a vehicle bearing Illinois license plate 707 5137 crossed from Canada into the United States at the Ambassador Bridge POE in Detroit, Michigan. CBP questioned the driver of the vehicle, who was identified as CHUN. Vehicle rental records obtained

-144-

during the course of the investigation verify that CHUN rented the vehicle bearing Illinois license plate 707 5137 during the period including April 7, 2005.

319. On July 27, 2006, the subject of a related federal drug trafficking investigation, Individual L, was interviewed by law enforcement officers under the terms of a proffer letter. Individual L is believed to have purchased MDMA from TOMMY LO during the course of the conspiracy. Individual L identified SEJIN OH and CHUN as partners selling MDMA together. Individual L stated that, on one occasion in 2005, Individual L purchased 1,000 MDMA pills from SEJIN OH and CHUN.

320. On August 2, 2006, law enforcement interviewed CHUN as he arrived at O'Hare Airport from the Republic of South Korea. The interview was conducted during secondary inspection. CHUN was not under arrest during the interview. During the interview, CHUN acknowledged knowing SEJIN OH and said that the two of them were partners together in a cell phone store business. During the interview, CHUN admitted to entering Canada on April 7, 2005, for the purpose of helping resolve a drug debt for MDMA and marijuana that SEJIN OH had incurred with a Canadian drug dealer. CHUN did not remember the amount of the debt but identified it as a "large amount of money." CHUN claimed that he left SEJIN OH in Detroit prior to CHUN heading over the border to negotiate with the sources. CHUN claimed that he met two Vietnamese individuals in Windsor, Canada, and that they then proceeded to an apartment building and discussed SEJIN OH's debt. CHUN also admitted that he arranged for his own purchase of 2,000 MDMA pills from the Vietnamese individuals but that he never received the MDMA pills. At that point, agents gave CHUN his Miranda warnings. CHUN agreed to be interviewed. CHUN also stated that, at one time he had sold to another person 300 MDMA pills that he

had received from either SEJIN OH or TOMMY LO.

321.    On August 16, 2006, CHUN contacted me by telephone after I had attempted to make contact with him. CHUN identified himself and I recognized the voice of the other party to be CHUN. I told CHUN at the outset of the interview that I did not think he had been fully truthful with me during the first interview on August 2, 2006. CHUN initially claimed that he had been truthful with the interviewing agents. I then reminded CHUN that I had given him his Miranda warnings and that anything he said could be used against him. CHUN reiterated that he had gone to Canada to help clear SEJIN OH's drug debt and to set up his own purchase of MDMA.

322.    On February 9, 2007, law enforcement officers interviewed CHUN at a fast food restaurant in Morton Grove, Illinois. Prior to the interview, I informed CHUN that he was not under arrest. During the interview, CHUN identified a photograph of Individual B as the person whom CHUN knew as "L." CHUN stated that Individual B was SEJIN OH's Canadian drug supplier and the person with whom CHUN met in Canada in order to clear SEJIN OH's drug debt and to set up his own drug transaction. (however, CHUN remembered the meeting being in May 2005 rather than April 2005). CHUN admitted that he had met Individual B earlier in 2005 in Chicago when Individual B came to meet with SEJIN OH and TOMMY LO. CHUN also identified a photograph of YVONNE LAW as Individual B's courier and a person he knew of as "Yvonne." CHUN admitted to meeting Yvonne and another male, Individual L, on 2-3 occasions. CHUN admitted that on one occasion they met him at CHUN's cell phone store near Foster Avenue and Pulaski Avenue in Chicago, but declined to identify the purpose of the meeting. Agents then told CHUN that it was known to the agents that CHUN had delivered a large amount of MDMA

-146-

to Individual L and had picked up payments of money by Individual L for the MDMA. CHUN did not deny having done so and, instead, simply said that he knew he was involved in criminal activity and did not make any money off of his criminal activity. CHUN said that he wanted to cooperate but also did not want to implicate himself and SEJIN OH in any offenses. CHUN said he did not blame SEJIN OH because it was CHUN who had approached SEJIN OH about getting involved in the trafficking of MDMA to other persons. CHUN told officers that he knew that he "was involved in criminal activity."

323.    On April 26, 2007, law enforcement officers interviewed CHUN at a fast food restaurant in Morton Grove, Illinois. During the interview, CHUN admitted that he and SEJIN OH became partners selling MDMA around approximately December 2004. CHUN stated that he, OH and DUMANLANG were intending to open a cell phone store and talked about selling MDMA and marijuana from Canada in order to generate the start-up capital for the store. CHUN admitted that Individual B delivered to them approximately 5,000 to 10,000 MDMA pills during the time he was partners with SEJIN OH. CHUN stated that he also knew Individual B as "Nam." CHUN admitted that he sold 4,000 of these pills to Individual L and an additional 600 to 1,000 pills to another person. CHUN also admitted that he and SEJIN OH received two loads of marijuana (15-20 pounds per shipment) from Individual B as well. CHUN admitted to eventually selling the marijuana to Individual L and other persons. CHUN also admitted that he was shot by one of his customers over the drug debt.[16]

---

[16] Information from CHUN and CPD confirms that, on May 24, 2005, CHUN was shot once in the abdomen by an individual possessing a .45 caliber handgun. The incident occurred inside a "Pro Wireless" store located in the 5200 block of North Pulaski Avenue in Chicago, Illinois.

-147-

324.    During one of the interview of TOMMY LO, TOMMY LO stated that one of the people who distributed drugs for SEJIN OH was named "Henry," and that "Henry" eventually became SEJIN OH's partner selling drugs. TOMMY LO identified a photograph of CHUN as a person whom TOMMY LO knew as "Henry." TOMMY LO further stated that TOMMY LO personally saw CHUN and SEJIN OH together pay LAW for drugs they received from Individual B.

FURTHER AFFIANT SAYETH NOT.

CHRISTOPHER W. YODER, Special Agent
United States Immigration and Customs Enforcement
United States Department of Homeland Security

SUBSCRIBED AND SWORN TO BEFORE ME
this 5th Day of December, 2007.

NAN R. NOLAN
United States Magistrate Judge